<u>NOT FOR PUBLICATION</u>                                        (Doc. No. 6)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | | |
|---|---|---|
| _____ | : | |
| FREDERICK NAHAS, M.D., | : | |
| | : | |
| Plaintiff, | : | Civil No. 13-6537 (RBK/AMD) |
| | : | |
| v. | : | |
| | : | **OPINION** |
| SHORE MEDICAL CENTER, STEVEN P. | : | |
| NACHTIGALL, JEFFREY GOSIN, | : | |
| PEYTON DEARBORN, AND PETER | : | |
| JUNGBLUT | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**KUGLER**, United States District Judge:

Before the Court is the motion of Shore Medical Center, Steven P. Nachtigall, Jeffrey Gosin, Peyton Dearborn, and Peter Jungblut (collectively "Defendants") to dismiss the complaint of Frederick Nahas ("Plaintiff") pursuant to Federal Rule of Civil Procedure 12(b)(6).  In the alternative, Defendants move to stay the proceedings pending resolution of a state-court action.  For the reasons set forth below, the motion to dismiss will be granted and the motion to stay the proceedings will be dismissed as moot.

**I.      FACTUAL BACKGROUND**

Plaintiff is a Lebanese-American medical doctor.  (Compl. ¶ 8.)  He is board-certified by the American Board of Surgery in General Surgery and Vascular Surgery.  (<u>Id.</u> ¶ 9.)  In 1978, he was first granted attending staff privileges in each of his board-certified specialties at Defendant Shore Medical Center ("SMC").  (<u>Id.</u> ¶ 10.)  SMC is a

hospital that admits approximately 10,000 patients and treats approximately 50,000 Emergency Department patients per year.  (Id. ¶ 12.)  In or about 1990, in response to advances in medical science, SMC established a new category of surgery, endovascular surgery, which required a separate application for privileges.  (Id. ¶ 17.)  Endovascular surgery is a minimally invasive surgery which involves the treatment of vascular diseases from inside the blood vessels, and often refers to procedures such as angioplasties and stents.[1]  Plaintiff subsequently received attending staff privileges for endovascular surgery at SMC.  (Id. ¶ 18).

Defendant SMC is a hospital located in Somers Point, New Jersey, and serves Cape May County and parts of Atlantic County, New Jersey.  (Id. ¶ 11.)  Defendant Nachtgall is a medical doctor who was President or past-President of medical staff at SMC during the time period relevant to this complaint.  (Id. ¶ 13.)  Defendant Gosin is a medical doctor who was the head of vascular surgery during the time period relevant to this complaint.  (Id. ¶ 14.)  Defendant Jungblut is a medical doctor who was Vice President of Medical Affairs at SMC during the time period relevant to this complaint. (Id. ¶ 15.)  Defendant Dearborn is a medical doctor who was an anesthesiologist, contracted by SMC, to provide anesthesia at SMC and the SMC outpatient surgery facility, during the time period relevant to this complaint. (Id. ¶ 16.)

In 2003 plead guilty to criminal charges related to Medicare billing.  (Id. ¶ 24.)  As a result of his conviction, Plaintiff's medical license was suspended for six months and his medical staff membership and clinical privileges at SMC were suspended for three years.  (Id. ¶¶ 25-26.)  SMC also declined to renew Plaintiff's general surgery,

---

[1] See Patients: FAQs – Endovascular Surgery, VASCULAR & ENDOVASCULAR SURGERY SOCIETY, http://vesurgery.org/patients/endovasc.html (last visited Sept. 29, 2014).

vascular surgery, and endovascular surgery privileges after his 2003 conviction.  In 2006, when Plaintiff applied to have his privileges reinstated,[2] he alleges that he encountered difficulties because of animus toward him on the part of other doctors who had privileges at SMC, including Defendants.  (Id. ¶¶ 31-32.)  Plaintiff attributes the alleged animus both to a "competitive relationship" with these physicians, as well as hostility toward Plaintiff's Middle Eastern ethnic background.  (Id. ¶ 31.)  Plaintiff alleges that his application for reinstatement was initially denied due to misrepresentations on the part of Defendants Gosin and Jungblut.  (Id. ¶ 33.)  However, through an administrative process known as a "Fair Hearing" request, Plaintiff secured a recommendation that SMC reinstate Plaintiff's privileges.  (Id. ¶ 38.)

