NOT FOR PUBLICATION                                                    (Doc. No. 18)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____
                                              :
FREDERICK NAHAS, M.D.,                        :
                                              :
                Plaintiff,                    :      Civil No. 13-6537 (RBK/AMD)
                                              :
        v.                                    :
                                              :      **OPINION**
SHORE MEDICAL CENTER et al.,                  :
                                              :
                Defendants.                   :
_____       :

**KUGLER**, United States District Judge:

        Before the Court is the Motion of Plaintiff Frederick Nahas, M.D. ("Nahas" or

"Plaintiff") for Leave to Amend his Complaint pursuant to Federal Rule of Civil

Procedure 15(a).  In opposition, Defendants ask the Court to deny Plaintiff leave to

amend on the grounds of futility.  For the reasons set forth below, Plaintiff's Motion will

be granted in part and denied in part.

## I.      PROCEDURAL BACKGROUND[1]

        Plaintiff filed this suit in late 2013, alleging that the actions of Defendants Shore

Medical Center ("SMC"), Dr. Steven P. Nachtigall ("Nachtigall"), Dr. Jeffery Gosin

("Gosin"), Dr. Peyton Dearborn ("Dearborn"), and Dr. Peter Jungblut ("Jungblut"), in

_____

[1] The facts in this case are extensive and were recited in detail in the Court's prior Opinion.  (See Doc. No.
14.)  Plaintiff's proposed Amended Complaint has ballooned from the already not-insubstantial 50 pages
and 228 paragraphs in the original Complaint, to 127 pages and 362 paragraphs in its current iteration,
which includes only two more claims.  Accordingly, the Court will rely on the basic recitation of the facts
of this case found in its first Opinion, which have not changed substantively aside from the addition of
further details, and will cite new or significant facts found in the Amended Complaint in the course of its
discussion of Plaintiff's claims.

denying Plaintiff's requests to have his endovascular privileges reinstated, and then suspending him from practice at SMC altogether, violated his rights.  (See Complaint (Doc. No. 1).)  Specifically, he alleged violations of the Sherman Antitrust Act, federal civil rights statutes, including 42 U.S.C. § 1981 and 42 U.S.C. § 1985, the Lanham Act, and the New Jersey Law Against Discrimination ("NJLAD"), as well as claims for breach of contract, tortious interference with a prospective economic advantage, defamation, and a violation of due process under either the Federal Constitution or the New Jersey Constitution.

The Defendants filed a timely Motion to Dismiss the Complaint on December 27, 2013, (Doc. No. 6), and the Court granted their motion, dismissing all of Plaintiff's claims on September 29, 2014.  (Doc. Nos. 14, 15.)  The Court also granted Plaintiff time in which to file a motion for leave to amend his Complaint, which he did on October 29, 2014, when he filed the present Motion to Amend the Complaint (Doc. No. 18.)

Attached to Plaintiff's Motion to Amend is the proposed Amended Complaint ("Amended Complaint"), in which he adds Dr. Leonard Galler ("Galler") and the SMC Medical Executive Committee (the "MEC") as Defendants.  In addition to adding more factual averments, Plaintiff removed his § 1985, defamation, and due process claims, but added claims for retaliation under § 1981 and the NJLAD, a state common law judicial review claim, a state law antitrust claim, and a claim for trade libel.  (See generally Proposed Amended Complaint ("AC").)

Defendants filed an opposition to Plaintiff's Motion for Leave to Amend, (Doc. No. 21), and Plaintiff filed a response to Defendants' opposition.  (Doc. No. 29.)  At this

time, the parties have fully briefed the issues before the Court, and it will proceed to

discuss their arguments.

## II.     LEGAL STANDARD

Under the Federal Rules of Civil Procedure, leave to amend pleadings shall be

"freely give[n]" when "justice so requires."  Fed. R. Civ. P. 15(a)(2).  In Foman v. Davis,

371 U.S. 178 (1962), the Supreme Court articulated the liberal policy of allowing

amendments underlying Rule 15(a) as follows:

> If the underlying facts or circumstances relied upon by a
> plaintiff may be a proper subject of relief, he ought to be
> afforded an opportunity to test his claim on the merits.  In
> the absence of any apparent or declared reason—such as
> undue delay, bad faith or dilatory motive on the part of the
> movant, repeated failure to cure deficiencies by
> amendments previously allowed, undue prejudice to the
> opposing party by virtue of allowance of the amendment,
> futility of amendment, etc.—the leave sought should, as the
> rules require, be "freely given."

Id. at 182; see also Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000).

In determining if a proposed amendment should be denied based on futility

grounds, courts employ the "same standard of legal sufficiency as applies under [Federal]

Rule [of Civil Procedure] 12(b)(6)."  Great W. Mining & Mineral Co. v. Fox Rothschild

LLP, 615 F.3d 159, 175 (3d Cir. 2010) (citations omitted); see also Alvin v. Suzuki, 227

F.3d 107, 121 (3d Cir. 2000) ("An amendment is futile if the amended complaint would

not survive a motion to dismiss for failure to state a claim upon which relief could be

granted.").  Under Rule 12(b)(6), a motion to dismiss may be granted if the plaintiff is

unable to articulate "enough facts to state a claim to relief that is plausible on its face."

Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  While "detailed factual

allegations" are not necessary, a "plaintiff's obligation to provide the 'grounds' of his

'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]"  Id. at 555; see also Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009).

### III.   DISCUSSION

#### 1)   Antitrust Claims – Counts I and II

##### a)   Section 1 Sherman Act Claim – Count I

Plaintiff alleges that Defendants acted in concert to restrain trade by wrongfully suspending Plaintiff's hospital privileges, and as a result of their exclusion of Plaintiff from the endovascular intervention market, consumers had restricted choices and were forced to pay higher prices.

To plead a Section 1 Sherman Act claim, a plaintiff must allege (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action.  Howard Hess Dental Laboratories Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 253 (3d Cir. 2010) (citing Gordon v. Lewistown Hosp., 423 F.3d 184, 207 (3d Cir. 2005)).

Defendants argue that Plaintiff has failed to sufficiently allege that an agreement was made, or that any alleged agreement produced the required anti-competitive effects. The Court finds that Plaintiff has alleged sufficient facts in his proposed Amended Complaint to support a Section 1 Sherman Act claim.

