NOT FOR PUBLICATION                                    (Doc Nos. 36, 37.)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____
                                            :
FREDERICK NAHAS, M.D.,                      :
                                            :
            Plaintiff,                      :        Civil No. 13-6537 (RBK/AMD)
                                            :
        v.                                  :
                                            :        **OPINION**
SHORE MEDICAL CENTER, STEVEN P.             :
NACHTIGALL, JEFFREY GOSIN,                  :
PEYTON DEARBORN, LEONARD GALLER,            :
PETER JUNGLUT, and the MEDICAL              :
EXECUTIVE COMMITTEE,                        :
                                            :
            Defendants.                     :
_____:

**KUGLER,** United States District Judge:

    Before the Court is the motion of Shore Medical Center ("SMC"), Dr. Steven P.

Nachtigall, Dr. Jeffrey Gosin, Dr. Peyton Dearborn, Dr. Peter Jungblut, and the Medical

Executive Committee ("MEC") (collectively "Defendants") to dismiss Plaintiff Dr. Frederick

Nahas's ("Plaintiff") First Amended Complaint ("FAC") pursuant to Federal Rule of Civil

Procedure 12(b)(1), or, alternatively, 12(b)(6).  Also before the Court is Plaintiff's Motion for

Reconsideration (Doc. No. 36) of the Court's decision denying Plaintiff leave to amend his

Complaint to include an NJLAD discrimination claim.  For the reasons set forth below, the

motion to dismiss is granted-in-part and denied-in-part, and Plaintiff's Motion for

Reconsideration is granted.

## I.       FACTUAL BACKGROUND

Plaintiff, a Lebanese-American medical doctor, is board-certified by the American Board of Surgery in General Surgery and Vascular Surgery.  (FAC ¶¶ 8–10, Doc. No. 35.)  SMC is a hospital located in Somers Point, New Jersey that serves Cape May County and parts of Atlantic County, New Jersey.  (Id. ¶ 11.)  It admits approximately 10,000 patients and treats approximately 50,000 emergency department patients per year.  (Id. ¶ 12.)  Defendant Steven P. Nachtigall ("Dr. Nachtigall") is a medical doctor who was President or past-President of medical staff at SMC during the time period relevant to this complaint.  (Id. ¶ 13.)  Defendant Jeffrey Gosin ("Dr. Gosin") is a medical doctor who was the head of vascular surgery during the time period relevant to this complaint.  (Id. ¶ 14.)  Defendant Peter Jungblut ("Dr. Jungblut") is a medical doctor who was Vice President of Medical Affairs at SMC during the time period relevant to this complaint.  (Id. ¶ 16.)  Defendant Dearborn is a medical doctor who was an anesthesiologist, contracted by SMC, to provide anesthesia at SMC and the SMC outpatient surgery facility, during the time period relevant to this complaint. (Id. ¶ 17.)

SMC first granted Plaintiff attending staff privileges in general and vascular surgery in 1978.  (Id. ¶ 10.) He held those privileges without interruption until 2003.  (Id. ¶ 34.) Beginning in 1990, with the advent of new endovascular interventions, SMC required that surgeons separately apply for endovascular privileges.  (Id.)  From 1990 to 2003, Plaintiff held privileges in general, vascular, and endovascular surgery, which he renewed upon application every two years. (Id. ¶ 35.) Plaintiff also served as the Director of the Department of Vascular Surgery from 2001 to 2003.  (Id.)

In 2003, Plaintiff pleaded guilty to criminal charges related to Medicare billing.  (Id. ¶ 38–39.)  As a result of his conviction, Plaintiff's medical license was suspended for six months

and his medical staff membership and clinical privileges at SMC were suspended for three years. (Id. ¶¶ 38–39.)  During this time, Plaintiff alleges that Dr. Gosin capitalized on Plaintiff's absence and by 2006 had driven out nearly all of the competition for endovascular surgeries.  (Id. ¶¶ 41–42.)

In early 2006, Plaintiff applied for medical staff privileges and general, vascular, and endovascular surgical privileges with SMC. (Id. ¶ 63.)  After going through multiple layers of review, Plaintiff's application was ultimately denied.[1] (Id. ¶¶ 73–83.)  He sought reconsideration, but when that proved unsuccessful, he brought suit in New Jersey Superior Court in 2007, seeking reinstatement and money damages.  As a result of his filing suit, the Board formally terminated his request for privileges.  (Id. ¶ 84.)  Plaintiff alleges that this "no litigation" policy is a violation of New Jersey public policy.  (Id. ¶ 85.)

The Superior Court appointed Dr. Jerome Vernick ("Dr. Vernick"), an independent special master, to evaluate Dr. Nahas's clinical competence.  (Id. ¶ 86.)  Dr. Vernick recommended that Plaintiff receive clinical privileges in general and vascular surgery immediately and endovascular privileges after a period of "proctoring."  (Id. ¶ 86.)  Apparently, Dr. Jungblut disagreed with Dr. Vernick's "proctoring suggestion" and represented that proctoring was unavailable.  (Id. ¶ 37.)  Nonetheless, the state court eventually ordered SMC to

---

[1] Plaintiff's application was first denied in July 2006 by SMC's Credentials Committee, whom he alleges relied on misrepresentations by Dr. Gosin and Dr. Jungblut.  (Id. ¶ 30.)  Dr. Gosin and his father, also a physician and Dr. Gosin's business partner, also allegedly misrepresented to the committee that Dr. Nahas lacked clinical competency.  (Id. ¶ 73.)  Thereafter, the MEC affirmed the Credential Committee's decision, which Plaintiff appealed through the Fair Hearing process provided for in the Bylaws.  (Id. ¶ 75.)  A three-physician panel convened for the Fair Hearing and found in favor of Plaintiff, recommending that he be awarded clinical privileges.  (Id. ¶ 77.)  The MEC appealed the Panel's decision, and an appellate review panel reversed the Fair Hearing Panel's recommendation.  (Id. ¶ 81.)  The Board of Trustees ultimately approved the denial of all Plaintiff's medical staff privileges.  (Id. ¶ 82.)

award Plaintiff privileges in general and vascular surgery immediately, and evaluate Plaintiff for endovascular privileges in accordance with the May 2005 Criteria ("the Criteria").  (Id. ¶ 89.) The Court reserved judgment on Plaintiff's claim for monetary damages.

