IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| Frederick NAHAS, M.D., | : |
| Plaintiff, | : Civil No. 13-6537 (RBK/AMD) |
| v. | : **OPINION** |
| SHORE MEDICAL CENTER, *et al.*, | : |
| Defendants. | : |

**KUGLER**, United States District Judge:

This matter comes before the Court today on Defendants' Motion for Summary Judgment. (ECF No. 107.) Plaintiff Frederick Nahas, M.D., has sued the Medical Executive Committee ("MEC") of Shore Medical Center ("Shore Medical"). Defendants argue that the MEC simply does not exist as a legal entity with the capacity to sue or be sued, while Plaintiff maintains that it is. As we explain below, the Court finds that the MEC is capable of being sued. Defendants' motion is accordingly **DENIED**.

I. **THE FACTS**

This controversy, as set forth in the voluminous Second Amended Complaint (ECF No. 45), is a "malicious peer review" action premised on certain actions that adversely affected Plaintiff Dr. Nahas's privileges to perform endovascular surgery at Shore Medical. The Court has already visited the facts of his previous complaints (*see* Ops., ECF Nos. 14, 31, and 43), and need not do so again today because the only issue actually before the Court is narrow. Plaintiff has sued Shore Medical Center's Medical Executive Committee under the Sherman Act, 15 U.S.C. § 1; 42 U.S.C. § 1981; and state-law supplementary claims. After the parties were unable to resolve their differences over whether the MEC is capable of producing documents in discovery, Shore Medical

1

has moved for summary judgment on whether the MEC is an entity that has the capacity to sue or be sued.

## A. The Medical Staff

Although Defendants maintain that the Medical Staff of Shore Medical is irrelevant to this motion, the Court disagrees, as the nature of the Medical Executive Committee can only be understood in context.

The State of New Jersey requires hospitals, as is the case in many other states, to establish both Medical Staffs and Medical Executive Committees:

> (a) There shall be an organized medical staff that is responsible to the governing body of the hospital. Bylaws governing all medical staff members shall be implemented.
>
> \*   \*   \*
>
> (g) There shall be an executive committee for the medical staff which performs supervisory functions.

N.J. Admin. Code § 8:43G-16.1.

Shore Medical is registered as a non-profit corporation in New Jersey, with more than 1500 employees, including more than 370 physicians. (Def. SUMF at ¶¶ 1-3.) Pursuant to New Jersey law, and as with many hospitals around the country, Shore Medical is divided into a Board of Trustees, the administrative staff, and the medical staff, consisting of medical professionals such as physicians. *Cf. Gordon v. Lewistown Hosp.*, 272 F. Supp. 2d 393, 398-99 (M.D. Pa. 2003), *aff'd* 423 F.3d 184 (3d Cir. 2005).

The Medical Staff works together with Shore Medical and its Board of Trustees to provide medical services. (*See* Shore Medical Center Medical Staff Bylaws, July 15, 2014 ("2014 Bylaws"), Def. Ex. D); Shore Medical Center Medical Staff Bylaws, Sept. 14, 2010 ("2010

Bylaws"), Pl. Ex. C.)[1] The Medical Staff's Bylaws provide that the purpose of the Medical Staff is as follows:

> The Medical Staff of Shore Memorial Hospital [the previous name of Shore Medical Center] is established by the Board of Trustees to assist the Hospital in meeting its mission and to carry out duties assigned to it by the Board in order to enhance the quality and safety of care, treatment, and services provided to patients.

(2010 Bylaws, art. I.)

Membership on Shore Medical's Medical Staff is a privilege granted only to professionally competent physicians who continuously meet the qualifications, standards, and requirements of the Bylaws. (2010 Bylaws, § 2.1.) All members of the Medical Staff are required to pay both an initial and reappointment fee to be part of the Medical Staff. (2014 Bylaws, § 12.3.) All members of the Medical Staff must also pay dues in an amount determined by the elected MEC. (*Id.*) Some members of the Medical Staff are employed by Shore Medical itself, while others are employed by Penn Medicine, an affiliate of the University of Pennsylvania Health System. (Pl. SUMF at ¶ 2.) Dr. Nahas has been a member of the Medical Staff of Shore Medical since 1978, with some interruptions because of his guilty plea to obstructing a Medicare fraud investigation. (Reply SUMF at ¶ 1.)