After SMC's Medical Executive Committee ("MEC"), on which Defendants Gosin and Jungblut sit, attempted to appeal the Fair Hearing panel's findings, Plaintiff commenced an action in New Jersey Superior Court, seeking reinstatement as well as monetary damages.  (Id. ¶¶ 40-41.)  Plaintiff obtained an interim Order from that court on March 31, 2009, which required SMC to reinstate Plaintiff's general surgery and vascular surgery privileges, and to cooperate with Plaintiff in the process of reinstating his endovascular surgery privileges.   Since that time, Plaintiff has been providing care to patients at SMC.  (Id. ¶ 45.)  However, Plaintiff alleges that Defendants have acted in contravention of the court's order by stymieing his efforts to obtain endovascular surgery privileges.  He alleges that Defendant Jungblut has opposed his efforts, and set "substitute criteria" in place that would apply to his reinstatement application, instead of the criteria ordered by the court.  (Id. ¶ 54.)  The "substitute criteria" allegedly contains

---

[2] Plaintiff does not specify which privileges he applied to have reinstated in 2006 (See Compl. ¶ 28.)

requirements that are impossible to satisfy and were designed as a result of Defendants'

ethnic bias and anticompetitive motives.  (Id. ¶ 55.)  In 2010, SMC's Credentials

Committee recommended that Plaintiff be allowed to perform endovascular surgeries

with a proctor.  (Id. ¶ 60.)  However, the Medical Executive Committee decline to follow

the recommendation.  (Id. ¶ 62.)

Plaintiff subsequently sought a review of this decision through the Fair Hearing

process once again.  (Id. ¶ 63.)  Over Plaintiff's objection, he alleges that the Defendants

appointed a "Hearing Officer" to adjudicate the Fair Hearing dispute, rather than a

"Hearing Panel."  (Id. ¶ 65.)  On August 27, 2012, the Hearing Officer upheld the

Medical Executive Committee's determination.  (Id. ¶ 70.)  Plaintiff then appealed the

Hearing Officer's decision to the Board of Trustees, which affirmed again.  (Id. ¶ 71.)

Additionally, Plaintiff alleges that after his general and vascular surgery

privileges were reinstated in 2009, Defendants began investigating and disciplining him

for performing procedures that he understood and considered to be under the umbrella of

vascular surgery, and not endovascular surgery.  (Id. ¶¶ 83-84.)  Plaintiff alleges that

there is no clear distinction between the two, and SMC does not publish a list of which

procedures fall under which category.  (Id. ¶ 81.)  He also alleges that similarly situated

doctors, who had only vascular privileges but performed the same procedures, but were

not of Plaintiff's ethnic background, were not disciplined.  (Id. ¶¶ 84-87.)  The discipline

included a fourteen-day suspension in September 2011, which Plaintiff attributes to

anticompetitive and discriminatory motives.  (Id. ¶ 102.)  Plaintiff's suspension was

announced in a letter, circulated to hospital staff, and included notice that he would not

be allowed on the premises, an action he claims certain staff members believed had never

happened before.  (Id. ¶ 108.)  The staff was additionally instructed to call the police if

Plaintiff appeared on site, to escort him off the property.  (Id. ¶ 109.)

Further, Defendant Nachtigall advised Plaintiff in a letter that he was referring

Plaintiff to the Physician's Assistance Program of New Jersey for a mental and

behavioral health examination.  (Id. ¶ 111.)  In 2012 Defendant Nachtigall sent Plaintiff

another letter stating that the MEC was initiating an investigation, and had formed an ad

hoc Investigating Committee, to examine Plaintiff's conduct.  (Id. ¶ 115.)  Defendant

Nachtigall later told Plaintiff that SMC had referred certain of Plaintiff's procedures to an

outside medical review organization, National Peer Review Corporation.  (Id. ¶ 117.)

Plaintiff asked an independent expert to review those same procedures, and that doctor

issued a report in early 2013 confirming that all Plaintiff's procedures were acceptable.

(Id. ¶ 121.)  After the Investigating Committee issued its report, Plaintiff was placed on a

Focused Professional Practice Evaluation ("FPPE"), in which Defendants would review

his clinical performance for an indefinite period of time.  (Id. ¶ 122.)  Plaintiff also

received a letter around this time informing him that he would no longer be permitted to

perform certain diagnostic procedures because those procedures could only be performed

by doctors with endovascular privileges.  (Id. ¶ 123.)