Because Defendants take no issue with Plaintiff's pleading the illegality of their alleged actions, (see AC ¶ 186), or the harm they allegedly caused Plaintiff, (see id. ¶

205), the Court accepts that Plaintiff has adequately alleged the third and fourth prongs of his Section 1 Sherman Act claim.

With respect to the first prong, the circumstantial facts pled in the Amended Complaint are sufficiently detailed to suggest an agreement was made between the various members of the MEC when they adopted new criteria which effectively barred Plaintiff from restoring his endovascular privileges at SMC.  (See AC ¶¶ 92-100.)[2]  As the Third Circuit held in Weiss v. York Hosp., 745 F.2d 786 (3d Cir. 1984), individual staff members at a hospital have independent economic interests separate from each other's interests, and when they act as a body, such as they did here on the MEC, their actions are subject to scrutiny under the Sherman Act.  Id. at 816.  Plaintiff is still left to his proofs in the event of a trial, but at this stage in the proceedings his allegations with respect to an agreement would survive a motion to dismiss.

Plaintiff has also sufficiently alleged that Defendants' actions resulted in an unreasonable restraint of trade.  For example, he claims Defendants' agreement "produced anticompetitive effects within the SMC community and Southern New Jersey market," (AC ¶ 194), that "Defendants' concerted actions reduced the competition for vascular and surgical services as provided by Plaintiff," (id. ¶ 195), and that "Defendants' concerted actions to exclude Plaintiff is a per se violation of the antitrust laws because it is plainly anticompetitive."  (Id. ¶ 198.)  While the Court cannot predict whether Nahas

---

[2] The Court reserves judgment on whether Plaintiff may succeed on his Sherman Act claims against SMC. Discovery and further factual development may reveal whether Gosin was operating independently from SMC and whether Gosin's and SMC's interests were aligned or divergent.  Cf. Nanavati v. Burdette Tomlin Mem. Hosp., 857 F.2d 96, 118 (3d Cir. 1988) (affirming the District Court's dismissal of a Sherman Act conspiracy claim against a hospital where there was no evidence that individual doctors, operating under contract with the hospital, had any interest in competition with the hospital) (citing Weiss v. York Hosp., 745 F.2d 786, 816 (3d Cir. 1984)).

will be able to prove these allegations come trial, he has done enough to meet his burden on a motion to dismiss.  See Fuentes v. South Hills Cardiology, 946 F.3d 196, 202 (3d Cir. 1991) (finding that it was sufficient to state an antitrust injury where the plaintiff pled that "by eliminating him as a competitor, the boycott successfully reduced competition for the defendants' cardiological services."); see also Brader v. Allegheny Gen. Hosp., 64 F.3d 869, 876 (3d Cir. 1995) (noting that, in antitrust cases, plaintiffs are generally not required to prove the existence of an "antitrust injury" on a motion to dismiss).

For these reasons, Plaintiff shall be permitted to maintain Count I and this claim will not be dismissed from the Amended Complaint.

### b) Section 2 Sherman Act Claim – Count II

Plaintiff also alleges that Defendants conspired and agreed to monopolize the endovascular intervention market by restricting Plaintiff's endovascular privileges, and as a result, patients not treated by Defendants were sent to another market to obtain endovascular intervention.

The Section 2 conspiracy claim has four elements which a plaintiff must allege: "(1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged." Howard Hess Dental Labs, 602 F.3d at 253 (citing United States v. Yellow Cab Co., 332 U.S. 218, 224–25 (1947); Am. Tobacco Co. v. United States, 328 U.S. 781, 788, 809 (1946)).

Defendants argue that Plaintiff has failed to allege the first three prongs required to state a Section 2 claim, and Plaintiff's leave to amend Count II should be denied.

Because the Court finds Plaintiff has failed to allege a specific intent to monopolize, it will deny Plaintiff leave to amend.[3]

Though the issue of specific intent is a closer question under this iteration of the Complaint, the Court finds that Plaintiff's facts do not allow the Court to infer that the Defendants acted with the specific intent to monopolize.  Cf. Howard Hess Dental Labs., 602 F.3d at 257-58 (noting that a court could have inferred specific intent if the plaintiffs "had stated enough factual matter to suggest some coordination among the Dealers, something to suggest that they knew that [the defendant] was spearheading an effort to squash its competitors by pressing the Dealers into its service and keeping prices artificially inflated.")  Plaintiff has not pled any facts, other than one allegation in the Amended Complaint, indicating that any of the Defendants might have had an intent to monopolize.  Plaintiff alleges in a conclusory manner that "Defendants conspired and agreed, with the intent that the Defendants would monopolize endovascular intervention procedures market identified herein in the relevant geographic market."  (AC ¶ 207.)  The one paragraph with factual detail relevant to this contention states that the Defendants formed their agreement [to monopolize] with "the specific intent of obtaining for the Defendants a monopoly over the market for … advanced vascular surgery (endovascular

---

[3] The Court notes that Plaintiff has otherwise sufficiently alleged an agreement to monopolize was made for the same reason that it found Plaintiff had sufficiently alleged an agreement to restrain trade in Count I. The same actions that formed the basis for the agreement, noted above, also were undertaken as "part of a conspiracy by plan … with the specific intent of obtaining for the Defendants a monopoly over the market for vascular surgery and/or advanced vascular surgery (endovascular intervention procedures) and the Defendants did so monopolize said market as the Defendants Gosin and Galler through their practices control almost 100% of the endovascular intervention procedures and more than 75% of the vascular procedures at SMC."  (AC ¶ 185 (emphasis added); see also id. ¶ 207 (Defendants conspired and agreed, with the intent that that the Defendants would monopolize endovascular intervention procedures market identified herein in the relevant geographic market.))  Similarly, the actions undertaken by Defendants to allegedly exclude Plaintiff from the endovascular surgery market, i.e., denying his privileges at SMC, are sufficient to constitute an overt act taken in furtherance of the conspiracy.

intervention procedures) and the Defendants did so monopolize said market as the Defendants Gosin and Galler through their practices control almost 100% of the endovascular intervention procedures … at SMC."  (Id. ¶ 185.)