Plaintiff's claims appear to focus on actions taking place after the state court ordered SMC to grant him privileges. (See FAC ¶ 90 ("Operative Facts").)  Although he did indeed receive privileges in general and vascular surgery, Plaintiff alleges that Defendants have since acted in contravention of the state court's order by stymieing his efforts to obtain endovascular surgery privileges.  (Id. ¶¶ 91–92.)  He alleges that Defendant Jungblut has opposed his efforts, and set in place new, heightened criteria ("the Substitute Criteria") to receive endovascular privileges and which violate the state court's order.  (Id. ¶ 93.)  The "substitute criteria" allegedly contain requirements that are impossible to satisfy and were designed as a result of Defendants' ethnic bias and anticompetitive motives.  (Id.)

In 2009, and after having allegedly satisfied the court-ordered criteria,[2] Plaintiff filed a renewed application for endovascular privileges.  (Id. ¶ 96.)  The Credentials Committee recommended that Plaintiff receive endovascular privileges with a proctor.  (Id. ¶ 98.)  The MEC then reviewed Plaintiff's Application, to which they applied the Substitute Criteria, and rejected the Credentials Committee's recommendation.  (Id. ¶ 108.) The MEC reasoned that Plaintiff had not performed enough training procedures as the "primary operator" and had not completed enough procedures in general, both of which were heightened requirements allegedly established by the Substitute Criteria. (Id. ¶ 108.)  Plaintiff also alleges that he was denied a meeting with the MEC, in violation of the Bylaws.  (Id. ¶ 99.)

---

[2] Plaintiff claims that he traveled extensively and spent thousands of dollars to obtain training to satisfy the court-ordered Criteria. (Id. ¶ 95.)

As he had done with his previous application in 2006, Plaintiff then pursued a round of internal appeals, seeking review through the Fair Hearing process.  He alleges that SMC improperly, and in violation of the bylaws, appointed an interested Hearing Officer rather than a disinterested panel to conduct his Fair Haring.  (Id. ¶ 111.)  The Hearing Officer recognized that the MEC had applied the wrong criteria but nevertheless upheld the MEC's determination.  (Id. ¶ 114.)  Plaintiff then appealed the Hearing Officer's decision to the Board of Trustees, which affirmed the Hearing Officer's denial.  The hearings process took over twenty-one months, a delay Plaintiff attributes to Defendant's anticompetitive motives.  (Id. ¶ 117.)

Additionally, Plaintiff alleges that after his general and vascular surgery privileges were reinstated in 2009, Defendants began investigating and disciplining him for performing procedures that he understood and considered to be under the umbrella of vascular surgery, and not endovascular surgery.  (Id. ¶¶ 127–129.)  Plaintiff alleges that there is no clear distinction between the two, and SMC does not publish a list of which procedures fall under which category.  (Id. ¶ 135.)  Indeed, he claims that he requested clarification on the distinction to no avail.  The discipline included a fourteen-day suspension in September 2011, which Plaintiff attributes to anticompetitive and discriminatory motives.  (Id. ¶ 137–149.)  Plaintiff brought suit in state court, seeking to enjoin SMC from suspending him, but the state court denied Plaintiff relief.  Plaintiff's suspension was announced in a letter, circulated to hospital staff, and included notice that he would not be allowed on the premises, an action he claims had never happened before.  (Id. ¶ 150.)  SMC also instructed its staff to call the police if Plaintiff appeared on site.  (Id. ¶ 109.)

Plaintiff alleges he was subject to a second investigation in 2012.  The MEC formed an ad hoc Investigating Committee to officially review all of Plaintiff's lower extremity cases.  (Id.

5

¶ 156.)  Plaintiff requested a meeting with the MEC, but his request was denied.  (Id. ¶ 157.)
The investigation took more than eighteen months, which allegedly exceeded the time allowed
by the Bylaws.  (Id. ¶ 160.)  Plaintiff asked an independent expert to review those same
procedures, and that doctor issued a report in early 2013 confirming that all Plaintiff's
procedures were acceptable.  (Id. ¶ 159.)  Also in 2013, Plaintiff was prohibited from accessing
the CVI facility, which he needs to perform certain diagnostic purposes. (Id. ¶ 163.)  He alleges
that this exclusion has reduced the scope his vascular privileges and his medical practice in
violation of the Bylaws because he was not afforded notice and a hearing.  (Id. ¶ 164.)

Finally, Plaintiff alleges that he has been subjected to an indefinite Focused Professional
Practice Evaluation and retaliatory actions.  (Id. ¶166–74.)  He must renew his privileges
annually rather than every two years as is customarily required.  (Id. ¶ 166.)  SMC has allegedly
deputized other physicians to monitor Plaintiff's procedures.  On one occasion, Dr. Tsyganov, an
anesthesiologist, instructed Plaintiff mid-surgery that the procedure he was to be perform was not
the ideal procedure to perform.  (Id. ¶ 168.)  Plaintiff alleges that Dr. Tsyganov then "reached
over into the sterile surgical area, breached the sterile area, and punched Dr. Nahas in the arm."
(Id. ¶ 169.)  When Plaintiff reported the incident to SMC, SMC reprimanded him and fired a
witness that corroborated Plaintiff's account of events.  (Id. ¶ 170.)

Plaintiff filed this suit in late 2013, alleging that the actions of Defendants Shore Medical
Center ("SMC"), Dr. Steven P. Nachtigall ("Nachtigall"), Dr. Jeffery Gosin ("Gosin"), Dr.
Peyton Dearborn ("Dearborn"), and Dr. Peter Jungblut ("Jungblut"), in denying Plaintiff's
requests to have his endovascular privileges at SMC, and suspending him from practice at SMC
altogether, violated his rights.  He alleges violations of the Sherman Antitrust Act, 42 U.S.C. §
1981, and New Jersey's Anti-trust Act, as well as claims for breach of contract, judicial review

for fundamental fairness, and tortious interference with a prospective economic advantage.[3]  (See

FAC, Counts I–VI.)