There are four categories of individuals who are on the Medical Staff: active, affiliate, referral, and honorary. (2010 Bylaws, art. III.) Active staff members are granted clinical privileges by the Board and have the ability to vote on all matters presented at meetings of the Medical Staff, and at meetings of the Department to which they have been appointed. (*Id.*) Medical Staff members who are eligible may also vote for officers of the Medical Staff, including the President, Vice-President, and Immediate Past President. (*Id.* at art VI.)

---

[1] Because the complete 2014 Bylaws have not been provided to the Court, we rely in part on Plaintiff's uncontested portions of the 2010 Bylaws.

3

Physicians of the Medical Staff must, among other things, be licensed to practice medicine in New Jersey, have liability insurance, and be eligible to participate in Medicare, Medicaid, or other federal state payer programs. (*Id.*) Members of the Medical Staff are also obliged, among other things, to provide continuous and timely care to all of their patients; they must update the Hospital of new and pertinent information; they must refrain from fee-splitting or other illegal inducement relating to patient referrals; and they must satisfy continuing medical education requirements for licensure. (*Id.* at § 2.3.) Members of the Medical Staff also agree to abide by the Bylaws and to participate in peer review activities of the Medical Staff. (*Id.*)

The Bylaws grant rights to all Medical Staff members. Among these rights are a right to an audience with the MEC on matters within the purview of the MEC's responsibilities, a right to initiate a recall vote, and a right to challenge any rule, regulation, or policy established by the MEC. (2014 Bylaws, art. IV.) Perhaps most significantly, the Bylaws also provide for indemnification of members of the Medical Staff "for all legal costs, settlements, and judgments or other monetary penalties resulting from a Medical Staff member's good faith participation in medical staff affairs." (*Id.*) Shore Medical's indemnification of Medical Staff members extends to "peer review activities" and "carrying out responsibilities as a Medical Staff officer, Department, Division, section or committee Chair, or committee member." (*Id.*) We note that this indemnification extends solely to the individuals on these committees, not to the committees themselves.

### B. The Medical Executive Committee

Turning to the MEC, the Bylaws expressly provide for "Medical Staff Committees and Liaisons," stating that "[t]here shall be an Executive Committee of the Medical Staff." (2014 Bylaws, § 8.) The Bylaws define the MEC as "[t]he executive committee of the Medical Staff that

4

has oversight over all Medical Staff Activities and is accountable to the Board of Trustees." (*See* 2014 Bylaws, Definitions.) All active Medical Staff members are eligible for MEC membership. (*Id.* at § 8.4.1.) The MEC consists of officers of the Medical Staff, along with Department Chairs, at-large members of the Medical Staff, and Chairs of other committees. (*Id.* at § 8.4.2.) "The membership of the Medical Staff exercises its authority over the MEC through the election of its members or the appointment of members by its elected officers." (*Id.* at § 8.4.3.) Approximately 24 individuals sit on the MEC. (Def. SUMF at ¶ 8.)

The MEC "shall represent the Medical Staff" and at all times acts "as the authorized delegate of the Medical Staff in regard to general and specific functions of the Medical Staff." (2014 Bylaws, § 8.4.6.) It "receives and acts on reports," can adopt policies "on behalf of the Medical Staff which it deems prudent," and "carries out Investigations." (2010 Bylaws, at § 8.4.) A significant responsibility of the MEC is to make Medical Staff recommendations directly to the governing body of Shore Medical for approval, including with respect to clinical privileges. (*Id.*) Rules or regulations adopted by the MEC are subject to approval by the Board of Trustees. (*Id.* at § 12.1.) Determinations about Medical Staff privileges are likewise recommendations to the Board—the MEC receives a privilege request from a credentials committee and then recommends specific actions to the Board, which has the discretion to reject, modify, or grant the privileges sought. (*Id.* at § 5.2.) A physician facing an adverse recommendation from the MEC has the right to appeal the matter. (*Id.*)

The MEC takes minutes, keeps records, and makes writings. As with all committees of the hospital, the MEC takes minutes, which "shall be signed by the chair or presiding designee" and must be made available to the MEC. (*Id.* at § 10.6.) The MEC "shall maintain a permanent file of its meeting minutes with Hospital Medical Staff Services." (*Id.*) When calling a special meeting,

the MEC must provide notice "by means of letter, facsimile, telephone, posting of notice or email." (*Id.*) It also sends out letters "to keep the medical staff informed of important issues." (*See* Letter from Raymond Schreyer, M.D., ECF No. 118-8.)