Plaintiff filed this suit, alleging that SMC's opposition to his reinstatement of

endovascular surgery privileges violates the Sherman Antitrust Act, as they constituted an

attempt to monopolize the market for advanced vascular surgery.  He also alleges civil

rights violations under 42 U.S.C. § 1981 and 42 U.S.C. § 1985, an unfair competition

claim under the Lanham Act, and possibly a federal constitutional due process violation.

He further advances claims under state law for violations of the New Jersey Law Against

Discrimination ("NJLAD"), breach of contract, tortious interference, a violation of due process under the New Jersey Constitution, and defamation.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss an action for failure to state a claim upon which relief can be granted.  When evaluating a motion to dismiss, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)).  In other words, a complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

To make this determination, a court conducts a three-part analysis.  Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010).  First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Id. (quoting Iqbal, 556 U.S. at 675).  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Id. at 131 (quoting Iqbal, 556 U.S. at 680).  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."  Id. (quoting Iqbal, 556 U.S. at 680).  This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 679.  A complaint cannot

survive where a court can only infer that a claim is merely possible rather than plausible. Id.

## III.    DISCUSSION

### A.  Antitrust Claims[3]

#### a.  Antitrust Standing

Defendants first argue that Plaintiff lacks antitrust standing.  Antitrust standing is an essential element of a Sherman Act antitrust claim.  Ethypharm S.A. France v. Abbott Labs., 707 F.3d 223, 232 (3d Cir. 2013).  The test for standing requires a court to analyze:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

In re Lower Lake Eric Iron Ore Antitrust Litig., 998 F.2d 1144, 1165-66 (3d Cir. 1993).

Defendants argue that specifically, the second element, antitrust injury, is lacking in this case.  They argue that Plaintiff is seeking to protect himself, a competitor, rather than competition in the market.  Defendants cite the Sixth Circuit's holding that an antitrust lawsuit may be appropriately dismissed when the plaintiff only alleges harm in his "capacity as a competitor in the marketplace, [and] not as a defender of marketplace competition."  B&H Med., L.L.C. v. ABP Admin., Inc., 526 F.3d 257, 265 (6th Cir.

---

[3] This section only goes on to discuss concerted action in connection with the individual defendants.  The Sherman Act Sections 1 and 2 claims fail against SMC because "as a matter of law, a hospital cannot conspire with its medical staff."  Urdinaran v. Aarons, 115 F. Supp. 2d 484, 488 (D.N.J. 2000).

2008) (citing Indeck Energy Servs. v. Consumer Energy Co., 250 F.3d 972, 977 (6th Cir. 2000)).

The Third Circuit, however, has not adopted such an approach to antitrust standing.  "[T]he fact that the antitrust laws are intended to protect competition rather than competitors does not mean that a competitor is never a proper antitrust plaintiff." Angelico v. Lehigh Valley Hosp., Inc. 184 F.3d 268, 275 n.1 (3d Cir. 1999).  Rather, "protecting a competitor's ability to compete . . . is clearly in the interest of competition." Id.; see also In re Lower Lake Erie Iron Ore Antirust Litig., 998 F.2d 1144, 1164 n.14 (3d Cir. 1993) (finding that direct competitors of alleged conspirators had "no standing problem").  The Third Circuit has specifically allowed an antitrust claim by a physician who was denied surgical privileges to proceed, finding that "the existence of an 'antitrust injury' is not typically resolved through motions to dismiss."  Brader v. Allegheny Gen. Hosp., 64 F.3d 869, 876 (3d Cir. 1995).

Defendants' argument against standing appears to be that Plaintiff is a competitor. Even if that resulted in a lack of standing under Sixth Circuit law, the law in this circuit is clear that courts should not find a lack of antitrust injury at the motion to dismiss stage merely because a plaintiff is a competitor.

### b.  Section 1 Sherman Act Claim – Count I

Plaintiff alleges that Defendants acted in concert to restrain trade by wrongfully suspending Plaintiff's hospital privileges, and as a result of their exclusion of Plaintiff from the endovascular intervention market, consumers had restricted choices and were forced to pay higher prices.

To plead a Section 1 Sherman Act claim, a plaintiff must allege "(1) concerted action by the defendants; that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." Howard Hess Dental Laboratories Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 253 (3d Cir. 2010) (citing Gordon v. Lewistown Hosp., 423 F.3d 184, 207 (3d Cir. 2005)).