There is no apparent motive for Defendants Nachtigall, Dearborn, Jungblut, SMC, or the MEC to support such a monopoly, and the facts do not otherwise point to intent on their part.  Nothing in the Amended Complaint suggests why these Defendants possessed the specific intent to have Galler and Gosin monopolize the endovascular intervention procedures, and the Court cannot infer intent absent some facts supporting such a conclusory allegation.

While the facts in the Amended Complaint might support Plaintiff's claim that Gosin and Galler controlled nearly all of the endovascular intervention procedures at SMC once Plaintiff was excluded, Plaintiff describes the relevant market elsewhere as being both SMC and "the Southern New Jersey Market."  (Id. ¶ 194.)  It is hard to conclude that Plaintiff has alleged the requisite specific intent where it is unclear whether Defendants only intended to monopolize the endovascular intervention market at SMC, and did so successfully, or intended to monopolize the entire Southern New Jersey endovascular intervention market, to unknown effect.  If Plaintiff intended the former, the conflicting allegations in the Amended Complaint concerning the relevant market weaken any claim of specific intent.  If the latter was intended, the Court finds the facts insufficient to suggest Gosin or Galler were capable of or intended to monopolize the entire Southern New Jersey endovascular intervention market.

Additionally, Plaintiff claims that "Defendant Gosin and others with endovascular privileges elected to not provide treatment," to Nahas' former patients, and they instead

8

sent these patients to Philadelphia, Pennsylvania for treatment as part of the conspiracy to monopolize the market.  (Id. ¶ 190; see also id. ¶ 192 ("Defendants' actions in making unsolicited contact with Dr. Nahas' patients and suggestion that they seek other medical care providers sanctioned by SMC is a conspiracy to monopolize the market.)  This simply makes no sense.  If Gosin and Galler would not take on Plaintiff's patients, and instead sent them to a competitor in another market, such a fact does not help, but hurts Plaintiff's allegation of specific intent to monopolize.  Whether or not these other healthcare providers were "sanctioned" by SMC, the clear implication is that Gosin and others were sending patients to their competitors.

Based on the foregoing, the Court finds that Plaintiff has failed to allege any facts suggesting Defendants possessed the specific intent to monopolize, and has actually made allegations at odds with such a claim.  The Court will deny Plaintiff's request to include Count II, and that claim shall be dismissed from the Amended Complaint.

### 2) Section 1981 Claims – Counts III and IV

#### a) Section 1981 Interference Claim – Count III

"Section 1981 prohibits 'racial' discrimination in the making of private and public contracts."  White v. Williams, 179 F. Supp 2d. 405, 419 (D.N.J. 2002) (citing Pamintuan v. Nanticoke Mem. Hosp., 192 F.3d 378, 385 (3d Cir. 1999)).

To survive a motion to dismiss, a plaintiff must allege facts indicating that: "(1) [plaintiff] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute."  Brown v. Philip Morris Inc., 250 F.3d 789, 797 (3d Cir.

2001) (citing Yelverton v. Lehman, Civ. No. 94–6114, 1996 WL 296551, at *7 (E.D. Pa. June 3, 1996), aff'd. mem., 175 F.3d 1012 (3d Cir. 1999)).

Plaintiff is an Arab American, which is a distinct racial minority group for purposes of § 1981.  See Saint Francis College v. Al-Khazraji, 481 U.S. 604, 613 (1987) (rejecting the argument that Arabs are Caucasians for purposes of § 1981, as Arabs were not considered Caucasians when § 1981 was enacted in 1870).  Defendants argue, however, that Plaintiff has failed to plead facts suggesting the intent to discriminate on the basis of race, or that discrimination concerning an activity enumerated in § 1981 even occurred.

Plaintiff has clearly alleged that SMC's Bylaws constitute a contract between the hospital and its staff, and that the Bylaws contain procedures and rules for "appointment … or termination of staff membership and privileges." (AC ¶¶ 20-21.)  This includes decisions made to grant or terminated specific privileges of a physician practicing in the hospital, which involves a peer review process at SMC.  (Id. ¶ 22.)  Later in the Amended Complaint Plaintiff notes that he would generally sign two year contracts with the hospital, a further indication that his employment relationship with SMC was governed in part by contract.  (See id. ¶ 274.)  Though Defendants argue that the terms of the Bylaws do not give Plaintiff "an absolute right to endovascular privileges," (Defs.' Opp'n at 42), the right protected under § 1981 is not so narrowly defined.  Section 1981 offers relief when racial discrimination "blocks the creation of a contractual relationship, as well as … [when it] impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 476 (2006).  The allegations in the Amended

10

Complaint make clear that the Bylaws afforded certain substantive and procedural rights to Plaintiff, and those rights were allegedly impaired by Defendants. The Court considers this sufficient to state the existence of a contract.

Unlike Plaintiff's original Complaint, the Amended Complaint includes enough factual detail to allow the Court to infer that Defendants discriminated against Plaintiff on the basis of his Arab ancestry and ethnicity.

First, Plaintiff has adequately pleaded he was treated differently than other non-minority staff at SMC when he sought reinstatement of his endovascular privileges. In Count III he claims that SMC has a "long-standing policy of permitting doctors who have experienced an absence from SMC to resume practice after a period of proctoring," yet Defendants refused to reinstate Nahas' privileges with a proctor, in spite of the recommendation by the Fair Hearing Panel in 2006, the state court's special master in 2009, and the Credentials Committee in April 2010. (AC ¶ 219.) In contrast, Drs. Lucasti, Rehnquist, Edden, and Jungblut—all non-Arab doctors at SMC—were permitted to resume their practices with their former privileges, under the supervision of a proctor, after periods of absence from practicing at SMC. (Id.) Nahas also claims that none of the other "vascular surgeons with credentials in endovascular privileges at SMC such as Defendants Gosin and Galler … ever had to obtain any training in endovascular surgery as a condition to obtaining or maintaining endovascular privileges." (Id. ¶ 221.) These allegations are sufficient to suggest that Plaintiff was treated differently than other non-Arab physicians at SMC.[4] Yet, Plaintiff is not required to plead comparator evidence to

---

[4] The Court appreciates Defendants are concerned that Plaintiff cannot show he is similarly situated in "all relevant respects" to any proposed comparators because he fails to adequately describe who the proposed comparators are or why they are similarly situated, and because his allegations do not take account of his

support an inference of discrimination.  "Such an inference could be supported in a number of ways, including, but not limited to, comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by her supervisors suggesting racial animus."  Golod v. Bank of America Corp., 403 Fed. App'x 699, 702 n.2 (3d Cir. 2010) (citing Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 511-12 (2002)).