## II.     LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a complaint may be dismissed for

lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  Generally, where a defendant

moves to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction, the plaintiff bears

the burden of proving by a preponderance of the evidence that the Court has subject matter

jurisdiction.  See Gould Elec. Inc. v. U.S., 220 F.3d 169, 178 (3d Cir. 2000).  "[I]n a factual

attack under Rule 12(b)(1), the court may consider and weigh evidence outside the pleadings to

determine if it has jurisdiction."  Id. (citing Mortensen v. First Fed. Sav. And Loan Ass'n, 549

F.2d 884, 891 (3d Cir. 1977)).  A district court has "substantial authority" to "weigh the evidence

and satisfy itself as to the existence of its power to hear the case."  Mortensen, 549 F.2d at 891.

"[N]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed

material facts will not preclude the trial court from evaluating for itself the merits of

jurisdictional claims."  Id.

Alternatively, under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss an

action for failure to state a claim upon which relief can be granted.  With a motion to dismiss

under Rule 12(b)(6), "'courts accept all factual allegations as true, construe the complaint in the

light most favorable to the plaintiff, and determine whether, under any reasonable reading of the

complaint, the plaintiff may be entitled to relief.'"  Fowler v. UPMC Shadyside, 578 F.3d 203,

210 (3d Cir. 2009) (quoting Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)).  In

---

[3] On May 29, 2015, the Court granted-in-part and denied-in-part Plaintiff's Motion to Amend his
Complaint.  (Doc. No. 32.)  In response, Plaintiff filed the FAC, which contains the
aforementioned six counts. (Doc. No. 35.)

other words, a complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

To make this determination, a court conducts a three-part analysis.  Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010).  First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Santiago, 629 F.3d at 131 (quoting Iqbal, 556 U.S. at 680).  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."  Santiago, 629 F.3d at 131 (quoting Iqbal, 556 U.S. at 680).  This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 679.  A complaint cannot survive where a court can infer only that a claim is possible rather than plausible.  Id.

## III.   DEFENDANT'S MOTION TO DISMISS

Defendants assert three bases for dismissal of Plaintiff's claims.  First, they move for dismissal under Rule 12(b)(1) on grounds that this Court lacks subject matter jurisdiction pursuant to the Rooker-Feldman doctrine.  Second, they move to dismiss under Rule 12(b)(6), arguing that principles of collateral estoppel bar Plaintiff's claims.  Third, they move to dismiss under Rule 12(b)(6), alleging that Defendants are entitled immunity under the HCQIA.  Because subject matter jurisdiction is a threshold requirement, the Court will first analyze whether Rooker-Feldman divests the Court of jurisdiction to hear Plaintiff's claims.

A. **Rooker-Feldman**

1. **The Rooker-Feldman Standard**

The Supreme Court decisions in Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923) and

District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983), established the basic

principle that a federal district court cannot exercise jurisdiction if it would result in

"overturn[ing] an injurious state-court judgment."  Exxon Mobil Corp. v. Saudi Basic Indus.

Corp., 544 U.S. 280, 292 (2005).  In reversing the Third Circuit's more expansive interpretation

of Rooker-Feldman, the Court, in Exxon-Mobil, clarified that Rooker-Feldman does not divest a

federal court of jurisdiction when "a state court reaches judgment on the same or related question

while the case remains sub judice" in federal court.[4] Id. at 292.

According to the Third Circuit's post-Exxon Mobil test,

there are four requirements that must be met for the Rooker-Feldman doctrine to
apply:  (1) the federal plaintiff lost in state court; (2) the plaintiff "complain[s] of
injuries caused by [the] state-court judgments"; (3) those judgments were
rendered before the federal suit was filed; and (4) the plaintiff is inviting the
district court to review and reject the state judgments . . . . The second and fourth
requirements are the key to determining whether a federal suit presents an
independent, non-barred claim.

Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 166 (3d Cir. 2010)

(quoting Exxon Mobil, 544 U.S. at 284).

When  a defendant's Rule 12(b)(1) motion is a factual attack on jurisdiction, as is the

case here, no presumptive truthfulness attaches to Plaintiff's allegations, and the existence of

disputed material facts will not preclude the trial court from evaluating for itself the merits of the

---

[4] Rather, as the Court explained, "[d]isposition of the federal action, once the state-court action is
complete, would be governed by preclusion law."  Id. at 293.

jurisdictional claims." <u>Mortensen</u>, 549 F.2d at 891.

### 2. Application of <u>Rooker-Feldman</u>

Defendants argue that <u>Rooker-Feldman</u> divests this Court of jurisdiction over Plaintiff's claims because Plaintiff seeks repudiation of two prior state-court orders:  (1) a November 14, 2011 Decision (the "November 2011 Decision") denying Plaintiffs request to enjoin SMC from suspending Plaintiff's clinical privileges and (2) a May 7, 2015 Decision ("the May 2015 decision") granting SMC's Motion for Summary Judgment on Plaintiff's damages claims against SMC.  (Defs.' Br. 19.)  The Court will examine each state court decision in turn.

The November 2011 Decision denied Plaintiff's application for temporary restraints, wherein he sought to enjoin the MEC from suspending him on account of performing procedures outside the scope of his privileges.  (<u>See</u> Fanning II, Ex. 1.)  After considering the papers submitted by both parties and conducting oral argument on the application, The Honorable Nelson C. Johnson found in favor of the MEC.  He held that Plaintiff's suspension was to run from November 26, 2011 through December 9, 2011.  He also permitted SMC to continue monitoring Plaintiff's procedures as set forth in Dr. Nachtigall's letters to Plaintiff, and to pursue a referral of Plaintiff to the Professional Assistance Program of New Jersey, if necessary.  (<u>Id.</u>)

The May 2015 Decision resolved Plaintiff's 2007 suit against SMC, namely Plaintiff's claim for damages.  There, the Honorable Raymond A. Batten held that SMC was statutorily immune from liability pursuant to the HCQIA, reasoning that Plaintiff had provided insufficient evidence that SMC's investigation of him was unreasonable or that denying him endovascular privileges was not "in furtherance of quality health care objectives."  (Fanning I, Ex. A at 42.)  In so finding, Judge Batten considered whether SMC's internal review proceedings constituted a "professional review activity," a threshold requirement for immunity under the HCQIA, and

whether Plaintiff had provided enough evidence to overcome the presumption of immunity.[5] (Id.

at 37, 38–41.)  Judge Batten reviewed four specific proceedings and found each to be a

professional review activity warranting immunity:  (1) SMC's denial of proctoring, (2) SMC's

use of an independent review agency to determine Plaintiff's clinical competence, (3) the denial

of Plaintiff's application, and (4) the letters that were critical of Plaintiff submitted by Dr. Gosin

and his father during Plaintiff's credentialing process.  (Id. at 37.)