The MEC is not registered with any state or governmental agency as a separate or distinct legal entity. (Def. SUMF at ¶ 6.) It is not registered as a non-profit and it has no bank account of its own. (*Id.*) The MEC does not maintain its own insurance, and the members of the medical staff who serve on the MEC have insurance coverage under Shore Medical's Hospital Professional Liability Policy and D&O Coverage policy. (*Id.* at ¶ 7.) The Bylaws explicitly state, however, that the MEC is a "Peer Review Body" under New Jersey law. (2010 Bylaws, § 12.2.)

## II. JURISDICTION

This case comes before the Court within its federal-question jurisdiction, *see* 28 U.S.C. § 1331, as Plaintiff has brought claims under the Sherman Act and 42 U.S.C. § 1981. The parties are not diverse—they all have New Jersey domiciles—and so the state-law claims in this action come within the Court's discretionary jurisdiction under 18 U.S.C. § 1367.

## III. THE SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A genuine dispute of material fact exists only if the evidence is such that a reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When a court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

If the party seeking summary judgment makes this showing, it is left to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner*, 247 F. App'x 353, 354 (3d Cir. Sept. 17, 2007) (quoting *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## IV. DISCUSSION

### A. Compliance with Rule 56.1

Plaintiff argues that dismissal of Defendant's Motion for Summary Judgment is proper because of a failure to comply with Local Civil Rule 56.1—Defendant filed the motion without

attaching the required Statement of Undisputed Material Facts. The Court declines to dismiss on this basis, however. It is within this Court's discretion to excuse the formal requirements of the motion where, as here, there is an absence of bad faith and where the facts are well-organized. *See, e.g.*, *Gabriel v. Safeway*, 2011 U.S. Dist. Lexis 133832 (D.N.J. Nov. 21, 2011). As a certification to the original motion set forth the exact same uncontested facts as the amended statement, the Court finds that the failure to submit the 56.1 statement is harmless and, whatever the case, has since been cured. We proceed to the merits.

### B. The MEC's Capacity to Sue or Be Sued

Under Federal Rule of Civil Procedure 9(a), the onus is on an opposing party to challenge a party's capacity to sue or be sued. As relevant, "a pleading need not allege . . . the legal existence of an organized association of persons that is made a party," and "[t]o raise any of those issues, a party must do so by a specific denial." Fed. R. Civ. P. 9(a).

Defendants entered an appearance for the MEC (ECF No. 53), stating (perhaps quixotically) that they represent an entity whose existence they also deny. However, their earlier answer to the Second Amended Complaint denied, in a footnote, the separate and distinct existence of the MEC. (ECF No. 47.) Although the Court notes this potential deficiency, as "arguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived," *Lunn v. Prudential Ins. Co. of Am.*, 283 F. App'x 940, 943 (3d Cir. 2008), the parties have not directly argued that Defendants have waived this defense and the instant motion makes clear beyond doubt their positions on the matter. Accordingly, we proceed to the question of whether the MEC can be sued.

Federal Rule of Civil Procedure 17(b) provides that the "[c]apacity to sue or be sued is determined as follows":

(1) for an individual who is not acting in a representative capacity, by the law of the individual's domicile;

(2) for a corporation, by the law under which it was organized; and

(3) for all other parties, by the law of the state where the court is located, except that:

    (A) a partnership or other unincorporated association with no such capacity under that state's law may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws . . .

Fed. R. Civ. P. 17(b).

Some clarity is necessary here because the parties have conflated capacity under state law and capacity under federal law. As the 1937 Advisory Committee Notes to the Rule explain, the drafters expressly relied on a series of cases and articles that dealt with the applicable law for determining questions of capacity. *See, e.g.*, *People of Puerto Rico v. Russell & Co., Sucesores Sociedad En Comandita*, 288 U.S. 476, 478 (1933) (finding, in a diversity action, that a "sociedad" is not a legal person under the common law but is one under Puerto Rican civil law and can, accordingly, be sued by application of the forum law of Puerto Rico); *United Mine Workers of Am. v. Coronado Coal Co.*, 259 U.S. 344, 389, 392 (1922) (excepting United Mine Workers' Union from common-law nonsuable capacity of unincorporated associations because of enormous financial power of union and because of Congress' purpose in passing antitrust laws; "[t]o remand persons injured to a suit against each of the 400,000 members, to recover damages and to levy on his share of the strike fund, would be to leave them remediless").[2] As the Supreme Court has since

---

[2] *See also* Charles E. Clark & James Wm. Moore, *A New Federal Civil Procedure II. Pleadings and Parties*, 44 Yale L.J. 1291, 1315-17 (1935) ("With regard to suits by and against partnerships

held, "Rule 17(b) was intended to work an accommodation of interests within our federal system." *Van Dusen v. Barrack*, 376 U.S. 612, 642 (1964).