Plaintiff has failed to allege sufficient facts in his Complaint to support a Section 1 Sherman Act claim. A Plaintiff must allege enough "factual matter (taken as true) to suggest that an agreement was made." Twombly, 550 U.S. at 556 (emphasis added). Here, Plaintiff has alleged ample parallel conduct, which he argues is more than enough to support the concerted action requirements. Yet, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." Id. In his Complaint, Plaintiff merely points to the actions of the Defendants on and after early 2009, which he claims "demonstrate collusion and conspiracy to unlawfully and wrongfully prevent [Plaintiff] from his remaining privileges for anticompetitive and discriminatory purposes." (Compl. ¶ 73.)[4] Plaintiff wants the Court to make an inference, but "[w]ithout more, parallel conduct does not suggest conspiracy." Twombly, 550 U.S. at 556-57. "[T]erms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in

---

[4] The closest Plaintiff comes to alleging an agreement in his Complaint is where he states that in 2010, "in furtherance of the Defendants' anticompetitive and discriminatory motives, the remaining members of the MEC in concert with Defendants Gosin and Defendant Jungblut, who were also members of the MEC, accepted Defendants Gosin and Jungblut's Substitute Criteria to evaluate Dr. Nahas' reinstatement application." (Compl. ¶ 61.) Plaintiff alleges concerted action from early 2009, and at best this conduct could be construed as an agreement beginning in early to mid-2010. Yet, even read favorably for the Plaintiff, this does not "[raise] a suggestion of a preceding agreement." Howard Hess Dental Labs., 602 F.3d at 256 (quoting Twombly, 550 U.S. at 557). Plaintiffs' allegations cannot be read to allege an agreement at all, but instead are replete with statements that "do no more than intimate 'merely parallel conduct that could just as well be independent action.'" Id.

conjunction with a more specific allegation—for example, identifying a written

agreement or even a basis for inferring a tacit agreement, ... but a court is not required to

accept such terms as a sufficient basis for a complaint." Id. at 557 (quoting DM

Research, Inc. v. College of Am. Pathologists, 170 F.3d 53, 56 (1st Cir. 1999) (quotation

marks omitted)).

Even in Plaintiff's Opposition Brief he both explicitly and tacitly asks the Court

to infer what is not actually in his Complaint.  (See, e.g., Pl.'s Opp'n at 35 ("[T]he

necessary implication to be derived [from the use of the "substitute criteria"] is that the

Defendants collectively relied upon these criteria to prevent Dr. Nahas from competing

with them."); id. ("[T]he entire thrust of the Plaintiff's Complaint establishes that … the

Defendants conspired to create "Substitute Criteria" that were impossible to meet."); id.

("The fact that all of the Defendants refused to cooperate with Plaintiff Nahas, despite the

clear terms in the [Order] … further establishes concerted and collusive action."); id. at

36 ("The Plaintiff has alleged that nearly all the actions taken by the Defendants after the

entry of the [Order] 'demonstrate collusion and conspiracy to unlawfully and wrongfully

prevent Dr. Nahas from obtaining his remaining privileges for anticompetitive

purposes.'") (quoting Compl. ¶ 73).)

What Plaintiff has pleaded is the outcome of a process which he considers

patently unfair and unjust, and which allegedly had anticompetitive effects.  However,

Plaintiff has not stated a claim under Section 1 of the Sherman Act because he has not

pleaded factual matter, anywhere in his Complaint, which suggests that an agreement was

made by Defendants.  For this reason, Count I of the Complaint, restraint of trade in

violation of Section 1 of the Sherman Act, will be dismissed.

### c.  Section 2 Sherman Act Claim – Count II

Plaintiff also alleges that Defendants conspired and agreed to monopolize the endovascular intervention market by restricting Plaintiff's endovascular privileges, and as a result, patients not treated by Defendants were sent to another market to obtain endovascular intervention.

The Section 2 conspiracy claim has four elements which a plaintiff must allege: "(1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged." Howard Hess Dental Labs, 602 F.3d at 253 (citing United States v. Yellow Cab Co., 332 U.S. 218, 224–25 (1947); Am. Tobacco Co. v. United States, 328 U.S. 781, 788, 809 (1946)).

For the same reasons that Plaintiff's Section 1 claim fails, his Section 2 claim fails.  Where a party alleges conspiracy to monopolize under Section 2, such a claim also requires the existence of an agreement.  Howard Hess Dental Labs, 602 F.3d at 254.  For the reasons discussed supra, Plaintiff has not pleaded facts which suggest that an agreement was made by Defendants.  Accordingly, Count II of the Complaint, conspiracy to monopolize in violation of Section 2 of the Sherman Act, will be dismissed.