Nahas has also pleaded facts which suggest the Defendants may have so significantly departed from their normal procedures that their course of action may be evidence of an impermissible purpose.  See Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 267 (1977) ("Departures from the normal procedural sequence … might afford evidence that improper purposes are playing a role."); Stewart v. Rutgers State Univ., 120 F.3d 426, 433-34 (3d Cir. 1997) (holding that factual and procedural inconsistencies, as well as "arbitrary and capricious conduct on the part of the [professional committee]" in reviewing a black applicant's application for tenure constituted "sufficient evidence upon which a jury could conclude that … [the] tenure denial may have stemmed from discrimination based on race.") (internal quotation marks omitted) (citing Metro. Hous. Dev. Corp., 429 U.S. at 267).  For instance, Plaintiff avers that he is the "only physician who has not had his privileges reinstated based on the

_____

"checkered background," or the fact that Plaintiff needed to file a new application, rather than a reapplication for his privileges due to his federal conviction, which allegedly caused him to lose the benefit of the grandfather clause.  (Defs.' Opp'n at 38-39.)  Because the question of whether Nahas can be classified as unique from the other proposed comparators in some way relevant to the denial of his privileges cannot be considered independently from the reasons proffered for that denial, those arguments are more appropriately raised at the summary judgment stage (and beyond), when Defendants bear the burden under McDonnell Douglas v. Green, 411 U.S. 792 (1973), of offering a legitimate, non-discriminatory reason for their adverse employment action.  Marzano v. Computer Science Corp. Inc., 91 F.3d 497, 511 (3d Cir. 1996).  Here, the Court is only concerned with whether Plaintiff's Amended Complaint states a plausible claim under § 1981.

favorable recommendation of the Credentials Committee at Defendant SMC during the past twenty (20) years." (AC ¶ 218.)  Defendants also allegedly refused to consider the applicability of a grandfathering provision, despite the fact Nahas was not a new applicant, and instead imposed higher standards on him than required by the very materials their Criteria were modelled on.  (Id. ¶ 220.)  He also claims that none of the other vascular surgeons at SMC with credentials in endovascular privileges had to obtain any training in endovascular surgery as a condition to obtaining or maintaining their endovascular privileges.  (Id. ¶ 221.)  When Plaintiff sought review of the denial of his privileges, he alleges that Defendants also refused to follow SMC's Bylaws regarding fair hearing procedures, and instead applied "unauthorized, unsanctioned and unilateral procedures that were previously unknown," to Plaintiff's case.  (Id. ¶ 224.)  Taken as a whole, the Court finds that Plaintiff has sufficiently pled facts to suggest that the procedures employed by SMC during his application process for endovascular privileges were so irregular and prejudicial that they might considered evidence of an intent to discriminate based on Plaintiff's Arab ancestry and ethnicity.

For these reasons, the Court finds that Plaintiff has pled sufficient facts to state a claim for a violation of § 1981.  Count III may proceed and will remain in the Amended Complaint.

### b)        Section 1981 Retaliation Claim – Count IV

Section 1981 also encompasses retaliation claims.  CBOCS West, Inc. v. Humphries, 553 U.S. 442, 451 (2008).  In Plaintiff's Amended Complaint he has added a claim in Count IV that Defendants retaliated against him for engaging in protected activity, i.e., seeking to obtain and enforce his contract rights, under §1981.

The legal standards for a retaliation claim under § 1981 are the same as those applicable to a Title VII retaliation claim.  See Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001).  To establish a prima facie case of retaliation under § 1981, the employee must show that (1) he engaged in protected activity, (2) his employer took an adverse employment action against him, and (3) there was a causal connection between his participation in the protected activity and the adverse employment action.  Estate of Oliva v. N.J., Dep't of Law & Pub. Safety, Div. of State Police, 604 F.3d 788, 798 (3d Cir. 2010).  An employment action is considered adverse if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006) (internal quotations omitted).  The third element of a prima facie case "identif[ies] what harassment, if any, a reasonable jury could link to a retaliatory animus."  Moore v. City of Phila., 461 F.3d 331, 342 (3d Cir. 2006).

The Court accepts that Plaintiff has pled he was engaged in a protected activity when he told a member of the Credentials Committee that he believed Gosin, Jungblut, other members of the MEC, and SMC staff were engaged in discriminatory conduct against Nahas based on his Arab ancestry or ethnicity, (AC ¶ 279), and that he made such claims clear again in 2013 and 2014 through counsel.  (See id. ¶¶ 280-81.)  It is not apparent, however, that Defendants took an adverse employment action against Plaintiff, or that there was a causal connection between Plaintiff's participation in these protected activities and any action taken by Defendants.

Plaintiff refers to a "no litigation" policy at SMC, but does no more than state in a conclusory fashion that such a policy would have "dissuaded a reasonable physician from

making or supporting a charge of discrimination." (Id. ¶ 278 (citing Burlington Northern, 548 U.S. at 68).) While such a policy may discourage employees from litigating employment disputes with SMC, it is unclear why it would dissuade an employee like Nahas from otherwise pursuing his claims of discrimination. Plaintiff describes the various procedural steps he took at SMC over a nearly six year span to have his privileges reinstated, and he has offered no indication that he was unable or discouraged by the "no litigation" policy from complaining of any alleged racial discrimination. In fact, the only protected activity Plaintiff apparently engaged in, prior to filing this lawsuit, involved talking to a member of the Credentials Committee about alleged discrimination. In other words, Plaintiff was not dissuaded from engaging in protected activity outside the confines of litigating his claims.