    After examining these state court decisions, the Court finds that neither decision divests

this Court of jurisdiction.  First, Rooker-Feldman is a basis to dismiss on a lack of jurisdiction

only when the state court judgment was rendered before the filing of the instant suit.  Great W.

Mining, 615 F.3d at 166.  Here, Defendant argues that Judge Batten's May 2015 decision

precedes Plaintiff's First Amended Complaint, officially filed on June 5, 2015.  (Def.'s Reply Br.

6.)  However, Rule 3 of the Federal Rules of Civil Procedure provides that "[a] civil action is

commenced by filing a complaint with the court," suggesting that Plaintiff's Complaint could be

considered commenced upon filing his initial complaint.  Other courts have held that an action is

commenced for Rooker-Feldman purposes on the date the initial complaint was filed.  See

Lozman v. City of Riviera Beach, Fla., 713 F.3d 1066, 1072 n.3 (11th Cir. 2013) (declining to

adopt the date on which the amended complaint was filed as the date of "commencement" for

purposes of Rooker-Feldman because such a rule would conflict with the principle that "if a

federal court has properly invoked subject matter jurisdiction at the time of the initial federal

complaint, the Rooker-Feldman doctrine cannot spring into action and eliminate jurisdiction

---

[5] "The presumption of immunity creates an unusual standard for reviewing summary judgment
orders, as the plaintiff bears the burden of providing that the professional review process was not
reasonable and thus did not meet the standard for immunity."  Gordon v. Lewistown, 423 F.3d
184, 202 (3d Cir. 2005).

merely because an amended complaint is filed"); see also McCloud v. Mairs, No. 12-2556, 2014 WL 9880043, at *2 (E.D.N.Y. Oct. 24, 2014) (recognizing that in other contexts, "the filing of an amended complaint that does not add a new defendant does not alter the date on which the federal suit is commenced" and declining to apply a different rule for purposes of Rooker-Feldman).

Rules in this district concerning statute of limitations also suggest that it is inappropriate for the Court to look to the date on which the FAC was filed.  In this district, if an amended complaint contains new causes of action not contained in the original complaint, those new causes of action are "commenced" when the Plaintiff files a motion to amend attaching a proposed amended complaint.  See Speth v. Goode, No. 95-0264, 2011 WL 221664, at *5 (D.N.J. Jan. 20, 2011) ("For claims contained in the proposed complaint attached to [the motion to amend the complaint], the statute of limitations is satisfied at the time of the filing of the motion."); Bell v. Lockheed Martin Corp, No. 08-6292, 2010 WL 2666950, at *10 (D.N.J. June 23, 2010) ("The filing of a motion for leave to amend a complaint has been held to be sufficient to commence an action.").  Those claims included in the original complaint relate back to the date the initial complaint was filed.  The Court sees no reason to depart from this principle for Rooker-Feldman purposes, particularly in light of Rooker-Feldman's narrow scope.

Here, Plaintiff's initial complaint was filed on October 13, 2013, well before the state court rendered the May 2015 decision.  The claims now before the Court were contained in that initial complaint with the exception of Count II (Judicial Review for Fundamental Fairness) and Count V (Restraint of Trade in Violation of New Jersey's Antitrust Act).  (Compare Doc. No. 1 with Doc. No. 35.)  Those claims, however, commenced on October 29, 2014, the date on which Plaintiff filed his motion to amend, which is also well before the state court's May 2015

12

decision.  The Court therefore finds that the May 2015 decision did not precede the commencement of Plaintiff's federal claims, and therefore this Court has proper jurisdiction over Plaintiff's federal suit.  Preclusion principles may very well preclude Plaintiff from re-litigating issues addressed in the May 2015 decision, but as the Third Circuit explained in Great Western, "[w]hen there is parallel state and federal litigation, Rooker-Feldman is not triggered simply by the entry of judgment in state court."  615 F.3d at 166 (quoting Exxon Mobil, 544 U.S. at 292).

On the other hand, the state court's November 14, 2011 judgment denying Plaintiff injunctive relief, however, clearly satisfies the timing requirement of Rooker-Feldman.  Less clear, however, is whether the injury of which Plaintiff now complains was "produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it."  Id. at 167.  Only if the state court proceeding is the source of Plaintiff's injury are Plaintiff's claims barred by Rooker-Feldman.  Defendants argue that Plaintiff now complains of injuries caused by the November 2011 Decision because it was that judgment that commenced Plaintiff's ultimate suspension and permitted the subsequent monitoring.  (Defs.' Reply Br. 4.)  Plaintiff emphasizes that he is not alleging "that the state court played any role in bringing about the hospital's decision to suspend him" but rather is complaining of the "independent claim" of discrimination. (Pl.'s Br. 14.)

The Court agrees with Plaintiff and finds that Plaintiff's complains of injuries independent from the state court judgment.  The discussion in Great W. Mining is of particular help in determining the source of plaintiff's injury.  There, the Third Circuit illustrated the situation in which "the source of the injury is the defendant's actions . . . even if it asks the federal court to deny a legal conclusion reached by the state court."  615 F.3d at 167.  The Court explained,

> [s]uppose a plaintiff sues his employer in state court for violating both state anti-discrimination law and Title VII and loses.  If the plaintiff then brings the same suit in federal court, he will be seeking a decision from the federal court that denies the state court's conclusion that the employer is not liable, but he will not be alleging injury from the state judgment.  Instead, he will be alleging injury based on the employer's discrimination.  The fact that the state court chose not to remedy the injury does not transform the subsequent federal suit on the same matter into an appeal, forbidden by Rooker-Feldman, of the state-court judgment.