Rule 17(b)(3) thus instructs the Court to first apply the forum's law to determine whether an entity is an unincorporated association. However, if state law finds that an entity lacks capacity, then the Court must evaluate under Rule 17(b)(3)(A) whether federal law nonetheless treats an entity as capable of being sued. As the MEC is plainly neither an individual nor a corporation, the Court must determine whether it is an unincorporated association. We begin, then, with the law of New Jersey.

### C. Capacity under New Jersey Law

There appears to be no New Jersey case law addressing whether an MEC has the capacity to sue or be sued. There are, however, a few cases in which an MEC has been sued and its capacity to be sued has not been challenged. In *Nanavati v. Burdette Tomlin Mem'l Hosp.*, 645 F. Supp. 1217 (D.N.J. 1986), *aff'd Nanavati v. Burdette Tomlin Mem'l Hosp.*, 857 F.2d 96 (3d Cir. 1988), a plaintiff had amended his antitrust complaint, at trial, to name both the hospital itself and the executive committee of the medical staff as defendants. But the issue of that committee's capacity, essentially identical to the MEC here, was apparently never raised, and neither the district court nor the Third Circuit addressed the issue. Although the Third Circuit in *Nanavati* ultimately upheld judgment against the executive committee, it also did so *against the hospital*, muddying the waters on whether the MEC could be sued in an action without the hospital. In state court proceedings concerning similar facts and with the MEC again named as a defendant, the Supreme Court of

---

and unincorporated associations, the federal courts at law have in general followed the state practice. But in [] *Coronado* when it appeared to the Supreme Court that a federal substantive right would otherwise be impaired, it treated a defendant unincorporated association as an entity, though the state court of the forum had earlier refused to recognize the association as such.").

10

New Jersey similarly passed over, without comment, the MEC's capacity to be sued. *See Nanavati v. Burdette Tomlin Mem'l Hosp.*, 107 N.J. 240, 244 (1987). Other cases that have named an MEC as a defendant follow the same pattern. *See, e.g.*, *Talwar v. Catholic Healthcare Partners*, 2006 WL 3526792, at *5 (N.D. Ohio Dec. 6, 2006), *aff'd*, 258 F. App'x 800 (6th Cir. 2007) *aff'd Talwar v. Catholic Healthcare Partners*, 258 F. App'x 800, 804 (6th Cir. 2007) (MEC named as defendant but capacity not addressed); *Boyer v. LeHigh Valley Hosp. Ctr., Inc.*, 1990 WL 94038, at *5 (E.D. Pa. July 2, 1990) (same). These cases, though, are firmly in the minority—of the hundreds of "malicious peer review" cases brought across the country on similar sets of facts, the overwhelming majority name the individual members of an MEC or the hospital as defendants, not the MEC. *See, e.g.*, *Pal v. Jersey City Med. Ctr.*, 658 F. App'x 68, 71 (3d Cir. 2016) (suit brought against hospital and MEC members, not MEC); *Novak v. Somerset Hosp.*, 2014 WL 4925200 (W.D. Pa. Sept. 30, 2014), *aff'd*, 625 F. App'x 65 (3d Cir. 2015) (same).

The guidance provided by these cases is limited because, with the exception of subject-matter jurisdiction, issues not raised are not adjudicated. Thus, "[t]he lack of capacity to sue or be sued is a defense that must be pleaded with specificity or it is waived." *Delta Consulting Grp., Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1140 (7th Cir. 2009) (citing Fed. R. Civ. P. 9(a)). There are any number of reasons why a defendant might not raise that defense, and there therefore appears to be no case law on point that concerns the MEC's capacity to be sued. Of course, *even if* there were such a case, the various ways hospitals have structured themselves would still require consideration of the specific facts of the case before us.