### B.  Federal Civil Rights Claims

### a.  Section 1981 Claim – Count III

"Section 1981 prohibits 'racial' discrimination in the making of private and public contracts." White v. Williams, 179 F. Supp 2d. 405, 419 (D.N.J. 2002) (citing Pamintuan v. Nanticoke Mem. Hosp., 192 F.3d 378, 385 (3d Cir. 1999)).

To survive a motion to dismiss, a plaintiff must allege facts indicating that: "(1) [plaintiff] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute." Brown v. Philip Morris Inc., 250 F.3d 789, 797 (3d Cir. 2001) (citing Yelverton v. Lehman, No. Civ. A. 94–6114, 1996 WL 296551, at *7 (E.D.Pa. June 3, 1996), aff'd. mem., 175 F.3d 1012 (3d Cir.1999)).

Here, the Complaint fails to allege sufficient facts to state a plausible § 1981 claim against Defendants.  A plaintiff must allege facts supporting each of the elements of his claim, and not merely the elements themselves.  The Complaint alleges in multiple locations that Defendants' opposition to Plaintiff's privileges being reinstated, and their alleged unfair discipline imposed, was based upon racial animus due to his Middle Eastern background.  However, it fails to allege any facts supporting discrimination on the basis of his race.  Alleging wrongdoing, and alleging that the victim of the wrong is a racial minority, without more, is insufficient to plead discrimination.  Where a pleading "alleges an abundance of wrongdoing," but "fails to allege any facts supporting the conclusion that those acts were motivated by discrimination on the basis of race," dismissal of a § 1981 claim is proper.  Gross v. R.T. Reynolds, 487 F App'x 711, 716 (3d Cir. 2012).  Stating "in conclusory fashion" that the reason behind alleged wrongs is discriminatory racial animus is insufficient.  Id.

In arguing that his pleadings as to racial discrimination are sufficient, Plaintiff evidently relies on Swierkiewicz v. Sorema, N.A., 534 U.S. 506 (2002), which he understands to mean that there is a general preference for being allowed to engage in discovery.  (See Pl.'s Opp'n at 46-47.)  In Swierkiewicz, the Supreme Court found that

an employment discrimination complaint did not have to satisfy a heightened pleading requirement because it "detailed the events leading to [the plaintiff's] termination, provided relevant dates, and included the ages and nationalities of at least some of the relevant persons involved with his termination."  Swierkiewicz, 534 U.S. at 514. However, the Third Circuit has since indicated in a published opinion that Swierkiewicz "has been specifically repudiated by both Twombly and Iqbal . . . at least insofar as it concerns pleading requirements . . . ."  Fowler, 578 at 211.  Thus, to the extent that Plaintiff relies on Swierkiewicz's pleading standard, the Court finds that it must apply the heightened standards set forth in Twombley and Iqbal instead.  Plaintiff generally asserts that he has pled sufficient facts, and promises that these facts "presage that abundant evidence of discriminatory intent will be forthcoming."  (Pl.'s Opp'n at 48.)  While he need not furnish evidence to survive a motion to dismiss, conclusory allegations coupled with a promise that evidence will come later is patently insufficient.

     The allegations supporting racial discrimination that Plaintiff sets forth in his Complaint are that, to his knowledge: (1) Plaintiff is the only physician who has not had his privileges reinstated after receiving a positive recommendation from the Credentials Committee; (2) Plaintiff is the only physician to have his suspension announced in a written communication to staff; (3) Defendants refused to follow the court ordered original criteria and placed more stringent requirements upon Plaintiff for obtaining and retaining his privileges; (4) Defendants allowed other physicians, who were subject to a medical peer review, to respond to the reviewers' concerns and/or to take corrective action before summary suspension and termination of privileges; and (5) Defendants allowed other physicians who were alleged to have committed wrongful acts to continue

their SMC practice.  (Compl. ¶ 163.)  Plaintiff also generally asserts that Defendants treated him differently than other non-minority physicians similarly situated for a host of reasons, pointing to many of the same violations alleged elsewhere.  (Id. ¶ 162.)