The Court is also not able to deduce from Plaintiff's Amended Complaint how SMC's "no litigation" policy is casually connected to his complaints of discrimination. It appears the policy preexisted Plaintiff's complaints, and as mentioned above, it does not appear that the policy was ever invoked in response to Plaintiff's allegations of racial discrimination. The only event cited by Plaintiff, the decision of the SMC Board of Trustees to pass a resolution terminating consideration of his privileges in 2008 based on his alleged breach of the covenant not to sue, (AC ¶ 276), occurred before Plaintiff first voiced concern over racial discrimination, and was ostensibly in connection with his earlier state court litigation. Plaintiff has not indicated that his state court litigation made similar claims concerning SMC's discriminatory actions in violation of his rights under § 1981, and the Court cannot find this one prior action causally connected to any of Plaintiff's activities protected in his § 1981 retaliation claim. The other actions cited by

Plaintiff are merely a recitation of the bad acts Plaintiff repeats elsewhere in his Amended Complaint, (see id. ¶ 283), and he offers no further justification for drawing a connection between those actions and any complaints he made or would have made concerning racial discrimination.

Because Plaintiff has not sufficiently pled two of the three required elements of a retaliation claim under § 1981, the Court will deny him leave to amend this claim. The § 1981 retaliation claim in Count IV may not proceed as pled, and will be dismissed from the Amended Complaint.

### 3) NJLAD Claims – Counts V and VI

#### a) NJLAD Discrimination Claim – Count V

While Plaintiff's state law discrimination claim appears to resemble his § 1981 claim, New Jersey law is narrower with respect to refusal-to-contract claims. The NJLAD provides that it is unlawful discrimination for any person to "refuse to … contract with … any other person on the basis of race … [or] national origin." N.J. Stat. § 10:5-12(l). That subsection, however, explicitly exempts "refusals or other actions … made or taken in connection with a protest of unlawful discrimination or unlawful employment practices." Id. In other words, this subsection only applies to non-employee relationships, such as independent contractors, and does not apply to employer-employee discrimination. See Rubin v. Chilton, 359 N.J. Super. 105, 111 (App. Div. 2003) ("The conduct proscribed by N.J.S.A. 10:5-12(l) is exclusively related to non-employee relationships. Because plaintiffs were not employees but independent contractors, it was the contract to perform work upon which they relied to carry on their pathology practice at the Hospital.")

16

Nowhere in Plaintiff's Amended Complaint is it stated that he was an independent contractor, and the Court is unable to draw such a conclusion without an allegation to that effect. Accordingly, the Court cannot permit Plaintiff to go forward with Count V, and it will be dismissed from the Amended Complaint.[5]

### b)        NJLAD Retaliation Claim – Count VI

In Count VI Plaintiff attempts to state a retaliation claim under the NJLAD. The applicable provision, § 10:5-12(d), prohibits individuals from retaliating against a person who is opposed to any practices or acts forbidden under the NJLAD, or because that person filed a complaint. Id.

To establish a retaliation claim under the NJLAD, Plaintiff must show that: (1) he was in a protected class; (2) he engaged in protected activity known to the employer; (3) he was thereafter subjected to an adverse employment consequence; and (4) there was a causal link between the protected activity and the adverse employment consequence. Victor v. State, 203 N.J. 383, 409 (2010).

The allegations in Count VI are substantially similar to those contained in Plaintiff's § 1981 retaliation claim, and the requirements of a NJLAD claim are similar, if not more exacting. The only protected conduct Plaintiff asserts in the Amended Complaint is his communication in 2009 that he believed defendants were engaged in racial discrimination regarding the denial of his privileges at SMC and his suspension,

---

[5] Plaintiff brings his NJLAD § 10:5-12(l) claim in Count V against SMC, and a related claim against the individually named defendants under § 10:5-12(n), which states that it is unlawful for any person to "aid, abet, incite, compel, coerce, or induce the doing of any act forbidden by subsection[ ] l."  Because the Court finds that Plaintiff has failed to state a claim for the underlying violation of § 10:5-12(l) against SMC, it also finds that Plaintiff has failed to state a claim under § 10:5-12(n) against the remaining Defendants.

and the acts taken through Plaintiff's attorney after filing this lawsuit, which included complaining of racial discrimination with respect to Plaintiff's right to make contracts. (See AC ¶ 306 (referring only to the "protected activity as set forth hereinabove").) Because the NJLAD only protects Plaintiff's right to contract as a non-employee, the Court finds that he has not actually pled that he engaged in a protected activity for purposes of his NJLAD retaliation claim.[6]

Because the Court finds that Plaintiff fails to plead a claim for retaliation in violation of the NJLAD,[7] Plaintiff will not be permitted to proceed with this claim, and Count VI will be dismissed from the Amended Complaint.

### 4)      Breach of Contract – Count VII

According to Plaintiff, the SMC Bylaws were a written contract between him and SMC under New Jersey law, and by its actions Defendant SMC breached that contract.

To maintain a claim for breach of contract under New Jersey law, Plaintiff must allege: (1) the existence of a contract; (2) that Defendant breached the contract; (3) damages flowing Defendant's breach, and; (4) that Plaintiffs performed their own contractual duties.  See Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 210 F. Supp. 2d 552, 561 (D.N.J. 2002).

---

[6] The Court also notes that Plaintiff's NJLAD claim would otherwise fail for the same reasons expressed supra at Part III.(2)(b).

[7] Here too Plaintiff brings his NJLAD § 10:5-12(d) claim in Count VI against SMC, and a related claim against the individually named defendants under § 10:5-12(e) and (n), which together state that it is unlawful for any person to "aid, abet, incite, compel, coerce, or induce the doing of any act forbidden" in the NJLAD.  Because the Court finds that Plaintiff has failed to state a claim for the underlying violations of § 10:5-12(d) and (l) against SMC, it also finds that Plaintiff has failed to state a claims under § 10:5-12(e) and (n) against the remaining Defendants.

Plaintiff has provided satisfactory information in his Amended Complaint to sustain a claim for breach of contract.  As noted above, he has alleged the existence of a contract, i.e., the SMC Bylaws.  (AC ¶¶ 317-18.)  Plaintiff claims he performed his own obligations under the Bylaws, and did not breach them in any material way.  (Id. ¶ 319.) Defendants SMC's various alleged breaches of the Bylaws are set forth in Table 1, included with the Amended Complaint.  (See Table 1 to AC; AC ¶ 320.)  Finally, Nahas claims he was unable to obtain patients or care for patients as a result of SMC's breach. (Id. ¶¶ 321-22.)