Id. (quoting Hoblock v. Albany Cnty. Bd. of Elections, 422 F.3d 77, 88–88 (2d Cir. 2005) (emphasis in original)).

Here, the state court denied Plaintiff the injunctive relief he sought, much like the court in the above-quoted example denied the plaintiff his or her requested remedy.  Although Plaintiff appears to again be challenging Defendant's suspension, his suspension was not "caused" by the state court denial of injunctive relief in the sense required by Rooker-Feldman.  Indeed, Plaintiff's alleged injury—his suspension—existed prior to the state court proceedings, meaning had he not sought injunctive relief in the first place, he would have been suspended.  See id. ("A useful guidepost is the timing of the injury, that is, whether the injury complained of in federal court existed prior to the state-court proceedings and thus could not have been "caused by" those proceedings.").  The fact that the state court did not stop his suspension from being carried out does not make it the source of Plaintiff's injury.  Plaintiff's challenge to his suspension may very well be precluded on different grounds, but the state court judgment is not a basis for divesting this court of jurisdiction over Plaintiff's claims.  Therefore, because Plaintiff's federal claims do not satisfy each element of Rooker-Feldman, the state court's November 2011 Decision does not divest this Court of jurisdiction over Plaintiff's claims relating to his suspension.

### B. Collateral Estoppel[6]

Defendant next argues that the doctrine of collateral estoppel bars Plaintiff's claims because the parties have previously litigated these issues in state court.  Plaintiff disagrees, arguing that his claims in the instant suit relate to internal proceedings that were not covered in the previous state court litigation.

Because Defendants seek to apply collateral estoppel with respect to a New Jersey State Court decision, this Court applies New Jersey's law on issue preclusion.  Anela v. City of Wildwood, 790 F.2d 1063, 1068 (3d Cir. 1987) ("The federal court, in determining the collateral estoppel effect of a state court proceeding, should apply the law of the state where the . . . proceeding took place.").  Under New Jersey law, the party asserting collateral estoppel to foreclose the relitigation of an issue must establish the existence of five conditions:

> (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

Olivieri v. Y.M.F. Carpet, Inc., 897 A.2d 1003, 1009 (N.J. 2006).  Moreover, collateral estoppel is rooted in equity and as such will be applied with a view towards obtaining a fair result for all parties.  See id. ("It is equally clear that '[e]ven where these requirements are met, the doctrine, which has its roots in equity, will not be applied when it is unfair to do so.'" (citation omitted)).

---

[6] "Although res judicata and collateral estoppel are affirmative defenses, they may be raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)."  Walzer v. Muriel, Siebert & Co., Inc., 221 Fed. Appx. 153, at *2 (3d Cir. 2007) (citing Connelly Found. V. Sch. Dist. Of Haverford Twp., 461 F.2d 495, 496 (3d Cir. 1972)).

Defendants first argue that the May 2015 decision, in which Judge Batten found SMC entitled to immunity under the HCQIA, has preclusive effect on Plaintiff's federal claims in the instant suit.  In response, Plaintiff contends that the claims in front of Judge Batten and those in the instant suit are not identical, as required under New Jersey state law.  See Olivieri, 897 A.2d at 1009. Defendant has the burden of establishing that the issues in this case are identical to those resolved in the state court proceeding.  "Identity of the issue is established by showing that the same general legal rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules." Suppan v. Dadonna, 203 F.3d 228, 233 (3d Cir. 2000) (citation and internal quotation marks omitted).

The Court is not convinced that Plaintiff's entire suit is comprised only of claims and issues identical to those resolved by the May 2015 Decision.  That decision focused on SMC's immunity from damages with respect to four internal review procedures:  (1) SMC's denial of proctoring, (2) SMC's use of an independent review agency to determine Plaintiff's clinical competence, (3) the denial of Plaintiff's application, and (4) the letters that were critical of Plaintiff submitted by Dr. Gosin and Dr. Gosin during Plaintiff's credentialing process.  (Id.) Based on the Court's reading of the May 2015 Decision, these procedures were in relation to the denial of Plaintiff's first application for privileges, which he submitted in 2006.  Indeed, the only time Judge Batten mentions Plaintiff's application for privileges in 2009 is in his chronological explanation of the facts, where he noted that Plaintiff had "instituted another round of internal procedures, which eventually resulted in the filing of federal litigation, well beyond the claims asserted in this case." (Id. at 13.)  Judge Batten's immunity analysis also focuses almost exclusively on the proceedings involved in the denial of Plaintiff's 2006 application.  For example, in discussing Plaintiff's failure to rebut the presumption that Defendant's decision was

in the furtherance of quality health care, the Court discusses proceedings and decisions that took

place in 2006.  (See id. at 38 (discussing Plaintiff's contention with Defendants' failure to

interview him in 2006, citing the August 28, 2006 denial of Plaintiff's privileges, and referencing

the MEC's December 20, 2006 statement regarding its concerns with Plaintiff's competency).)

Likewise, when examining the fairness of review proceedings, Judge Batten specifically noted

the Gosin's 2006 letters, SMC's appeal to the appellate panel in 2006, Dr. Jungblut's statements

to the Board and the court in March 2009 when the 2006 denial was being litigated, and

Plaintiff's Fair Hearing in March 2006.  (Id. at 38–40.)  The Court sees no discussion of

Plaintiff's claims as they relate to the 2009 denial of his privileges or the internal procedures

associated therewith.[7]

      Plaintiff's claims rest on a number of allegations and circumstances not addressed by

Judge Batten and which go beyond the internal procedures he reviewed.  Count I of Plaintiff's

Complaint alleges multiple violations of the Bylaws and Judge Perskie's Order, namely the

application of unapproved criteria to evaluate Plaintiff's 2009 Application, the appointment of a

Hearing Officer rather than a panel to Plaintiff's 2010 Fair Hearing request, the Appellate

Review Panel's adoption of the Hearing Officer's flawed recommendation in 2013, the two-year

delay in the hearing process, SMC's alleged retaliatory publishing of discipline taken against

---

[7] Even if Judge Batten had considered Plaintiff's 2006 Application and 2009 Application as one
transaction, "when significant new facts grow out of a continuing course of conduct the issues in
a successive suit may fail to constitute the same 'issue' so as to merit preclusive effect."
Hawksbill Sea Turtle v. FEMA, 126 F.2d 461, 465 (3d Cir. 1997) (finding the district court erred
in giving preclusive effect to factual findings in a previous proceeding in light of substantially
new and different evidence); see also Anspach ex rel. Anspach v. City of Philadelphia, 380 Fed.
App'x 180, at *3 (3d Cir. 2010) (finding claims were not barred by collateral estoppel where new
evidence was not "qualitatively different" to the evidence considered in the prior proceeding).