We turn to the relevant standard. New Jersey permits for unincorporated organizations or associations to sue or be sued if they consist of more than seven persons:

> Any unincorporated organization or association, consisting of 7 or more persons and having a recognized name, may sue or be sued in any court of this state by such

11

name in any civil action affecting its common property, rights and liabilities, with the same force and effect as regards such common property, rights and liabilities as if the action were prosecuted by or against all the members thereof. Such an action shall not abate by reason of the death, resignation, removal or legal incapacity of any officer of the organization or association or by reason of any change in its membership.

N.J. Stat. Ann. § 2A:64-1. This "shall not apply to a fraternal, charitable or other organization not organized for pecuniary profit." N.J. Stat. Ann. § 2A:64-6. *See Davidson v. Roselle Park Soccer Fed'n*, 700 N.J. A.2d 900, 902 (N.J. Super. Ch. 1996) (finding girls' soccer league not amenable to suit as an unincorporated association because it is not organized for a pecuniary interest).

The courts of New Jersey have found that this statute is "remedial legislation" that "ought to be given as liberal an interpretation as possible consistent with its language." *Donnelly v. United Fruit Co.*, 40 N.J. 61, 72 (1963). The statute's purpose "was not only to authorize suit against the association as an entity in cases where tortious or contractual wrongs were inflicted by its agents upon individual members, but also to make the assets of the entity available for the payment of any judgment resulting from such action." *Id.*[3] As in *Coronado*, 259 U.S. at 389, equitable considerations should be taken into account to ensure that a plaintiff is able to seek recovery against an entity when she is otherwise "remediless."

After an extensive review of the case law, this Court observes that the capacity of an entity to be sued as an unincorporated association turns on whether it is (a) voluntarily organized for a common purpose and (b) separate and distinct from another entity or its own members. As to the first quality, "[a] voluntary unincorporated association is an aggregate of persons under a common

---

[3] *But see* Antonin Scalia, *Assorted Canards of Contemporary Legal Analysis*, 40 Case W. Res. L. Rev. 581, 581-82 (1990) (noting that the phrase "remedial statutes are to be liberally construed" "is surely among the prime examples of lego-babble. We lawyers have all heard it and read it since our first year in law school. Yet I am not sure that anybody knows - and, worse yet, that anybody really cares - what in the world it means.").

name for the pursuit of a common enterprise." *Harker v. McKissock*, 12 N.J. 310, 96 A.2d 660, 662 (1953). The parties do not dispute that the MEC is an aggregate of persons organized for a common purposes—it is plain beyond doubt that its committee members work together on wide variety of hospital-related matters. But that is not the end of the inquiry.

New Jersey courts have also evaluated whether an entity is distinguishable from its members or a larger body to which it may belong. In *Bango v. Ward*, the New Jersey Supreme Court reasoned that an unincorporated club engaged in a soap box derby, the "Carteret Lions Club," was "not a legal entity separate and distinct from the persons who comprise its membership. It derive[d] its existence 'from the consensual agreement of the component members, who act not by a distinct entity but by virtue of a mere agency.'" 12 N.J. 415 (1953) (quoting *McKissock*, 96 A.2d at 662). Thus, an action against a "club by name was in reality an action against the collective membership." *Bango*, 97 A.2d at 150.

The New Jersey Supreme Court has also found that when an association is sufficiently distinct and its membership is distinguishable from the entity, it can be found to be an unincorporated association with the capacity to be sued. Thus, the Court, consistent with a nationwide shift away from the old common-law approach, has held that a union could be sued, on the basis that "the individual members of such unions are not in any true sense principals of the officers of the union or of its agents and employees so as to be bound personally by their acts under the strict application of the doctrine of respondeat superior." *Donnelly*, 40 N.J. at 72 (citing *Marshall v. International Longshore. & W.U., Local 6*, 22 Cal. Rptr. 211, 213 (Sup. Ct. 1962)). Indeed, the New Jersey Supreme Court, in holding that a local union could disaffiliate from its national union, has noted that it "is not a realistic conception of the relations between the local

affiliates and their members and the central body" to say that a local union cannot sue because it is "'mere constituent part' of 'a single integrated national structure.'" *McKissock*, 7 N.J. at 327.