Despite these allegations, Plaintiff has offered insufficient factual matter to bolster what are largely legal conclusions.  Plaintiff does not provide relevant characteristics of other similarly situated physicians who did or did not have their privileges reinstated or any factual allegations regarding their circumstances.  He does not provide details of any other physician suspensions at SMC, including the minority or non-minority status of those physicians.  The Court is not convinced that Plaintiff has pleaded sufficient facts that tend to show the "substitute criteria" applied by the MEC were unreasonable as compared to the original criteria.  Nor is it clear that other non-minority physicians had ever been subject to and satisfied the original criteria in the first place.  Again, where Plaintiff suggests other physicians were treated differently regarding medical peer review and summary suspension, he fails to set forth any relevant characteristics or similar circumstances from which the Court could infer discriminatory treatment of Plaintiff due to his minority status.[5]

The only instance where Plaintiff references an action taken against him that was not taken against a similarly situated individual relates to SMC's failure to convene an

---

[5] Plaintiff's assertion is also apparently based on his claim that federal law limits summary suspensions to situations "where the failure to take such an action may result in an imminent danger to the health of any individual," suspending his privileges was not required to prevent imminent danger to the health of his patients, and therefore Defendants acted unlawfully.  (Compl. ¶ 105 (citing 42 U.S.C. § 11112(c)(2)).)  Not only is this conclusory, it is a misleading use of this federal law to bolster his arguments.  That same statute, in § 11112(c)(1)(B) states that the procedures in 11112(a)(3), notice and fair hearing, are not required "in the case of a suspension or restriction of clinical privileges, for a period of not longer than 14 days, during which an investigation is being conducted to determine the need for a professional review action."  Plaintiff acknowledges in his complaint that the summary suspension was only for 14 days, and he does not contend that an investigation was not taking place to determine the need for professional review action.  Without more, Plaintiff has not set forth enough information to suggest that Defendants improperly applied § 11112(c) with respect to his summary suspension.

Investigating Committee and impose sanctions on SMC Chief of the Department of

Surgery, Dr. Galler, who allegedly reviewed and approved some of the procedures

Plaintiff was investigated for by the National Peer Review Corporation.  (See id. ¶ 120.)

However, Plaintiff does not assert whether Dr. Galler is a minority or non-minority, and

provides no basis for determining how Plaintiff was treated differently as a result of his

race.

Of course, Plaintiff is not required to plead comparator evidence to support an

inference of discrimination.  "Such an inference could be supported in a number of ways,

including, but not limited to, comparator evidence, evidence of similar racial

discrimination of other employees, or direct evidence of discrimination from statements

or actions by her supervisors suggesting racial animus."  Golod v. Bank of America

Corp., 403 Fed. Appx. 699, 702 n.2 (3d Cir. Dec. 13, 2010) (citing Swierkiewicz, 534

U.S. at 511-12).  Yet, Plaintiff has provided none of this sort of information, or any facts

which support his claim.  What the Court is left with are numerous assertions that

Defendants were motivated by racial animus, but no factual matter suggesting that

Defendants actually discriminated against Plaintiff on account of his minority status.

Taken individually and taken as a whole, Plaintiff's facts do not tip the scale from

"sheer possibility" to plausibility.  Iqbal, 556 U.S. at 678.  Plaintiff has not pleaded facts

supporting an inference of discrimination.  For this reason, Count III of the Complaint,

violation of Plaintiff's civil rights under § 1981, will be dismissed.

**b.  Section 1985 Claim – Count IV**

Plaintiff alleges that Defendants' actions were undertaken as part of a conspiracy, with the purpose of depriving him of the equal protection of the law, in violation of 42 U.S.C. § 1985(3).

To survive a motion to dismiss, a plaintiff must assert: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States." Farber v. City of Paterson, 440 F.3d 131, 134 (3d Cir. 2005) (citing United Bhd. Of Carpenters & Joiners v. Scott, 463 U.S. 825, 828-29 (1983)).

Plaintiff has offered no information supporting his contention that Defendants were part of a conspiracy.  "[A]llegations of a conspiracy must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action."  Capogrosso v. The Supreme Court of New Jersey, 588 F.3d 180, 185 (3d Cir. 2009) (citing Crabtree v. Muchmore, 904 F.2d 1475, 1481 (10th Cir. 1990)).  For the same reasons, discussed supra, Plaintiff's claims for violation of Sections 1 and 2 of the Sherman Act were inadequate, i.e., for failing to sufficiently allege concerted action or an agreement, Plaintiff's § 1985(3) claim is deficient.  Accordingly, the Court will dismiss Count IV of the Complaint, conspiracy to violate civil rights under § 1985.