Because Plaintiff has pled the four basic elements of his breach of contract claim, he will be permitted to proceed with this claim, and Count VII will remain in the Amended Complaint.

### 5)      Judicial Review for Fundamental Fairness – Count VIII

In Count VIII Plaintiff claims Defendant SMC acted arbitrarily and capriciously when it failed to follow and fairly apply its own Bylaws, obey an order of the state court, and ultimately denied him reinstatement of his endovascular privileges.

Contrary to Defendants' objection, Plaintiff may state a claim for judicial review of a hospital's decision to deny staff privileges under New Jersey law.  In Griesman v. Newcomb Hosp., 40 N.J. 389 (1963), the New Jersey Supreme Court recognized the right to review the decisions of private hospitals concerning staff privileges.  Id. at 395-96. Twenty-five years later, the New Jersey Supreme Court confirmed that an individual doctor could seek judicial review of a private hospital's decision to deny or revoke staff privileges.  See Nanavati v. Burdette Tomlin Mem. Hosp., 107 N.J. 240, 249-50.

19

Because Plaintiff has pled that SMC denied his privileges in an arbitrary and capricious manner, violating his right to fundamental fairness in making such a decision, the Court considers this sufficient to state a claim for judicial review under New Jersey law.  Accordingly, Plaintiff may proceed with Count VIII, and it will remain in the Amended Complaint.

> **6)      Restraint of Trade in Violation of New Jersey Law – Count IX**

The New Jersey Antitrust Act, <u>see</u> N.J. Stat. § 56:9-3, is interpreted "in harmony" with its federal analog, Section 1 of the Sherman Act.  <u>Glasofer Motors v. Osterlund, Inc.</u>, 180 N.J. Super. 6, 19 (App. Div. 1981) (citing <u>State v. Lawn King</u>, 84 N.J. 179, 192 (1980)).  Since the Court has already determined Plaintiff may proceed with his Section 1 Sherman Act claim in Count I, he may also maintain the state law restraint of trade claim, and Count IX in the Amended Complaint shall remain.

> **7)      Intentional Interference with Prospective Business Advantage –**
>
> **Count X**

Plaintiff claims Defendants tortiously interfered with a prospective business advantage when they delayed reinstating his general and vascular surgery privileges, and completely failed to reinstate his endovascular privileges after the 2009 state court order.

To state a claim for tortious interference Plaintiff must allege that (1) there was a reasonable expectation of advantage from a prospective contractual or economic relationship; (2) Defendants interfered with the advantage intentionally and without justification or excuse; (3) that the interference caused the loss of the unexpected advantage; and (4) that the injury caused damage.  <u>Printing Mart-Morristown v. Sharp Elec. Corp.</u>, 116 N.J. 739, 751 (1989).  Importantly, the protected interest need not be an

enforceable contract, but Plaintiff must demonstrate that "without the interference, there was a reasonable probability that he would have received the anticipated economic benefits." Patel v. Soriano, 369 N.J. Super. 192, 242 (App. Div. 2004) (citing Jenkins v. Region Nine Hous. Corp., 306 N.J. Super. 258, 265 (App. Div. 1997), certif. denied, 153 N.J. 405 (1998); Lamorte Burns & Co. v. Walters, 167 N.J. 285, 306 (2001); MacDougall v. Weichert, 144 N.J. 380, 404 (1996)).  The determination of whether Defendants acted intentionally and without justification or excuse is made on "an individualized basis, and the standard is flexible, viewing the defendant's actions in the context of the facts presented." Lamorte Burns & Co., 167 N.J. at 306.  Generally, this may require the Court to consider whether Defendants' conduct was sanctioned by the "rules of the game," or merely just incident to healthy competition, though a "line clearly is drawn at conduct that is fraudulent, dishonest, or illegal and thereby interferes with a competitor's economic advantage." Id. at 306-07.

Defendants argue the Amended Complaint fails to support any claim that Plaintiff had a reasonable expectation of advantage from a prospective contractual or economic relationship, and that Plaintiff has failed to plead that Defendants acted intentionally and without justification or excuse.[8]

The Court finds Defendants argument concerning Plaintiff's reasonable expectation of advantage premature.  The thrust of their dissatisfaction with Plaintiff's claim is that Plaintiff could not have a reasonable expectation of obtaining endovascular

---

[8] Defendants argue that Plaintiff has failed to plead malice, (see Defs.' Opp'n at 52-53), but for purposes of a tortious interference claim, the requirement to show "malice" is actually the requirement that Plaintiff show Defendants inflicted the harm on Plaintiff "intentionally and without justification or excuse." Lamorte Burns & Co., 167 N.J. at 306.

privileges because he was not qualified to obtain them.  (Defs.' Opp'n at 51-52.)  Such an argument may be appropriate in view of the record evidence, but not on a motion to amend.  Plaintiff has clearly stated in several places that he expected to obtain Defendants' cooperation in having his endovascular privileges reinstated, including his averment that Defendants were aware the Credentials Committee recommended Nahas be allowed to perform endovascular procedures with a proctor as early as April 2010.  (AC ¶ 98.)  He reiterates this expectation in Count X (see id. ¶ 335), and the Court notes that Plaintiff's entire Amended Complaint reads as a long recitation of the ills Nahas believes he suffered when he was thwarted from obtaining and exercising the endovascular privileges to which he thought he was entitled.  That Plaintiff was not guaranteed his endovascular privileges is not dispositive at this stage.  He has alleged throughout the Amended Complaint enough material to suggest that there was a reasonable probability he would have obtained the restoration of his endovascular privileges, and this is sufficient for the purposes of pleading.  See Patel, 269 N.J. Super. at 242.  In sum, Plaintiff has met his burden for pleading that he had a reasonable expectation of advantage.

Plaintiff has also alleged enough factual detail to suggest Defendants acted intentionally and without justification or excuse.  In Count X Plaintiff claims Defendants violated the Bylaws, a state court Order, and his rights under the Constitution in the process of denying him reinstatement of his endovascular privileges.  These acts at least appear to be a violation of the "rules of the game," and are enough to suggest Defendants may have engaged in fraudulent, dishonest, or illegal conduct.  Lamorte Burns & Co., 167 N.J. 306-07.  Again, the whole of the Amended Complaint corroborates Plaintiff's

version of Defendants' conduct.  Though the parties will undoubtedly continue to dispute the veracity of Plaintiff's alleged facts and the context in which these events actually occurred, it is not for the Court to weigh such things at this time.  In his Amended Complaint, Plaintiff has pled facts sufficient to state the second element of his tortious interference claim.