Plaintiff, and SMC's reprimands of Plaintiff for reporting information adverse to SMC,[8] among

other things.  (See FAC ¶ 181.)  Judge Batten did not review these internal procedures in his

HCQIA immunity determination.  Count II alleges that Defendants' use of the substitute criteria

was motivated by racial discrimination and that his vascular privileges were reduced without

basis.  The Court likewise sees no discussion of these allegations.  Count III can be construed to

apply only to the denial of Plaintiff's 2009 Application and the internal proceedings that

followed, as can Counts IV, V, and VI.  Judge Batten did not immunize SMC for the review

procedures associated with Plaintiff's 2009 application, and he did not discuss the retaliatory

reprimands Plaintiff alleges occurred in 2012 and 2013.  Plaintiff's claims are therefore not

summarily precluded from litigation.  However, to the extent Plaintiff seeks to re-litigate the

denial of his 2006 Application and the professional review activities considered by Judge Batten,

his claims are precluded.

　　　　Defendants argue that collateral estoppel bars Plaintiffs' allegations that SMC applied

substitute criteria.  (Def.'s Reply Br. 12–13.)  However, Defendants do not contend that this

issue was resolved by Judge Batten.  Rather, Defendants argument goes to the merits:  that the

substitute criteria were not actually applied in Plaintiff's review hearings.  (Id. at 13.)

Defendants assert that the Court is permitted to "consider documents that form the basis of a

claim" when resolving motions to dismiss.  (Id. (citing Lum v. Bank of Am., 361 F.3d 217, 221

(3d Cir. 2004), abrogated in part on other grounds by Twombly, 550 U.S. 544 (2007)).)  It

appears to the Court that the Hearing Officer did indeed apply the original Criteria ordered to be

---

[8] Plaintiff alleges that Defendants reprimanded Dr. Nahas for reporting a 2014 incident where
Dr. Tsyganov punched Plaintiff mid-surgery and breaching the sterile surgical area when doing
so.  (FAC ¶ 169.)  The Court sees no record of this allegation in Judge Batten's decision.

applied by the state court.[9]  However, Plaintiff's Complaint contains allegations that the MEC applied the wrong criteria, which would have warranted reversal by the Hearing Officer.  (FAC ¶¶ 114–115.)  Despite Defendant's contentions, that the Hearing Officer applied the correct criteria does not refute Plaintiff's allegations.  Therefore, the Court finds it inappropriate to resolve this dispute at the motion to dismiss stage.[10]

The Court does find, however, that Plaintiff's Complaint brings claims related to two issues that have already been resolved in state court.  First, Plaintiff's claims are based in part on Defendant's policy regarding "proctoring."  (See, e.g., FAC ¶ 48, 88, 104, 122, 180, 215, 229.) For example, in Count I, Plaintiff alleges that Defendants Jungblut and Gosin were acting "only for anticompetitive purposes" when they falsely represented that proctoring was not available. (FAC ¶ 180.)  As noted supra, one of the four internal review procedures Judge Batten analyzed under the HCQIA was SMC's denial of proctoring.  (See Fanning I, Exh. A at 37.)  He explicitly rejected the notion that proctoring was available but not provided to Plaintiff:  "the Bylaws make

---

[9] The Hearing Officer noted that the MEC appears to have notified Plaintiff that it denied his Application because he failed to satisfy the Substitute Criteria, which contained an additional requirement that Plaintiff be the "primary operator" in a set number of cases as opposed to the original Criteria's requirement that he be a "senior level participant." (Fanning II, Exh. 6 at 10 n.7.)  The Hearing Officer indicated that the MEC's reference to this Substitute Criteria "appears to be erroneous," and he declined to apply the Substitute Criteria in his review.  (Id.)

[10] Moreover, although the Third Circuit in Lum stated that courts may indeed consider documents forming the basis of Plaintiff's claims at the motion to dismiss stage, it also noted that a document only forms the basis of Plaintiff's claims if it is "integral to or explicitly relied upon in the complaint."  361 F.3d at 221 n.3.  In Lum, the extraneous document was a credit agreement on which the Plaintiff had brought suit.  (Id.)  In Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, (3d Cir. 1994), where the Third Circuit first held that district courts may consider documents outside the complaint, the court considered a purchase and sale agreement underlying Plaintiffs' claims.  Here, Plaintiff's claims are based on multiple layers of administrative review, and examining that record to determine the plausibility of Plaintiff's claims is an endeavor best left for a motion for summary judgment.

clear that proctoring is neither required nor available to any applicant other than, per Part II, § 9

at 39, an applicant who has taken leave from practice for more than five (5) years for entirely

different reasons." (Id. at 40.)  Moreover, Plaintiff has already argued in the state court litigation

that Dr. Jungblut and Dr. Gosin falsely represented that proctoring was not available.  (See id. at

13 n.25, 23, 24.)  Therefore, the Court finds that Plaintiff is precluded from proceeding on claims

to the extent they allege that proctoring was available but not offered to Plaintiff for

anticompetitive or discriminatory reasons.

Second, the Court finds that the May 2015 also precludes Plaintiff from re-litigating the

propriety of SMC's "no litigation" policy.  Plaintiff's Complaint alleges that SMC requires

applicants to consent to SMC's no litigation policy in order to apply for clinical privileges.

(FAC ¶ 52.)  Plaintiff also alleges that this policy is unenforceable and against public policy.  (Id.

¶¶ 84–85.)  However, Plaintiff argued before the state court that the policy was contrary to

fundamental fairness and due process, and Judge Batten found Plaintiff had provided insufficient

evidence to support that claim.  (See id. at 40.)  As such, the Court finds Defendants have met

their burden on this issue:  the issue of Defendant's "no litigation" policy is identical to that

previously litigated in state court, and Judge Batten's decision was final.  This Court will not

afford Plaintiff another opportunity to re-litigate SMC's no litigation policy.