The courts of New Jersey have found that the following entities are capable of suing or being sued: business trusts, *Greate Bay Hotel & Casino, Inc. v. City of Atl. City*, 264 N.J. Super. 213, 218, 624 A.2d 102, 105 (Law. Div. 1993); joint stock associations, *Saunders v. Adams Exp. Co.*, 71 N.J.L. 270, 57 A. 899, *aff'd*, 71 N.J.L. 520, 58 A. 1101 (1904); tenants associations, *Crescent Park Tenants Ass'n. v. Realty Equities Corp. of New York*, 58 N.J. 98, 275 A.2d 433 (1971); associations of travel agents, *Travel Agents Malpractice Action Corps. v. Regal Cultural Soc., Inc.*, 118 N.J. Super. 184, 287 A.2d 4 (App. Div. 1972); and masonic lodge associations, *Buteas v. Raritan Lodge No. 61*, 248 N.J. Super. 351, 591 A.2d 623 (App. Div. 1991). Notably, all of these entities were collections of individuals operating *outside* the confines of a larger entity.

Plaintiff and Defendant disagree on whether the Medical Staff is itself an entity with the capacity to sue or be sued. At least one New Jersey case has held that it can be: *Corleto v. Shore Memorial Hospital*, a superior court opinion from 1975 that concerned the predecessor corporation to Shore Medical Center. 350 A.2d 534 (Law. Div. 1975). *Corleto* primarily addresses a hospital's liability under *respondeat superior* for the acts of both the members of its medical staff and the medical staff itself. With respect to the medical staff, the court extended *Donnelly* by finding the medical staff had some similarities to a union, including its due-paying members. The *Corleto* court also reasoned that Plaintiffs "could have named all 141 doctors [of the Medical Staff] individually as defendants, but to do so would serve no useful purpose," and again noted that the "law permitting suits against unincorporated associations is remedial legislation." *Id.* at 539.[4]

---

[4] Contrary to Plaintiff's representations, *Corleto* does not stand for the proposition that the MEC is an entity capable of being sued; it solely addresses the Medical Staff's capacity to be sued.

*Corleto* also relied on precedent treating a hospital's relationship with its medical staff, bound up in bylaws, as one in the nature of a contract. *See Joseph v. Passaic Hosp. Ass'n*, 26 N.J. 557, 569 (1958) ("The Association's Constitution and By-laws are essentially conventional; the compact derives from the common consent of the parties, and is limited accordingly."). *Corleto*'s analysis leaves much to be desired on this point, simply saying that there was "precedent" for designating the medical staff as a party, but *Joseph v. Passaic Hospital* can be read as standing for the proposition that the medical staff are able to enter into an agreement with the hospital itself— suggesting that the medical staff is separate and distinct from the hospital and, as such, suable.

Despite this, the legal status of medical staffs is not entirely settled. *Compare Exeter Hospital Medical Staff v. Board of Trustees of Exeter Health Resources, Inc.*, 810 A.2d 53, 56-58 (N.H. 2002) ("the medical staff lacks independence and autonomy and is ultimately accountable to the hospital board of trustees . . . [it] has no legal life of its own and is merely one component of the hospital corporation"); *Ramey v. Hosp. Auth. of Habersham County*, 218 Ga. App. 618 (1995) ("the medical staff and its chief of staff are not separate, independent entities capable of being sued independently of the hospital authority.") *with St. John's Hosp. Med. Staff v. St. John Reg'l Med. Ctr., Inc.*, 90 S.D. 674, 679, 245 N.W.2d 472, 475 (1976) ("medical staff bylaws do constitute a contract which is, by its express terms, subject to amendment when the amendment is agreed to by both the medical staff and the medical center.") (citing *Joseph v. Passaic Hosp. Ass'n*, 26 N.J. 557.) Much has changed in the legal landscape for hospitals since 1975 and New Jersey law generally places liability on the hospital itself, not its medical staff.[5]

---

[5] *See, e.g.*, N.J. Admin. Code § 8:43G-16.1 ("There shall be an organized medical staff that *is responsible to the governing body of the hospital*."); N.J. Admin. Code § 8:43G-16.1 ("*The hospital shall notify the New Jersey State Board of Medical Examiners . . . if a practitioner . . . has*

Nonetheless, we find it likely that the courts of New Jersey, applying *Donnelly*, 40 N.J. at 72, would still find that Shore Medical's Medical Staff has the capacity to sue or be sued, in large part because the Medical Staff pays dues, which implies an association with defined membership and defined boundaries. The Bylaws also indicate that the Medical Staff is established by the Board of Trustees, that it exists in a contractual relationship with the Board of Trustees, and that Shore Medical indemnifies members of the Medical Staff. Indeed, and despite Plaintiff's contentions, nothing in the Bylaws can be interpreted as stating that Shore Medical indemnifies the MEC itself—the Bylaws specifically refers to the Staff.