### C.  Lanham Act Claim – Count VII

Plaintiff alleges that Defendants have misrepresented the characteristics and qualities of Plaintiff's services and commercial activities in violation of § 43(a) of the Lanham Act.  This provision indicates that:

> Any person who, on or in connection with any goods or services, or any container
> for goods, uses in commerce any word, term, name, symbol, or device, or any
> combination thereof, or any false designation of origin, false or misleading
> description of fact, or false or misleading representation of fact, which . . . in
> commercial advertising or promotion, misrepresents the nature, characteristics,
> qualities, or geographic origin of his or her or another person's goods, services, or
> commercial activities, shall be liable in a civil action by any person who believes
> that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

A Plaintiff asserting a violation of section 1125(a)(1)(B) must show that (1)
defendant made a false or misleading statement in a commercial advertisement or
promotion about its own or the plaintiff's product or service; (2) the statement actually
deceived or at least had a tendency to deceive a substantial portion of the intended
audience; (3) the deception was material in that it likely influenced purchasing decisions;
(4) the advertised product traveled in interstate commerce; and (5) the plaintiff was likely
to be or was injured by the false or misleading statement.  Innovasystems, Inc. v. Proveris
Scientific Corp., No. 13-5077, 2014 WL 3887746, at *6 (D.N.J. Aug. 6, 2014) (citing
Ditri v. Coldwell Banker Residential Affiliates, Inc., 954 F.2d 869, 872 (3d Cir. 1992)).

Evidently, the misrepresentations which Plaintiff believes support a Lanham Act
claim consist of (1) a letter sent August 24, 2011 from Defendant Nachtigall to Plaintiff,
(2) SMC's public announcement of Plaintiff's fourteen-day suspension, and (3)
unspecified "false and defamatory comments" made to patients and staff about the quality
of Plaintiff's services.  (Compl. ¶¶ 195-201.)

Plaintiff has not cited any law where a Lanham Act claim was stated under
circumstances even remotely similar to the instant case.  A Lanham Act claim is not a
statutory defamation claim that can be brought for "maligning the [plaintiff him]self, but
rather a remedy for misrepresentation in advertising about a particular product or

commercial service." <u>Syngy, Inc. v. Scott-Levin, Inc.</u>, 51 F. Supp. 2d 570, 578 (E.D. Pa. 1999) (citing <u>U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia</u>, 898 F.2d 914,921 (3d Cir. 1990)); <u>see also Chovanes v. Thoroughbred Racing Ass'n</u>, No. 99-185, 2001 WL 43780, at *9 (E.D. Pa. 2001) (a "garden variety defamation and/or commercial disparagement" claim does not amount to a Lanham Act cause of action").

Here, Plaintiff does not even allege that the August 24, 2011 letter from Defendant Nachtigall was ever distributed to anyone other than Plaintiff. "Statements … not contained in a commercial advertisement or promotion are not actionable under the Lanham Act." <u>Cape Bank v. VSES Galloway, Inc.</u>, No. 14-5293, 2014 WL 4271951, at *3 (D.N.J. Aug. 29, 2014) (internal citation omitted). The facts pled in the complaint cannot plausibly support a finding that a letter from Nachtigall to Plaintiff was a "commercial advertising or promotion," as required by the plain language of the Lanham Act. Similarly, the announcement to hospital staff announcing Plaintiff's suspension cannot seriously be considered a commercial advertisement or promotion. Further, Plaintiff does not allege that any "false or misleading" information was contained in the announcement, which is also an unambiguous requirement of the Lanham Act. Rather, he pleads that his suspension was announced "in a letter circulated to the entire hospital staff that Dr. Nahas was suspended and would not be allowed on the property." (Compl. ¶ 108.) Plaintiff does not plead that any of this information is false or misleading; in fact, his allegations appear to support the truth of the material in the letter, as he pleads that he was in fact suspended, and required to stay away from the hospital during his suspension. Finally, although Plaintiff alleges "false and defamatory comments" to patients and staff, he pleads nothing suggesting that such "comments" could be construed as "commercial

advertising and promotion." In addition, failure to plead the nature of the false and defamatory statements in more than conclusory fashion would further be fatal to Plaintiff's Lanham Act claim. <u>Santiago</u>, 629 F.3d at 131.

Plaintiff's Lanham Act claim cannot be sustained, as even if all of Plaintiff's allegations are taken as true, he has not satisfied the elements of § 1125(a). For this reason, the Court dismisses Count VII of the Complaint, violation of Section 43(a) of the Lanham Act.

### D. Due Process Claim - IX

Plaintiff's claim that Defendants violated his Constitutional Due Process rights is not a model of clarity. At the outset, the Court notes that Plaintiff has not specified <u>which</u> Constitution was violated (i.e., federal or State),[6] nor has he alleged which law or laws entitle him to relief. However, even if Plaintiff had stated a cause of action for a violation of the Federal Constitution, the Court finds that he has not properly alleged state action.