In light of the foregoing, the Court finds that Plaintiff has successfully stated a claim for tortious interference with a prospective business advantage.[9]  Plaintiff may proceed with this claim, and Count X will remain in the Amended Complaint.

### 8)      Lanham Act Claim – Count XI

Plaintiff alleges that Defendants have misrepresented the characteristics and qualities of Plaintiff's services and commercial activities in violation of § 43(a) of the Lanham Act.  This provision indicates that:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

---

[9] Though not addressed by Defendants, the Court notes that Plaintiff has adequately pled the third and fourth elements of his claim—that Defendants' interference prevented Plaintiff from obtaining his endovascular privileges, and that as a result of this interference Plaintiff was damaged through the reduction in his income.

A plaintiff asserting a violation of section 1125(a)(1)(B) must show that (1) the defendant made a false or misleading statement in a commercial advertisement or promotion about its own or the plaintiff's product or service; (2) the statement actually deceived or at least had a tendency to deceive a substantial portion of the intended audience; (3) the deception was material in that it likely influenced purchasing decisions; (4) the advertised product traveled in interstate commerce; and (5) the plaintiff was likely to be or was injured by the false or misleading statement. Innovasystems, Inc. v. Proveris Scientific Corp., Civ. No. 13-5077, 2014 WL 3887746, at *6 (D.N.J. Aug. 6, 2014) (citing Ditri v. Coldwell Banker Residential Affiliates, Inc., 954 F.2d 869, 872 (3d Cir. 1992)).

In its Opinion on Defendants' original Motion to Dismiss, the court already found that Plaintiff's Lanham Act claim failed with respect to his allegations involving (1) a letter sent August 24, 2011 from Defendant Nachtigall to Plaintiff, (2) SMC's public announcement of Plaintiff's fourteen-day suspension, and (3) unspecified "false and defamatory comments" made to patients and staff about the quality of Plaintiff's services. For the same reason the Court rejected those claims in the original Complaint, Plaintiff's new allegations in the Amended Complaint regarding the reporting of his suspension to the HCQIA and the publication of his suspension in the New Jersey Board of Medical Examiners and the federal Clearing House Coordinator fail to support a Lanham Act Claim. The Amended Complaint does not indicate that these publications are false or misleading, there is no indication why either could be considered a "commercial advertising or promotion," and the facts do not suggest that the Defendants themselves are actually responsible for any publication of the information they shared with the

HCQIA, the New Jersey Board of Medical Examiners, or the federal Clearing House
Coordinator.  See Cape Bank v. VSES Galloway, Inc., Civ. No. 14-5293, 2014 WL
4271951, at *3 (D.N.J. Aug. 29, 2014) (internal citation omitted) ("Statements … not
contained in a commercial advertisement or promotion are not actionable under the
Lanham Act.")  In short, Plaintiff fails again in his attempt to use the Lanham Act to state
a federal statutory defamation claim.  See Synyg, Inc. v. Scott-Levin, Inc., 51 F. Supp. 2d
570, 578 (E.D. Pa. 1999) (noting that a Lanham Act claim cannot be brought merely for
"maligning the [plaintiff him]self," but is instead "a remedy for misrepresentation in
advertising about a particular product or commercial service.") (citing U.S. Healthcare,
Inc. v. Blue Cross of Greater Phila., 898 F.2d 914,921 (3d Cir. 1990)); see also Chovanes
v. Thoroughbred Racing Ass'n, Civ. No. 99-185, 2001 WL 43780, at *9 (E.D. Pa. 2001)
(a "garden variety defamation and/or commercial disparagement" claim does not amount
to a Lanham Act cause of action").

Plaintiff has, however, included a new claim in his Amended Complaint worth
mentioning.  For the first time he alleges that Defendant Gosin, his father Dr. Steven
Gosin, and their medical practice Jersey Shore Surgical Group PC "falsely advertised in
at least the Atlantic City Press that Steven Gosin was a board certified vascular surgeon."
(AC ¶ 353.)  Because Dr. Steve Gosin was allegedly not a board certified vascular
surgeon, Plaintiff claims these advertisements were false, and were made to take business
away from Nahas, who was a direct competitor and a board certified vascular surgeon.
(Id.)

The Court observes that there is no allegation that this advertisement concerning
Dr. Steven Gosin traveled in or affected interstate commerce.  Plaintiff only alleges that it

was published in the Atlantic City Press.  Without more, Plaintiff fails to allege one of the

requisite elements in a Lanham Act claim.  Additionally, the Court is concerned that

Plaintiff is attempting under this new theory to assert a Lanham Act claim against a party

who is not even a defendant in the instant action.  Plaintiff has not named New Jersey

Shore Surgical Group PC, or Dr. Steve Gosin, as defendants in this case, and to the extent

he wishes to assert a claim concerning an advertisement made in the Atlantic City Press,

the entity responsible for the advertisement must be made a party.

For these reasons, Plaintiff's new and old Lanham Act claims cannot be sustained.

The Court will deny Plaintiff leave to amend this claim, and Count XI will be dismissed

from the Amended Complaint.

### 9)   Trade Libel – Count XII

In Count XII Plaintiff adds a claim for trade libel.  He asserts that SMC's

publication of his summary suspension fliers and the national publication of his

suspension were made to the public, were derogatory, and were designed to prevent

others, including patients, from dealing with him.

Under New Jersey law, trade libel consists of "communications made to a third

person of false statements concerning the plaintiff, or plaintiff's property or business."

Enriquez v. West Jersey Health Systems, 342 N.J. Super. 501, 524 (App. Div. 2001)

(citing Henry V. Vaccaro Constr. Co. v. A.J. DePace, Inc., 137 N.J. Super. 512, 514 (Law

Div. 1975)).  In general, such communications must be made to a third person, must be

false, and must play a material part in inducing others not to deal with the plaintiff.