Finally, Defendants contend that the November 2011 decision collaterally estops Plaintiff

from challenging SMC's suspension of his privileges in 2011.  (See Defs.' Reply Br. 8.)

Defendants emphasize that Plaintiff's lack of defense is "telling."  (Id.)  However, Defendant's

initial brief makes no mention of collateral estoppel barring Plaintiff's claims on account of

Judge Johnson's 2011 decision.  Indeed, Defendants' original brief dedicates only one paragraph

to the application of collateral estoppel, (see Defs.' Br. 22), wherein they identify the issue as

whether preclusion principles apply in light of the HCQIA Immunity decision—not Judge Johnson's denial of temporary restraints. (Id. ("There cannot be any dispute that Plaintiff was provided every opportunity to address the applicability of the HCQIA immunity provisions in the state-court action. As noted both parties submitted extensive briefing, lengthy and voluminous exhibits, and argued the issue before Judge Batten for several hours. *The issue—namely, the applicability of the HCQIA immunity provision to bar Plaintiff's claims that stem from the denial of his medical staff privileges—is indisputably identical*.") (emphasis added).)

Even if the Court did permit Defendants to raise this argument for the first time in their Reply Brief, see Millner v. Bayada Nurses, Inc., No. 05-3164, 2006 WL 231993, at *4 (D.N.J. Jan. 30, 2006) (citing multiple cases in which courts have declined to consider new arguments in a reply brief), the Court cannot, on the factual record before it, determine whether Judge Johnson's denial of temporary restraints collaterally estops Plaintiff's related claims. Here, the Court has only Judge Johnson's Order, which does not, on its own, demonstrate that the issues here are identical to those litigated in state court. It also does not satisfy the Court on the issue of finality, an element of collateral estoppel that Defendants have not addressed. To be a final decision for purposes of collateral estoppel, the prior decision need not be final in the sense of being appealable. The Supreme Court of New Jersey, citing the Restatement (Second) of Judgments, has clarified that "the doctrine of collateral estoppel applies whenever an action is 'sufficiently firm to be accorded conclusive effect.'" Hills Dev. Co. v. Twp of Bernards, 510 A.2d 621, 652 (N.J. 1986) (quoting Restatement (Second) of Judgments § 13). Hills Development signals that the Supreme Court of New Jersey approves of the Restatement (Second) of Judgments. Comment g to the Restatement identifies relevant considerations in determining whether a decision is to be given conclusive effect: "that the parties were fully

heard, that the court supported its decision with a reasoned opinion, that the decision was subject

to appear or was in fact reviewed on appeal, are factors supporting the conclusion that the

decision is final for the purpose of preclusion."  Restatement (Second) of Judgments § 13 cmt. g.

The Court cannot evaluate these considerations on only Judge Johnson's November 2011 Order.

However, because reaching the merits of this issue will further "the just, speedy, and inexpensive

determination" of this suit, Defendants may raise the defense again in any future motion for

summary judgment.

### C.  IMMUNITY UNDER THE HCQIA

Congress enacted the Health Care Quality Improvement Act in 1986 to, as the name

suggests, "improve the quality of medical care by restricting the ability of physicians who have

been found to be incompetent from repeating malpractice by moving from state to state without

discovery of such finding."  Gordon v. Lewistown Hosp., 423 F.3d 184, 201 (3d Cir. 2005).  To

enable to hospitals and doctors to engage in professional review absent fear of liability for

actions taken, the Act immunizes from money damages persons participating in professional

review activities or providing information to professional review bodies.  Id. (citing 42 U.S.C. §

11111(a)(1)–(2)).  "At its heart, the HCQIA was intended to deter antitrust suits by disciplined

physicians."  Id. (citation omitted).

In order to qualify for immunity under the HCQIA, a professional review action[11] must

be taken:

---

[11] Under the HCQIA, a "professional review action" is,

> an action or recommendation of a professional review body which is taken or
> made in the conduct of a professional review activity, which is based on the
> competence or professional conduct of an individual physician (which conduct
> affects or could affect adversely the health or welfare of a patient or patients), and
> which affects (or may affect) adversely the clinical privileges, or membership in a
> professional society, of the physician.  Such term includes a formal decision of a

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action as warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. §11112(a). Courts presume that professional review actions satisfy these requirements unless Plaintiff successfully rebuts the presumption by a preponderance of the evidence. 42 U.S.C. § 11112(a). As the Third Circuit has noted, this provision implies both "that plaintiffs bear the burden of proving noncompliance with these standards" and "some opportunity to discover relevant evidence." Brader v. Allegheny General Hosp., 64 F.3d 869, 879 (3d Cir. 1995).

Defendants move to dismiss Plaintiff's Complaint under Rule 12(b)(6) on grounds that "Plaintiff has not alleged any facts in his First Amended Complaint that could rebut the finding of immunity" under the HCQIA. (Defs.' Br. 28.) As an initial matter, the Court notes that the HCQIA expressly exempts civil rights violations from the statute's immunity provision, 42 U.S.C. § 11111(a)(1)(D), and applies only to immunity from monetary damages. Therefore, Defendant's motion under Rule 12(b)(6) does not apply to Plaintiff's claim under 28 U.S.C. § 1981 or to Plaintiff's Amended Complaint to the extent it seeks injunctive relief.

When limiting Plaintiff's Complaint to those review procedures that Plaintiff is not precluded from relitigating, the Court finds that Plaintiff's allegations, if true, are sufficient to

---

professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action.

42 U.S.C. § 11151(9).

overcome HCQIA immunity.  Plaintiff provides multiple instances where he was subjected to

unfair internal review procedures, including being evaluated in accordance with heightened

criteria, being evaluated by reviewers not approved by the Bylaws, and by encountering

significant delay in his review proceedings.  (See, e.g., FAC at 79–80.)  The Court finds that if

these allegations were true—which it is obligated to do at the motion to dismiss stage—

Defendants' would not be entitled to immunity under the HCQIA.  See Brader, 64 F.3d at 879

(declining to affirm the district court's dismissal of plaintiff's claims on alternative grounds of

HCQIA immunity because if plaintiff's allegations regarding the alleged failure to provide him

with fair procedures are true, then defendants could not be entitled to HCQIA immunity).