If Shore Medical's Medical Staff is an unincorporated association with the capacity to sue or be sued, then it is also true that Plaintiff is asking to sue an unincorporated association (the MEC) within—or at least dependent on—an unincorporated association (the Medical Staff). And there is some authority for this proposition. Since *Corleto*, Congress enacted the Health Care Quality Improvement Act ("HCQIA") of 1986, 42 U.S.C. §§ 11101-11152, which sheds some light on the MEC's legal status. Section 11111 of the Act immunizes "the professional review body" of a hospital and "any person acting as a member or staff to the body" for engaging in protected peer review actions. Under the HCQIA, the term "professional review body" means "a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity." § 11151. The statute does not indicate what entities can or cannot be sued, only that such entities can be entitled to immunity

---

full or partial privileges revoked."); N.J. Admin. Code § 8:43G-16.5 ("*The hospital shall establish* policies and procedures for response times for emergencies.") (emphases added).

16

if they are. But the very fact that Congress decided to immunize professional review bodies—of which the MEC is undoubtedly such an entity—shows it contemplated both their capacity to be sued and their separate and distinct nature from their own committee members. New Jersey has enacted a similar statute providing immunity for committees engaged in peer-review activities. *See* N.J. Stat. Ann. § 2A:84-22.10.

This Court has previously considered whether the nursing staff of a prison's medical staff had the capacity to sue or be sued, finding that the nursing staff did not have such capacity, as it was "a subgroup of the individuals comprising the prison's medical services staff." *Simrin v. Corr. Med. Servs.*, No. CIV. 05-2223 RBK, 2006 WL 469677, at *3-4 (D.N.J. Feb. 24, 2006). The MEC is, under the approach advanced by Plaintiff, a subgroup of the Medical Staff, and subgroups of organizations are typically barred from suit. *See, e.g.*, *Lewis v. American Cyanamid Co.*, 294 N.J. Super. 53 n.1 (App. Div. 1996) (noting that an unincorporated division of a corporation has no separate corporate existence); *E.E.O.C. v. St. Francis Xavier Parochial School*, 77 F. Supp. 2d 71, 77 (D.D.C. 1999) ("an unincorporated association does not encompass an unincorporated division of a corporation" because "an unincorporated division does not possess separate assets; all of its assets are owned by the corporation.").

But as this Court noted in *Simrin*, the Medical Staff in *Corleto* had the capacity to be sued because it was "(1) recognized as a collective entity, (2) governed by a set of formal hospital bylaws, and (3) authorized to make staff privilege recommendations on behalf of the hospital." *Id.* Those qualities describe the MEC as well as the Medical Staff. They suggest a legal capacity to sue or be sued. Bolstering this interpretation is the HCQIA. Congress has decided to immunize MECs, and as such New Jersey courts have found MECs, indeed *this very MEC*, to be immune to suit. *See Nahas v. Shore Mem'l Hosp.*, No. C-92-11 (N.J. Super. May 7, 2015), *aff'd Nahas v.*

*Shore Mem'l Hosp.*, No. A-4638-14T2, 2016 WL 7148526, at *1 (N.J. Super. Ct. App. Div. Dec. 7, 2016). True, the MEC itself was not a defendant in *Nahas*, which instead held that the members of the MEC were immune. But it is clear that both the trial court and Appellate Division regarded the MEC as a decision-making entity and so this Court doubts that New Jersey courts would find suing the MEC to be objectionable. *See, e.g., Nahas*, 2016 WL 7148526, at *1 ("The MEC appealed the [Fair Hearing Panel's] decision to the Appellate Review Panel.") We also note that the MEC takes minutes and appears to present itself as an entity distinct from the Medical Staff, both of which are suggestive of its status as an entity. Although this Court has its misgivings about the analytical rigor of treating a group of people on a committee as a singular committee for purposes of legal capacity, the clear trend under New Jersey law is to regard such groups as unincorporated associations. We find that the MEC has the capacity to sue or be sued, but express no opinion whatsoever on what claims may be brought against it.

V.  **CONCLUSION**

We find that the Medical Executive Committee has the capacity to sue or be sued. Defendant's motion for summary judgment is **DENIED**.


Dated:   April 27, 2018                                                             s/ Robert B. Kugler
                                                                                    ROBERT B. KUGLER
                                                                                    United States District Judge