If he wishes to state a cause of action for violation of his due process rights under the Fifth and Fourteenth Amendments by Defendants, Plaintiff must invoke 42 U.S.C. § 1983. Two elements must be alleged in order to recover under § 1983: (1) deprivation of a constitutional right by the defendant, (2) acting under the color of law. <u>Piecknick v. Commonwealth of Pennsylvania</u>, 36 F.3d 1250, 1255-56 (3d Cir. 1994). Private action is immune from the restrictions of the Fourteenth Amendment. <u>Jackson v. Metropolitan Edison Co.</u>, 419 U.S. 345, 349 (1974). In determining whether private conduct allegedly causing the constitutional deprivation may fairly be attributable to the State, the Court

---

[6] For reasons discussed <u>infra</u>, the Court declines to address Plaintiff's state law claims, including any due process claim under the New Jersey Constitution.

conducts a two part analysis.  "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible … Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor."  Lugar v. Edmondson Oil Co, Inc., 457 U.S. 922, 937 (1982).

The only relevant allegation is that Defendants did not comply with the provisions of the Health Care Quality Improvement Act ("HCQIA").  (Compl. ¶¶ 217-18.)  Even if the Court accepts that the HCQIA is a rule of conduct imposed by the State, Plaintiff has not alleged why the Court should consider Defendants to be state actors.  Here, only private actors were responsible for the decision to deny reinstatement of Plaintiff's endovascular privileges.  Plaintiff has not pleaded facts demonstrating that "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." Jackson, 419 U.S. at 351.  Nor has the plaintiff alleged facts to suggest that the State "has exercised coercive power or has provided such significant encouragement, either overt of covert, that the choice must in law be deemed to be that of the State."  Blum v. Yaretsky, 457 U.S. 991, 1004 (1982).

For these reasons, if Plaintiff has attempted to state a claim under § 1983, his claim lacks sufficient factual matter to be sustained.  Accordingly, so far as Plaintiff alleges a violation of his Due Process rights under the Federal Constitution, Count IX of the Complaint will be dismissed.

**E.  State Law Claims**

Because all of Plaintiff's claims arising under federal law will be dismissed, and Plaintiff has pleaded no other basis for jurisdiction, the Court will decline to exercise supplemental jurisdiction over the remaining state-law claims.  28 U.S.C. § 1367(c)(3).

## IV.    MOTION TO STAY

As the Court will be dismissing all of Plaintiff's claims, it need not address Defendants' motion to stay these proceedings.  Accordingly, Defendants' motion to stay the proceedings will be dismissed as moot.[7]

## V.    LEAVE TO AMEND

When a complaint is dismissed for failure to state a claim, leave to amend should normally be granted.  Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000); Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002) ("When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile.")

Here, the Court is unable to conclude that Plaintiff could not possibly amend his pleading to adequately state his federal claims against Defendants.  Therefore, within the period of time set forth in the Order accompanying this Opinion, Plaintiff may file a motion seeking leave to amend his Complaint.[8]

---

[7] The Court notes that Defendants never submitted evidence of whether this matter is the subject of any other matter pending in any court, which would make it hard for the Court to rule in Defendants' favor even if it were to reach the issue.  Also, Local Civil Rule 11.2 requires that "The initial pleading, motion or other paper of any party filed in any case in this Court, other than a criminal action, shall be accompanied by a certification or other document complying with 28 U.S.C. § 1746 as to whether the matter in controversy is the subject of any other action pending in any court … and, if so, the certification or other authorized document shall identify each such action … and all parties thereto."  Plaintiff failed to comply with this rule.

[8] If Plaintiff files a motion for leave to file an amended complaint, he shall attach to the motion a copy of the proposed amended complaint, as required by Loc. Civ. R. 7.1(f).  Additionally, the Court asks that

**VI.    CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss will be **GRANTED**.

All of the claims against Defendants will be **DISMISSED**, and Plaintiff may file a

motion for leave to amend his complaint within the time period specified in the Order

accompanying this Opinion.  Defendants' motion to stay the proceedings will be

**DISMISSED AS MOOT**.  An accompanying Order shall issue.

Dated: _____

_____

ROBERT B. KUGLER
United States District Judge

---

Plaintiff attach a certification of any other pending action, as required by Loc. Civ. R. 11.2.  See supra note 6.