Enriquez, 342 N.J. Super. at 524 (citing Prosser & Keeton on Torts § 128 at 967 (5th ed.

1984)).

26

In order to state a claim for trade libel, Plaintiff must allege: (1) publication; (2) with malice; (3) of false allegations concerning his property, product or business, and (4) special damages, i.e. pecuniary harm.  Mayflower Transit, LLC v. Prince, 314 F. Supp. 2d 362, 378 (D.N.J. 2004) (citing Sys. Operations Inc. v. Scientific Games Dev. Corp., 555 F.2d 1131, 1140 (3d Cir. 1977); Lithuanian Commerce Corp. v. Sara Lee, 47 F. Supp. 2d 523, 537 (D.N.J. 1999); New Jersey Automobile Ins. Plan v. Sciarra, 103 F. Supp. 2d 388, 409 (D.N.J. 1998)); see also Patel, 369 N.J. Super. at 246-47 ("A plaintiff alleging trade libel must prove publication of a matter derogatory to the plaintiff's property or business, of a kind designed to prevent others from dealing with him or otherwise to interfere with plaintiff's relations with others.  The communication must be made to a third person and must play a material part in inducing others not to deal with plaintiff.") (internal citation omitted) (citing Prosser & Keeton, § 128 at 967).

With respect to the last element, Plaintiff must plead special damages with particularity, which includes alleging either "loss of particular customers by name, or a general diminution of business, and extrinsic facts showing that such special damages were the natural and direct result of the false publication."  Mayflower Transit, 314 F. Supp. 2d at 378.  If Plaintiff is predicating his claim on diminution in business, he should allege

> facts showing an established business, the amount of sales for a substantial period preceding the publication, the amount of sales for a period subsequent to the publication, facts showing that such loss in sales were the natural and probable result of such publication, and facts showing the plaintiff could not allege the names of particular customers who withdrew or withheld their custom.

27

Id. (quoting Juliano v. ITT Corp., Civ. No. 90-1575, 1991 WL 10023, at *6 (D.N.J. Jan. 22, 1991)).

Defendants contend Plaintiff has failed to allege any of the elements required to state a claim for trade libel.  The Court agrees that Plaintiff has failed to plead at least three of the requisite elements.

Nowhere in the Amended Complaint does Plaintiff contend that the fliers alerting staff and patients at SMC of his summary suspension, or that the publication of his suspension to the New Jersey Board of Examiners and the federal Clearing House Coordinator, were false or intentionally misleading.  He only alleges that these publications were designed to interfere with his business relations and prevent others from dealing with him.  (AC ¶¶ 357-60.)  Plaintiff also fails to allege anywhere that Defendants knew these publications were false, or that they were published with reckless disregard for their falsity.  Floorgraphics, Inc. v. New Am. Marketing In-Store Servs., Inc., Civ. No. 04-3500, 2006 WL 2846268, at *6 (D.N.J. Sept. 29, 2006); see also id. (finding the plaintiff had sufficiently alleged the malice element where he "repeatedly alleges[d] in the Complaint that Defendant 'intentionally' made false statements.")

Further, Plaintiff is apparently proceeding under a general diminution of business theory of special damages, as he has not named or even suggested any lost patients by name.  Cf. Floorgraphics, Inc., 2006 WL 2846268, at *7 (finding that where the plaintiff had named "specific retailers and business that refused to deal with it or imposed extraordinary measures as a result of Defendant's conduct," elsewhere in the complaint, he was proceeding under the particularized lost customers theory of special damages).  Nahas' generalized assertion that he was harmed "through the loss of patient and referral

revenue," (AC ¶ 361), is insufficient to meet the pleading requirements for a general diminution in business theory of special damages in a trade libel claim.  See Mayflower Transit, 314 F. Supp. 2d at 378.

Because Plaintiff has failed to plead several of the required elements for his trade libel claim, the Court will deny him leave to amend Count XII, and it will be dismissed from the Amended Complaint.

## IV.    PLAINTIFF'S STATE COURT ACTION

Defendants again argue that Plaintiff's claims are barred by collateral estoppel, and that the Court should abstain from hearing this case under Colorado River Conservation Dist. v. United States, 424 U.S. 800, 817 (1976).  The Court notes neither party attached any documents related to the pending state court action with the Amended Complaint or their briefs.  Defendants did submit a recent opinion and order by Judge Raymond P. Batten, on May 7, 2015, granting the state court defendants' motion for summary judgment, by letter on May 12, 2015, (Doc. No. 30), but no other state court documents, including the operative complaint, have been submitted to this Court.

Due to the dearth of a basic record from the state court action, the Court is unable to determine what claims, if any, may be barred from adjudication or subject to preclusion in this matter.  Moving forward, if Defendants wish to argue that some or all of the claims in this case are barred under Rooker-Feldman, Article IV § 1 of the Constitution, or preclusion principles, they should attach the appropriate documents to their submission and file an appropriate motion depending on the relief they are requesting, e.g., a motion to dismiss for lack of subject matter jurisdiction under Fed. R.

Civ. P. 12(b)(1) on the basis that certain claims are barred by the Rooker-Feldman doctrine.

### V.    LEAVE TO AMEND

Leave to amend should be granted freely.  See Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000); Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002) ("When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile.")

Here, the Court is unable to conclude that Plaintiff could not possibly amend his pleading to adequately state his presently dismissed claims against Defendants. Therefore, within the period of time set forth in the Order accompanying this Opinion, Plaintiff may file a motion seeking leave to amend the Amended Complaint.  However, if Plaintiff elects to seek leave to amend his Amended Complaint, he must limit his proposed Second Amended Complaint to no more than 50 pages.[10]

### VI.    CONCLUSION

For the foregoing reasons, the Motion to Amend will be **GRANTED IN PART** and **DENIED IN PART**.  Counts II, IV, V, VI, XI, and XII will be **DISMISSED WITHOUT PREJUDICE** from the Amended Complaint.  An accompanying Order shall issue.


Dated:   __5/29/2015___                          _s/ Robert B. Kugler__
                                                 ROBERT B. KUGLER
                                                 United States District Judge

---

[10] If Plaintiff files a motion for leave to file an amended complaint, he shall also attach to the motion a copy of the proposed Second Amended Complaint, as required by Loc. Civ. R. 7.1(f).