Likewise, Plaintiff's allegations are sufficient to overcome Defendants' presumptive immunity

under New Jersey's analog to the HCQIA, N.J.S.A. 2A:84A-22.10, which "extends a similar

form of immunity protection for hospitals, peer reviewers, and decision-makers," because

Plaintiff has sufficiently pleaded that Defendants acted out of malice rather than in the

furtherance of health care.  See Hurwitz v. AHS Hosp. Corp., 103 A.3d 285, 303 (N.J. Super. Ct.

2014) (providing that state law immunity applies "so long as such action or recommendation was

taken or made without malice in the reasonable belief after reasonable investigation that such

action or recommendation was warranted upon the basis of facts disclosed" (quoting N.J.S.A.

2A:84A-22.1(e)).

　　　　Defendants also argue the HCQIA immunity issue on the merits, urging the Court to take

notice of the state record before it.  (See Def.'s Br. 22–27.)  However, considering the record for

immunity purposes on a Rule 12(b)(6) motion would convert the motion to one for summary

judgment, requiring that Plaintiff be permitted to submit evidence in response.  See, e.g., Rose v.

Bartle, 871 F.2d 331, 340 (3d Cir 1999) (explaining Rule 12(b) and 12(c)'s shared requirement

that a court convert a motion to dismiss to one for summary judgment if "matters outside the pleading are presented to and not excluded by the court").  Moreover, the question of whether Defendants are entitled to immunity from damages is an issue more appropriately determined at the summary judgment stage.  Brader, 64 F.3d at 879; Bryan v. James E. Holmes Reg'l Med. Ctr, 33 F.3d 1318, 1332–33 (11th Cir. 1994) ("A district court should consider the issue of HCQIA immunity from damages at the summary judgment stage"); Smith v. Ricks, 31 F.3d 1478, 1485–86 (9th Cir. 1994), cert denied, 514 U.S. 1035 (1995) ("Because the 'reasonableness' requirements of § 11112(a) were intended to create an objective standard, rather than a subjective standard, this inquiry may be resolved on summary judgment."); Chudacoff v. Univ. Med. Ctr., 609 F. Supp. 2d 1163, 1168, 1171 (D. Nev. 2009) (resolving the HCQIA immunity issue on a motion for partial summary judgment after previously denying defendants' motion to dismiss because "it was inappropriate to resolve the HCQIA matter at the motion to dismiss stage, as the issue turned on questions of fact").

The parties have been involved in some form of litigation for nearly ten years, and the Court recognizes the perverse incentive that time-consuming, expensive discovery can have on the decision to award or withhold clinical privileges.  (See Defs.' Reply Br. 19.)  The Third Circuit in Brader recognized a similar concern but ultimately concluded that "[o]nce the plaintiff has alleged that the defendants have failed to satisfy the requirements of HCQIA immunity, we can only rely on the Feral Rules of Civil Procedure, particularly the obligations of parties and attorneys under Rule 11, to stem the tide of lawsuits subsequently held to be without factual or legal foundation."  64 F.3d at 880.  And so the Court must hold here.  The Court will therefore deny Defendant's motion to dismiss as it relates to their immunity under HCQIA.  However,

Defendants may file a motion for summary judgment on immunity grounds at any point they feel the record is sufficiently developed.

### IV.     PLAINTIFF'S MOTION FOR RECONSIDERATION

"The purpose of a motion for reconsideration . . . is to correct manifest errors of law or fact to present newly discovered evidence." Max's Seafood Café ex rel Lou-Ann Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999).  Plaintiff seeks reconsideration of this Court's May 29, 2015 Opinion and Order denying him leave to amend his Complaint to include a claim under the New Jersey Law against Discrimination (NJLAD).  (Pl.'s Br. 16.)  The Court reasoned that because Plaintiff had not pleaded anywhere in his Complaint that he was an independent contractor, he could not proceed with a claim under NJLAD § 10:5-12(1), which specifically does not apply to employer-employee relationships.  Plaintiff argues that his status as an independent contractor is a natural inference from the face of his complaint, which describes his business relationship with the hospital, and, that this inference is in line with the court's decision allowing him leave to amend his claims for anti-trust, restraint of trade, and tortious interference, each of which is consistent with Plaintiff's status as an independent contractor.  (Id.)

The Court agrees that Plaintiff should be allowed to amend his Complaint to include a claim under § 10:5-12(1) of the NJLAD.  Plaintiff's Complaint includes multiple descriptions of his relationship with SMC, from which the Court can reasonably infer his status as an independent contractor.  He alleges that he has his own medical practice in southern New Jersey specializing in vascular and general surgery.  (FAC ¶ 10).  He also alleges, in multiple places, that his relationship between Dr. Nahas and SMC is "contractual."  (See, e.g., ¶ 207, 261.)  The inference of his independent contractor status is reasonable from these allegations.  Moreover, the Court granted leave to amend multiple claims that are inconsistent with a finding that

26

Plaintiff was an SMC employee.[12]  Lastly, allowing Plaintiff's claim under the NJLAD will not cause undue delay or unduly prejudice the defendant.  Finding no "undue delay, bad faith or dilatory motive" on Plaintiff's part, Great W. Min. & Mineral Co., 882 F. Supp.2d at 764, the Court will grant Plaintiff's motion for reconsideration and permit him to file an amended complaint that includes a discrimination claim under the NJLAD.

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted-in-part and denied-in-part, and Plaintiff's Motion for Reconsideration is granted.


Dated: 3/14/2016                                    s/Robert B. Kugler
                                                    ROBERT B. KUGLER
                                                    United States District Judge

---

[12] Defendant suggests that instead of granting Plaintiff leave to amend his NJLAD allegation, we should revisit our decision instead to dismiss all claims that would be inconsistent with Plaintiff's position as an employee.  Given that Plaintiff's failure to explicitly plead his status does not appear to be gamesmanship, and that Rule 15 provides that leave to amend shall be "freely given," the Court declines to revisit its opinion and strike those claims that also depend on Plaintiff's status as an independent contractor.