**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

_____
                                   :

FREDERICK NAHAS, M.D.,          :
                                   :

        Plaintiff,         :      Civil No. 13-06537 (RBK/JS)
                                   :

        v.             :
                                   :      **OPINION**

SHORE MEDICAL CENTER, STEVEN P.  :
NACHTIGALL, JEFFREY GOSIN,    :
PEYTON DEARBORN, LEONARD GALLER, :
PETER JUNGLUT, and the MEDICAL   :
EXECUTIVE COMMITTEE,         :
                                   :

        Defendants.      :
_____:

**KUGLER,** United States District Judge:

Before the Court are the motions of Shore Medical Center ("SMC"), Dr. Steven P. Nachtigall, Dr. Jeffrey Gosin, Dr. Peyton Dearborn, Dr. Peter Jungblut, and the Medical Executive Committee ("MEC") (collectively "Defendants") for summary judgment (Doc. 212) (hereinafter "Def. Mot."), and Plaintiff's motion for partial summary judgment (Doc. 214) (hereinafter "Pl. Mot."). For the reasons set forth in the opinion below, the Court hereby **GRANTS** the Defendants' motion for summary judgment in part, specifically as to Plaintiff's federal antitrust and federal discrimination claims. As those claims are the basis for jurisdiction in this case, Plaintiff's pendent state law claims are dismissed pursuant to 28 U.S.C. § 1367(c) for lack of subject matter jurisdiction. This Court **DENIES** Plaintiff's motion for partial summary judgment.

## I.    BACKGROUND

This case, which has stretched over a decade in multiple courts, arises from Defendant Shore Medical Center's denial of surgical admitting privileges to Dr. Nahas, the Plaintiff. A comprehensive history of Plaintiff's case has been previously laid out in several opinions, and an abbreviated version is set out again here.

### A.    Parties

Plaintiff, a Lebanese-American medical doctor, was first licensed to practice in New Jersey in 1978, and is board-certified by the American Board of Surgery in General Surgery and Vascular Surgery. (Doc. 241-2, Plaintiff's Revised Counterstatement of Facts ("Pl. CSOF") ¶1-2.) He was first granted attending staff privileges in general and vascular surgery at Defendant Shore Medical Center in 1978. (*Id.*)

Defendant Shore Medical Center (hereinafter "SMC") is a hospital located in Somers Point, New Jersey that serves Cape May County and parts of Atlantic County, New Jersey. (Second Amended Complaint ("SAC") ¶10.) The Medical Executive Committee (hereinafter "MEC") of Shore Medical Center, also named as Defendant in this case, is "[t]he executive committee of the Medical Staff that has oversight over all Medical Staff Activities and is accountable to the Board of Trustees." (2014 Bylaws, Definitions.)[1] The MEC is composed of approximately 24 individuals, including officers of the Medical Staff, Department Chairs, at-large members of the Medical Staff, and Chairs of other committees. (*Id.* at § 8.4.1.) Significantly for the purposes of this case, the MEC makes recommendations about Medical Staff and clinical privileges to SMC's governing body. (Pl. CSOF ¶8.)

---

[1] This Court previously held that the MEC is an independent legal entity that may be sued. *See Nahas v. Shore Med. Ctr.*, Civ. No. 13-6537, 2018 WL 1981474 (D.N.J. Apr. 27, 2018)

Defendant Steven P. Nachtigall, M.D., was a member of SMC's medical staff from 1998 until June 2017, was an MEC member from 2007 to 2014, and served as MEC President from 2011 to 2012. (Pl. CSOF, ¶37-38.)

Defendant Peyton Dearborn, M.D., worked on SMC's medical staff as an anesthesiologist from 1994 to 2017, was Anesthesiology Division Director from 2002 to 2017, was a member of the MEC from 1999 to 2017, and was Medical Staff President from 2009-2010. (Pl. CSOF, ¶ 16-17.)

Defendant Leonard Galler, M.D. is a surgeon and member of SMC's medical staff with privileges in general, vascular, and endovascular surgery. He has been Chief of Surgery since 2000, a position in which he oversees the General Surgery and Vascular Division Directors. (Pl. CSOF, ¶21.) Dr. Galler also co-owned the private practice "GFH Surgical Associates." (*Id.* ¶18-20.)

Defendant Jeffrey Gosin, M.D. has been a member of SMC's medical staff since 1997, with privileges in general and vascular surgery. (Pl. CSOF, ¶27.) Dr. Gosin has been SMC's Vascular Division Director and Medical Director of the CardioVascular Institute ("CVI") since 2003. (*Id.* ¶29-30.) He also co-owns a private surgical practice, "Jersey Shore Surgical Group," with his father, Dr. Stephen Gosin. (*Id.* ¶30.)

Defendant Peter Jungblut, M.D., was SMC's Vice-President of Medical Affairs from March 2003 until December 2011, though he remained involved as interim Vice-President afterwards. (Pl. CSOF, ¶31.) Dr. Jungblut oversaw the credentialing and re-credentialing process and served as a non-voting member of the Credentials Committee. (*Id.*)

## B. Factual Background

Plaintiff was granted attending staff privileges at SMC in general and vascular surgery in 1978. (SAC ¶9.) He successfully renewed these privileges every two years until 2003, when he pleaded guilty to criminal charges related to Medicare billing. (SAC ¶37.) Plaintiff's conviction resulted in a six-month suspension of his New Jersey medical license and caused SMC to suspend his medical staff membership and clinical privileges for three years. (*Id.*).

### The 2006 Application

The events at the heart of this litigation began in March 2006, when Plaintiff re-applied to SMC for medical staff privileges and general, vascular, and endovascular surgical privileges. (SAC ¶61.) After several layers of an internal SMC review process, Plaintiff's 2006 application was ultimately denied.[2] In response to this denial, Plaintiff filed a complaint in May 2007 in the Superior Court of New Jersey, Chancery Division, Docket No. Atl-C-69-07, seeking general, vascular, and endovascular privileges. (Pl. SOF ¶10.) The Superior Court appointed an independent special master, Dr. Jerome Vernick, who recommended that Plaintiff receive privileges in general and vascular surgery and added that Plaintiff could receive endovascular privileges after a period of proctoring. In March 2009, the state court accordingly ordered SMC to grant Plaintiff privileges in general and vascular surgery, and instructed SMC to use a set of criteria (the "2005 Criteria") to evaluate Plaintiff's request for endovascular privileges. (SAC ¶87.)

---

[2] In July 2006, both SMC's Credentials Committee and the MEC voted to deny Plaintiff's application for privileges. (Doc. 214-1, Plaintiff's Statement of Undisputed Material Fact ("Pl. SOF") ¶2-3.) Plaintiff appealed to a Fair Hearing Panel ("FHP") composed of three physicians, which in October 2006 found in favor of Plaintiff. The MEC then appealed the FHP's decision to the Appellate Review Panel; in January 2007, the Review Panel reversed the FHP's favorable recommendation, and instead recommended that an independent reviewer make a recommendation. (Pl. SOF ¶7.) SMC's Board of Trustees adopted this recommendation; however, since Plaintiff did not agree to SMC's condition that the outside reviewer's determination would be binding, SMC terminated the 2006 application. (Pl. SOF ¶9.)

### The 2009 Application

In November 2009, believing he met the state court-ordered criteria, Plaintiff filed a renewed application for endovascular privileges. This application similarly went through a series of internal reviews and was ultimately denied by a Fair Hearing Officer in 2012.[3] Plaintiff argues emphatically and repeatedly that Defendants erred by applying "substitute criteria" in evaluating his 2009 application; however, while substitute criteria were considered at different points in this process, it is clear from the record that the ultimate denial of Plaintiff's 2009 endovascular application was based on the state court-ordered 2005 Criteria, and that there is no legitimate dispute of material fact as to this issue.[4] Plaintiff appealed the Fair Hearing Officer's determination to an Appellate Review Panel, which affirmed the Hearing Officer's recommendation. (Pl. SOF ¶131.) In 2013, the Board of Trustees affirmed the Review Panel's recommendation, and Plaintiff's 2009 Application for endovascular privileges was then conclusively denied. (*Id*. ¶133, 141.)

### The 2011 Suspension

While Plaintiff's 2009 application for endovascular privileges was under review, Plaintiff was actively performing general and vascular procedures at SMC, as he had been granted

---

[3] The Credentials Committee met in December 2009 to consider Plaintiff's application, but because it could not determine how many procedures he had completed, it recommended that the MEC or an outside party make a determination. (Pl. SOF ¶64.) In May 2010, the MEC made an adverse recommendation on Plaintiff's 2009 application. Plaintiff requested a fair hearing at which, under the SMC bylaws, a Fair Hearing Officer would determine whether the MEC's adverse recommendation was "arbitrary, capricious, or not supported by credible evidence." (Pl. SOF ¶76.) The August 27, 2012 decision of the Fair Hearing Officer held that Plaintiff did not meet the 2005 Criteria, and accordingly, that the MEC's adverse recommendation was not without merit.

[4] Even in Plaintiff's own Statement of Facts (Doc. 214-1), he admits, "the Hearing Officer unilaterally modified the issue to be whether Dr. Nahas had satisfied the March 31, 2009 court-ordered criteria, notwithstanding that the Medical Executive Committee had used different criteria." (Pl. SOF ¶81.) Thus, regardless of what criteria had been debated before, the *effective* denial of Plaintiff's 2009 application by the Fair Hearing Officer was based on the state court-ordered 2005 Criteria. This court previously made such a finding in *Nahas v. Shore Med. Ctr.*, Civ. No. 13-6537, 2016 WL 1029362, at *9 (D.N.J. Mar. 15, 2016), and it remains consistent here.

privileges to do so based on the state court's 2009 order. In February 2011, Plaintiff received a warning from Defendants for performing four unauthorized endovascular procedures while his application for endovascular privileges was still pending, and for planning to perform a fifth endovascular procedure. (Doc. 212-19, Defendant's Statement of Material Facts ("Def. SOF") ¶4.)[5] The MEC conducted an investigation into the procedures, and in August 2011 determined that it would be appropriate to: (1) refer Plaintiff to the Professional Assistance Program of NJ for a mental and behavioral health examination, and (2) suspend Plaintiff's clinical privileges for 14 days. *Nahas v. Shore Memorial Hospital*, Dkt. No. C-82-11 at 16 (Sup. Ct. N.J. May 7, 2015). The MEC also let Plaintiff know that it would continue monitoring his procedures as a result of his having performed unauthorized surgeries. *Id.*

Plaintiff then brought a separate complaint in NJ state court, seeking injunctive relief to halt SMC from suspending him for 14 days. (Def. SOF ¶33-35.) He was denied relief because the state court found that the hospital's suspension was reasonable and supported by reliable evidence. (*Id.*)[6]

### *The 2011-2013 Investigation*

Plaintiff alleges he was subject to "continuous investigation and heightened scrutiny" by the MEC from 2011-2013. (Pl. CSOF ¶118.) During this time, the MEC decided to formally review all of Plaintiff's lower extremity cases; this was based on its determination that Plaintiff had made an error in medical judgement in two separate procedures that occurred between July 2011 and February 2012. (Pl. CSOF ¶119–127.) Plaintiff requested a meeting with the MEC, but his request

---

[5] Plaintiff argued that his performance of unauthorized procedures was inadvertent, as Defendants had not clearly delineated between procedures considered vascular and those considered endovascular. (Def. SOF ¶7-9.)

[6] The state court case in which Plaintiff brought the complaint about his 2011 suspension was consolidated into his earlier state court action challenging the denial of his 2006 application. (Def. SOF ¶38-39.)

was denied. (*Id.* ¶131.) Plaintiff submitted a report from his expert, Dr. Veith, that defended his medical record and decisions. (*Id.* ¶135.) Because of the investigation, the Credentials Committee recommended that Plaintiff be required to apply for renewal of privileges annually, instead of every two years as was typical for physicians. (*Id.* ¶134.) In August 2013, the MEC placed Plaintiff on a Focused Professional Practice Evaluation; a physician at SMC, Dr. Herrington, was assigned to this review, and ultimately determined that Plaintiff's actions were appropriate. (*Id.* ¶139.)

### *The CVI Suite*

Also in 2013, the heads of Divisions of Cardiology, Diagnostic Radiology, and Vascular Surgery met and determined that access to the Cardiovascular Suite (CVI Suite) should be limited to only physicians with endovascular privileges. (Def. SOF ¶111–116.) Because Plaintiff did not have endovascular privileges, he was prohibited from accessing the CVI facility. Plaintiff argues that this violated the SMC Bylaws because he was not afforded notice before being deprived of access. (Pl. CSOF ¶145.)

### *The Incident with Dr. Tsyganov*

In 2014, Plaintiff was performing a procedure in an operating room that Dr. Igor Tsyganov was assigned to as anesthesiologist. (Pl. CSOF ¶147.) According to Plaintiff, Dr. Tsyganov "suddenly and without warning…breached the sterile surgical area, and punched [Plaintiff] in the arm." (*Id.* ¶148.) When Plaintiff reported the incident to SMC, SMC reprimanded him for "disruptive behavior"; shortly afterward, SMC fired a surgeon that corroborated Plaintiff's account of events. (*Id.* ¶149–153.)

### *Conclusion of the State Court Action; Initiation of the Current Action*

In October 2013, while his state court case was still ongoing, Plaintiff filed this current action, alleging violations of § 1 of the Sherman Act and 42 U.S.C. § 1981, as well as a bevy of

state law claims.[7] In May 2015, the NJ Superior Court dismissed Plaintiff's remaining claims. (Pl. SOF ¶136-138.) Plaintiff appealed to the New Jersey Appellate Division; its December 2016 decision affirmed the Superior Court's dismissal. (*Id.*) The New Jersey Supreme Court denied certification in March 2017. (*Id.* ¶140.)

This present federal court case has endured six years and several motions. Defendants now move for summary judgment on all of Plaintiff's claims; Plaintiff is moving for partial summary judgment. The claims in the operative complaint, all of which Defendant seeks summary judgment on, are as follows: (I) restraint of trade in violation of § 1 of the Sherman Act; (II) disparate treatment, obstruction and interference with contract in violation of 42 U.S.C. § 1981; (III) breach of contract; (IV) judicial review for fundamental fairness; (V) restraint of trade in violation of the NJ Antitrust Act; (VI) intentional interference with prospective business advantage; (VII) discrimination in violation of the NJLAD; and (VIII) retaliation and interference in violation of the NJLAD. (Def. Mot.) Plaintiff moves for summary judgment specifically as to claim III (breach of contract), seeks a finding that the state court's 2009 order has preclusive effect here, and asks this Court to strike Defendant's affirmative defense of immunity under the Health Care Quality Improvement Act (HCQIA). (Pl. Mot.)

## II.    LEGAL STANDARD

The court should grant a motion for summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "material" to the dispute if it could alter the outcome, and a dispute of a material fact is "genuine" if "a reasonable jury could return a verdict

---

[7] Plaintiff's original complaint contained additional claims, but those were dismissed by this court in *Nahas v. Shore Med. Ctr.*, Civ. No. 13-6537, 2016 WL 1029362 (D.N.J. Mar. 15, 2016). The list here contains the claims in the operative complaint, Plaintiff's Second Amended Complaint (Doc. 45, hereinafter "SAC").

for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Matsushida Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)). In deciding whether there is any genuine issue for trial, the court is not to weigh evidence or decide issues of fact. *Anderson*, 477 U.S. at 248. Because fact and credibility determinations are for the jury, the non-moving party's evidence is to be believed and ambiguities construed in his favor. *Id*. at 255; *Matsushida*, 475 U.S. at 587.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment. *Anderson*, 477 U.S. at 256. The nonmoving party must at least present probative evidence from which jury might return a verdict in his favor. *Id.* at 257. The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.    DISCUSSION

Plaintiff's Second Amended Complaint (Doc. 45) alleges only two federal claims and a litany of state claims. As detailed below, this Court finds summary judgment is warranted for Defendants on both federal claims. As jurisdiction in this case is based on those two federal claims, this court declines to exercise supplemental jurisdiction over the state claims. Thus, the parties' summary judgment arguments on Plaintiff's state law claims are not discussed here.

Defendants move for summary judgment on several grounds: first, Defendants argue that Plaintiff's claims are barred by *res judicata* and claim preclusion, alleging that Plaintiff already

litigated the same issues in state court.[8] (Def. Mot. at 5.) Second, Defendants argue that the Health Care Quality Improvement Act provides them with immunity from Plaintiff's claims. (*Id.* at 11.) Addressing the merits of Plaintiff's claims, Defendants then argue that Plaintiff's § 1981 claim of racial discrimination is unsupported. (*Id.* at 26.) Finally, Defendants argue that Plaintiff's § 1 Sherman Act claim fails because he lacks antitrust standing and cannot support his restraint of trade claim. (*Id.* at 33.)

In moving for partial summary judgment, Plaintiff argues that a state court order entered on March 31, 2009 should be considered preclusive by this Court, and attempts to strike Defendants' immunized defense under the Health Care Quality Improvement Act. (Pl. Mot. at 1.)

### A. Defendants' Immunity Under the Health Care Quality Improvement Act

Congress enacted the Health Care Quality Improvement Act in 1986 to "improve the quality of medical care by restricting the ability of physicians who have been found to be incompetent from repeating malpractice by moving from state to state without discovery of such finding." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 201 (3d Cir. 2005). To enable hospitals and doctors to engage in professional review absent fear of liability for actions taken, the HCQIA immunizes from money damages persons participating in professional review activities or providing information to professional review bodies. *Id.* (citing 42 U.S.C. § 11111(a)(1)-(2)). "At its heart, the HCQIA was intended to deter antitrust suits by disciplined physicians." *Id.* (citation omitted).

---

[8] The Court does not discuss the parties' *res judicata* and collateral estoppel arguments here, as it is clear that summary judgment is warranted for Defendants on other grounds. This case has been litigated piecemeal over the past 13 years in both state and federal courts, and this Court finds it unnecessary to trace each relevant fact to the proceeding in which it may or may not have been previously litigated when doing so will not affect the outcome of this case. As Plaintiff's federal claims fail on the merits, the Court will instead focus on that analysis. *See e.g., Johnson v. City of Philadephia*, Civ. No. 07-3110, 2010 WL 3582517, at *3 (E.D. Pa. Sept. 10, 2010) ("Because the Court is satisfied that Plaintiff's claims are clearly barred. . . it declines to waste precious judicial resources explaining to Plaintiff why his claims would fail under many of the aforementioned theories.").

In order to qualify for immunity under the HCQIA, a professional review action must be taken:

> (1) in the reasonable belief that the action was in the furtherance of quality health care,
>
> (2) after a reasonable effort to obtain the facts of the matter,
>
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
>
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a).

Courts presume that professional review actions satisfy these requirements unless the plaintiff successfully rebuts the presumption by a preponderance of the evidence. 42 U.S.C. § 11112(a). This standard "places a high burden on physicians to demonstrate that a professional review action should not be afforded immunity." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 202 (3d Cir. 2005). As the Third Circuit has noted, this provision implies "that plaintiffs bear the burden of proving noncompliance with these standards." *Brader v. Allegheny General Hosp.*, 64 F.3d 869, 879 (3d Cir. 1995). Because the burden is on the plaintiff, the "standard for reviewing summary judgment under the HCQIA is therefore unconventional: although the defendant is the moving party, we must examine the record to determine whether the plaintiff satisfied his burden of producing evidence that would allow a reasonable jury to conclude that the Hospital's peer review disciplinary process failed to meet the standards of HCQIA." *Brader v. Allegheny General Hosp.*, 167 F.3d 832, 839 (3d Cir. 1999).

As a preliminary matter, the Court notes that the HCQIA expressly exempts civil rights violations from the statute's immunity provision, 42 U.S.C. § 11111(a)(1)(D), and applies only to

immunity from monetary damages. Therefore, Defendant's motion cannot apply to Plaintiff's claim under 28 U.S.C. § 1981 or to any injunctive relief Plaintiff seeks.

Defendants claim that SMC, as a "health care entity," is covered by § 11111(a)(1)(A), the MEC is covered by § 11151(11), and the individual physician defendants are covered by §§ 11111(a)(1)(B)-(D). (Def. Mot. at 14). The parties do not appear to dispute this; rather, their main quarrel is whether Defendants' actions constituted professional review "actions" or professional review "activities." The Third Circuit has held that "'professional review activity' refers to preliminary investigative measures taken in a reasonable effort to obtain the facts relevant to a possible change in a physician's privileges, while the term 'professional review action' refers to the decision that results from a review of the facts obtained." *Mathews*, 87 F.3d at 634.

Defendants claim that only the "Board's denial of Plaintiff's 2009 Application for privileges in endovascular interventions is a peer review action under the Act," and thus it is the only one that must meet the Act's requirements for immunity. (Def. Mot. at 17.) According to Defendants, all other events that Plaintiff complains of, such as the 2011 suspension and the investigation into Plaintiff's surgeries, are professional review activities, and are thus subsumed into the Board's ultimate denial. (*Id.*) Defendants argue that Plaintiff cannot rebut the HCQIA's presumptive immunity for denial of endovascular privileges because it was based on Plaintiff's failure to meet the 2005 Criteria, which had been found in earlier proceedings to not be arbitrary and capricious. (*Id.* at 22.) Defendants claim that the denial meets the HCQIA's requirements because it was motivated by a legitimate desire to further quality health care, and Plaintiff was afforded fair process before the action was taken. (*Id.* at 25.)

Plaintiff argues in response that the HCQIA does not provide immunity in disputes about credentialing criteria; rather, it provides immunity in cases where a physician is disciplined. (Pl.

Resp. at 6.) Plaintiff argues that he was found competent by the Hearing Officer to perform endovascular interventions, and denial of his 2009 application was not related to quality of patient care – thus, he contends that HCQIA immunity is not applicable. (*Id*. at 6.) Plaintiff also contends that there were three professional review actions at issue: the denial of his 2009 application, the 2011 suspension, and the 2013 restriction of his privileges to perform diagnostic arteriograms. (*Id*. at 7.) Though maintaining that immunity does not apply, Plaintiff alternatively claims that even if a presumption does apply he has rebutted it. (*Id*.) He argues that Defendants held secret meetings, destroyed evidence of its decision-making record, and subjected him to unfair substitute criteria. Finally, he argues that the Board's decisions were not based on quality of health care. (*Id*. at 14.)

### *Monitoring of Plaintiff's Surgeries and Restriction on Diagnostic Arteriograms*

As to the monitoring of Plaintiff's surgeries, this Court finds that this qualifies as a professional review "activity." *See Mathews,* 87 F.3d at 634 ("'Professional review actions' do not include a decision or recommendation to monitor the standard of care provided by a physician or factfinding to ascertain whether a physician has provided adequate care. These are 'professional review activities.'"). The restriction on diagnostic arteriograms was also not a professional review action; Plaintiff was unable to perform these procedures because Defendants limited access to the CVI Suite, where they needed to be performed, to only those with endovascular privileges. This was a hospital-wide rule that was not targeted at Plaintiff; no "action" was taken against him.

### *The 2011 Suspension*

This Court disagrees with Defendants' characterization of the 2011 suspension as a professional review activity, rather than a professional review action. As Plaintiff points out, a suspension must meet the HCQIA's listed requirements unless it lasts less than 14 days, during which an "investigation is being conducted to determine the need for a professional review action."

42 U.S.C. § 11112(c)(1)(B). Here, the 14-day suspension was disciplinary in nature, and took place *after* Defendants investigated the unauthorized surgeries Plaintiff performed. Thus, it does not fall into the category in § 11112(c)(1)(B) that would exempt it from HCQIA requirements. While Plaintiff is correct that this constitutes a professional review action, he is incorrect in his assertion that he was entitled to a fair hearing before it took place. Section 11112(a)(3) states that, for a professional review action to have presumptive immunity, it must be taken "after adequate notice and hearing procedures are afforded to the physician involved or *after such other procedures as are fair to the physician under the circumstances*." 42 U.S.C. § 11112(a)(3) (emphasis added). In this situation, Plaintiff performed four unauthorized endovascular procedures, and was planning to perform a fifth when Defendants intervened to stop him. Plaintiff's continuous unauthorized conduct, and apparent plans to maintain this course of action, make this situation one in which Defendants reasonably believed that immediate disciplinary suspension was warranted.

The other requirements for presumptive immunity are clearly met here: the suspension was in the furtherance of quality health care, as it could be damaging to patient health for a physician to perform unauthorized surgeries. Defendants reasonably attempted to obtain the facts of the matter, and after doing so, believed that a suspension was warranted, as they explained to Plaintiff in the letter detailing their action – a letter which Plaintiff himself attaches to his motion for partial summary judgment. (Doc. 214-20.) Because the procedures used to suspend Plaintiff were fair under the circumstances, and because the HCQIA's other requirements were met, the 2011 suspension merits presumptive immunity under the HCQIA.

Plaintiff has attempted to rebut Defendants' reasons for the suspension by alleging that the action was motivated by anticompetitive conduct and racial bias. This is contra to Third Circuit precedent, which holds that "a defendant's subjective bad faith is irrelevant under § 11112(a)" and

a finding of immunity may be upheld "if, on the basis of the record, the court could conclude that the professional review action would further quality health care." *Mathews*, 87 F.3d at 635. The subject of the inquiry for purposes of immunity is not whether Defendants were motivated to suspend plaintiff because of anticompetitive or racialized reasons; rather, the inquiry is whether suspending him or denying his application furthered quality health care. *Id*. Because suspending Plaintiff for performing unauthorized surgeries on patients is clearly in the interest of furthering quality health care, Plaintiff cannot rebut the Act's immunity for the 2011 suspension.

### The 2009 Application

Both parties agree that denial of Plaintiff's 2009 application was a professional review action and must meet the requirements under the HCQIA to enjoy immunity. Plaintiff argues that immunity should not attach here; he argues that there was no question that he was competent to perform endovascular procedures, whether or not he met the specifics of the 2005 Criteria, and thus forcing him to meet the 2005 Criteria would not further quality of health care. (Pl. Resp. at 13.) This argument is unpersuasive. Requiring applicants for endovascular privileges to meet a uniformly standard of competence as defined by the 2005 Criteria, rather than relying on an applicant's individualized assertion of competence, *is* intended to further quality of health care.

Plaintiff also argues that Defendants' "conflicting reasons for denial" of his 2009 Application are further proof that the Board "disregarded quality health care" in its decision to deny privileges, and thus he claims that any presumption of immunity should be rebutted. (Pl. Resp. at 11, 14.) As noted above, "a defendant's subjective bad faith is irrelevant under § 11112(a)" and a finding of immunity may be upheld "if, on the basis of the record, the court could conclude that the professional review action would further quality health care." *Mathews*, 87 F.3d at 635. The 2005 Criteria that Plaintiff was measured against here were upheld in the state court's 2009

order – an order which Plaintiff has actively sought to enforce. (Pl. Mot. at 4.) Regardless of Defendants' motive in denying Plaintiff's application, it is apparent from the record that he did not meet the applicable 2005 Criteria. Thus, the denial of Plaintiff's application meets the requirements for immunity under the HCQIA, because: denying the applications of surgeons who do not meet required criteria is in furtherance of quality health care; Plaintiff went through a two-year process of hearings and review of each level of decision-making on his application; and Defendants reasonably obtained facts which they based their denial off of.

Plaintiff has offered no evidence in the record to rebut the finding that he did not meet the 2005 criteria, other reading different definitions into the criteria and suggesting ulterior motives he believed Defendants had. (Pl. Mot. at 12-13.) Accordingly, Defendants are entitled to immunity under the HCQIA for denial of Plaintiff's 2009 application. Further, even if HCQIA immunity did not apply to the relevant claims, Plaintiff's federal claims would still fail on the merits, as discussed below.

### B. Sherman Act § 1 Claim

Plaintiff alleges that Defendants engaged in "restraint of trade in violation of section 1 of the Sherman Act," 15 U.S.C. § 1. (SAC ¶173.) Plaintiff claims that SMC and the individual Defendants took concerted actions to exclude him "from the market for endovascular procedures, and to damage his business with the intent of ultimately excluding him from the vascular surgery market as well." (SAC ¶176.) Plaintiff further "alleges that his competitors engaged in a group boycott to exclude him from the market for endovascular surgery on the lower extremities," which they accomplished, "inter alia, by the misuse of a congressionally regulated peer review process." (Pl. Resp. at 16.) In moving for summary judgment, Defendants argue that Plaintiff lacks antitrust

standing, and that even if he had standing, Plaintiff cannot meet the elements of a § 1 Sherman Act claim.

### i. Antitrust Standing

A plaintiff must always meet the initial threshold requirement of standing. *See Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 232 (3d Cir. 2013) ("Standing is a threshold requirement in all actions in federal court."). In antitrust actions particularly, a plaintiff must have "antitrust standing;" a determination that a plaintiff does not have antitrust standing "does not affect the subject matter jurisdiction of the court, as Article III standing does, but prevents a plaintiff from recovering under the antitrust laws." *Ethypharm*, 707 F.3d at 232. In determining whether a plaintiff has antitrust standing, the Third Circuit uses a multi-factor test:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Ethypharm*, 707 F.3d at 232. The second factor in this analysis, antitrust injury, is the only one debated by the parties here. (Def. Mot. at 34; Pl. Resp. at 18.)

Antitrust injury is "a necessary but insufficient condition of antitrust standing." *Ethypharm*, 707 F.3d at 233 (internal citations omitted). Antitrust injury is defined as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful." *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977)). The "class of plaintiffs capable of satisfying the antitrust-injury requirement is limited to consumers and competitors in the restrained market, and to those whose injuries are the means by which

defendants seek to achieve their anticompetitive ends." *West Penn Allegheny Health System, Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010) (internal citations omitted).

Here, Plaintiff is alleging antitrust injury as a competitor. (Pl. Resp. at 19.) Defendants contend that Plaintiff's alleged injury, which they frame as "the denial of privileges due to a failure to meet established requirements and an alleged loss of patients as a result of that conduct," is "not the type that the antitrust laws were enacted to prevent." (Def. Mot. at 35.) Defendants argue that competition has not been harmed, pointing out that endovascular interventions are not limited to physicians at SMC, but are also performed by physicians at Atlantic Regional Medical Center, "a hospital with full-scale facilities and campuses that are located approximately 10 miles and 13 miles from SMC." (Def. Mot. at 35.) Plaintiff argues in response that the existence of other hospitals in the area that perform endovascular interventions does not negate antitrust injury. (Pl. Resp. at 20.) Plaintiff argues that despite his status as a competitor, the antitrust laws were nonetheless still designed to protect him. (*Id*.)

While it is true that a showing of injury will not fail merely because the injured is a competitor, this Court nonetheless finds that Plaintiff has not made a proper showing of antitrust injury. This case is factually similar to several district court cases within the Third Circuit. *See, e.g. Untracht v. Fikri*, 454 F.Supp.2d 289 (W.D. Pa. 2006); *Mathews v. Lancaster General Hosp.*, 883 F. Supp. 1016, 1038 (E.D. Pa. 1995), aff'd, 87 F.3d 624 (3d Cir. 1996); *Huhta v. Children's Hosp. of Philadelphia*, 1994 WL 245454 (E.D. Pa. 1994), aff'd, 52 F.3d 315 (3d Cir. 1995).

For example, in *Untracht v. Fikri*, the plaintiff, a doctor, brought a Sherman Act § 1 claim against several area hospitals, arguing that the hospitals and individual doctors had conspired to prevent him from competing in the market. *Untracht,* 454 F.Supp.2d at 309. The *Untracht* court found that, even if the plaintiff had evidence of a conspiracy, he could not show that he had been

shut out of the market because he had voluntarily foreclosed his staff privileges at a separate hospital he could have practiced at. *Id.* The court further determined that this distinguished the plaintiff's situation from *Angelico v. Lehigh Valley Hosp., Inc.,* 184 F.3d 268 (3d Cir. 1999) and *Brader v. Allegheny Gen. Hosp.,* 64 F.3d 869 (3d Cir. 1995), both hospital antitrust cases in which courts found antitrust injury because plaintiffs "had been completely *shut out* of the market by a purported group boycott." *Id.* (emphasis in original).

In another example, *Mathews v. Lancaster General Hosp.*, the plaintiff doctor alleged antitrust injury stemming from restriction of his hospital privileges. 883 F. Supp. 1016, 1038. The court found that there was no antitrust injury; it reasoned that only some of the plaintiff's privileges were limited, since he could still perform other services at the defendant hospital, and he could perform the surgery at issue at outside hospitals. *Mathews*, 883 F. Supp. 1016 at 1045.

Again in *Novak v. Somerset Hosp.*, 625 F.App'x. 65, the plaintiff, a surgeon, sued under § 1 of the Sherman Act after his privileges were terminated by the defendant hospital. He argued that the hospital board members conspired to terminate his privileges to reduce competition and restrain patient choice. *Id.* at 66. The court found no antitrust violation, holding that the plaintiff had not been shut out of the relevant product market because he could still perform surgeries at another, albeit smaller and less comprehensive, hospital located roughly 32 miles away. *Id.*

Here, like the plaintiffs in *Untracht* and *Mathews*, Plaintiff has not been completely shut out of the market, and he retains the ability to perform endovascular surgery at outside facilities. Plaintiff admits he has unrestricted endovascular admitting privileges at Vascular Access Center, and that he has not even applied for similar privileges at AtlantiCare, a nearby facility. (Def. Mot. Exhibit I ("Pl. Dep.") at 213-215.) Thus, in contradiction to his arguments, Plaintiff cannot show "coercive activity that prevents its victims from making free choices between market alternatives,"

as patients are free to seek Plaintiff's services at the Vascular Access Center, and potentially at other facilities at which Plaintiff has not yet sought endovascular privileges. (Pl. Resp. at 18-19.) Plaintiff has not presented any reason, such as insurance or distance, why these alternatives will harm patient choice. Further, similar to *Mathews*, patients may still seek Plaintiff's services for general and vascular surgery at SMC, as he retains those privileges.

Because Plaintiff lacks antitrust standing, he may not bring a claim under § 1 of the Sherman Act; accordingly, summary judgment is warranted in favor of Defendants on this claim.

### ii.     Restraint of Trade in Violation of § 1 of the Sherman Act

Even if Plaintiff did have antitrust standing, summary judgment for Defendants would nonetheless be appropriate because Plaintiff is unable to show the required elements of a Sherman Act § 1 antitrust claim.

In antitrust cases involving a denial of hospital privileges, the plaintiff must prove "that the challenged conduct suppresses or destroys competition rather than merely regulating and perhaps thereby promoting competition." *Mathews*, 883 F.Supp. at 1036. Rather than presuming that the defendants' conduct unreasonably restrains competition, "the defendants' conduct is analyzed on a case-by-case basis whereby the fact finder weighs all the circumstances in a case to determine whether a particular practice amounts to an unreasonable restraint of trade." *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003).

To survive a motion for summary judgment under this analysis, the plaintiff must show "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *Howard Hess Dental Laboratories*

*Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir.2010) (citing *Gordon v. Lewistown Hosp.*, 423 F.3d at 207).

### a. Concerted Action

The first element that a plaintiff bringing a § 1 Sherman Act claim must show is concerted action; the "existence of an agreement is the hallmark of a Section 1 claim." *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300, 315 (3d Cir. 2010). The plaintiff must "submit evidence that reasonably tends to prove that the defendants had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Mathews*, 883 F.Supp. at 1036. "Unilateral activity by a defendant, no matter the motivation, cannot give rise to a section 1 violation." *InterVest,* 340 F.3d at 159. To "withstand a motion for summary judgment on the issue of concerted action, a plaintiff need not establish an explicit agreement, nor must he produce direct evidence of conspiracy. Rather, a plaintiff may rely on circumstantial evidence and the inferences which may reasonably be drawn from that evidence." *Mathews*, 883 F.Supp. at 1036.

However, "when a plaintiff relies solely on circumstantial evidence in an antitrust case, [the court] must apply special considerations so that only reasonable inferences are drawn from the evidence. This is because antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *InterVest*, 340 F.3d at 160. One such limit is that evidence of "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *InterVest*, 340 F.3d at 160. "To survive a motion for summary judgment, therefore, a plaintiff must present evidence that tends to exclude the possibility that the alleged conspirators acted independently." *Id.* (internal citations omitted).

Defendants argue that summary judgment on this claim is warranted because Plaintiff has not presented evidence showing conspiracy between the hospital, the MEC, and the individually

named defendants. (Def. Mot. at 37.) Specifically, they argue that the hospital cannot legally conspire with its medical staff, and that the hospital's peer review process and ultimate decision to deny endovascular privileges to Plaintiff is not enough to prove the existence of a conspiracy. (*Id.*). Plaintiff argues in response that he has produced "written evidence of an agreement to exclude competitors" in the form of the 2005 Criteria, "which are exclusionary on their face." (Pl. Resp. at 26.) He also argues that he has proof by way of Defendant's prior 2008 settlement offer, along with additional anticompetitive conduct alleged to have occurred over the years of this litigation. (Pl. Resp. at 26.)

### The 2005 Criteria

Plaintiff's argument that the 2005 Criteria are evidence of concerted action is unpersuasive, as the voluminous record in this case suggests otherwise. The 2005 Criteria were originally created by Defendants months before Plaintiff first submitted his 2006 application for privileges at SMC. In Defendant Gosin's testimony at the fair hearing in 2011, he stated that he had no way of knowing that Plaintiff would be applying for privileges within the next few months when the criteria were created. (Def. Resp. Exhibit 1, "2011 Fair Hearing Tr." at 90.) Rather, the 2005 Criteria were created by Defendant Dr. Jeffrey Gosin and Dr. Lynn Helmer in accordance with standards set out in the Journal of Vascular Surgery, and typed up by Defendant Dr. Peter Jungblut. (2011 Fair Hearing Tr. At 70, 89.) These criteria were created to, as Defendant Gosin testified, apply equally to everyone. (2011 Fair Hearing Tr. at 89.)

Plaintiff points out that Defendants Gosin and Jungblut developed the 2005 Criteria, and that the MEC and Defendants Dearborn and Galler had to recommend that the Board approve the Criteria; he takes these facts as evidence of concerted action amongst Gosin, Jungblut, Dearborn,

Galler, and the MEC. (Pl. CSOF ¶157-159.) He argues that the criteria were created to be exclusionary, and constitute evidence of concerted action to restrain the endovascular market.

First, based on the undisputed record explaining the formation of the 2005 Criteria, this Court finds that there is no evidence suggesting that creation of the 2005 Criteria was part of a concerted action between Defendants to specifically exclude Plaintiff, who had not yet even applied for privileges, from the market for endovascular surgery. Second, this Court finds no evidence suggesting that the 2005 Criteria were designed to restrain trade in general.

Plaintiff's argument that the 2005 Criteria were concerted action to restrain trade is undermined by the fact that another endovascular surgeon, Dr. Herrington, was able to satisfy the 2005 Criteria and receive endovascular privileges. (2011 Fair Hearing Tr. at 89.) Plaintiff argues that Dr. Herrington did not actually meet the 2005 Criteria because he was granted privileges prior to *fully* meeting them. (Pl. Resp. at 26.) However, the approval of Dr. Herrington's privileges was predicated on the condition that he meet the remaining criteria in the last two months of his fellowship – a feat that Defendants believed would be easily achievable based on his closeness to completion and the time left in his fellowship. Further, the New Jersey Superior Court previously found that Defendants' processes for applying the Criteria to Plaintiff were "grounded in reason and fairness, and that they are not arbitrary or capricious." *Nahas v. Shore Memorial Hospital*, Dkt. No. C-82-11 (Sup. Ct. N.J. May 7, 2015).

Plaintiff also presents as evidence of concerted action the fact that the 2005 Criteria grandfathered in surgeons who were already on the medical staff. (Pl. Resp. at 26.) He claims that the Criteria were created to protect existing surgeons and insulate them from competition. (*Id.*). Defendants justify the grandfathering clause by explaining that surgeons with existing endovascular privileges are already subject to ongoing review of their performance; those newly

applying have not yet demonstrated competence at SMC, and thus the hospital needs an objective metric to determine competence. (2011 Fair Hearing Tr. 96-97.)

As stated earlier, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *InterVest*, 340 F.3d at 160. The law is clear that, "where defendants have cited legitimate medical reasons for their conduct, the limitation of staff privileges, without more, does not give rise to an inference of an antitrust conspiracy." *Mathews* at 1040. As the state court succinctly stated, "After plaintiff was convicted and served a prison term for obstructing a federal Medicare fraud investigation, SMH acted responsibly in carefully scrutinizing his application to restore his privileges and examining his clinical competency to perform endovascular surgery." *Nahas v. Shore Memorial Hospital*, Dkt. No. A-4638-14T2 (N.J. Sup. Ct. App. Div. Dec. 7, 2016).

The individual Defendants' recommendation that Plaintiff's application be denied does not alone show concerted action. The Third Circuit has held that "a mere recommendation does not prove concerted action." *McGary v. Williamsport Regional Medical Center*, 775 Fed.Appx. 723, 728 (3d Cir. 2019). Rather, "in order to prove concerted action between a hospital and its staff, there must be something such as a conscious commitment by the medical staff to coerce the hospital into accepting its recommendation." *Id.* (internal citations omitted). Plaintiff argues that Defendants' prospective economic gain, combined with their negative recommendation, is enough to show concerted action; however, this Court disagrees. The situation here is highly similar to that in *Mathews*, where the court stated:

> "We agree with plaintiff that, viewed in its entirety and in the light most favorable to him, the evidence of record supports a finding that each of the alleged conspirators was a competitor of plaintiff and stood to gain economically from his elimination from the market for orthopedic services. This alone, however, cannot support a finding that defendants conspired to restrict plaintiff's privileges. . . At most, plaintiff has shown that each defendant would have been pleased to eliminate plaintiff from the market. He has not presented evidence which tends to suggest that the defendants conspired to achieve this effect."

*Mathews*, 883 F. Supp. at 1038.

The creation and implementation of the 2005 Criteria, and the determination that Dr. Nahas failed to meet these criteria, are actions that just as easily serve a valid medical purpose as they do support an inference of conspiracy. The fact that Defendants might compete with Plaintiff does not automatically convert Defendants' actions into legally defined "concerted action." As such, Defendants' use of the 2005 Criteria and denial of Plaintiff's 2009 Application cannot be viewed as proof of concerted action.

### The 2008 Settlement Letter

Plaintiff then turns from the 2005 Criteria to Defendants' 2008 settlement offer. He claims that in 2008, Defendants made a settlement offer that would grant Plaintiff bariatric surgical privileges if he would agree to stop seeking privileges in general, vascular, and endovascular surgery. (Pl. Resp. at 26.) He argues that this is evidence of intent to restrain the endovascular surgical market and to allocate customers. (*Id.*).

Plaintiff's use of a confidential settlement offer as evidence of concerted action is troubling. Under Federal Rule of Evidence 408, compromise offers are inadmissible to prove the validity of a disputed claim. Though Plaintiff argues that he is actually offering the settlement statement to prove that Defendants are attempting to allocate customers in an illegal agreement, the Court sees no evidence of this in the record. The settlement letter does not require Plaintiff to stop performing general, vascular, or endovascular procedures. Accordingly, the 2008 Settlement Letter may not be used to support a finding of concerted action.

### The 2011 Suspension and Subsequent Investigations

Plaintiff argues that Defendants took concerted action in 2011, when he was suspended after performing four unauthorized endovascular surgeries. Plaintiff claims that Defendants

refused to clarify which procedures were endovascular versus vascular, and that he believed the four surgeries at issue were actually vascular. (Pl. CSOF ¶101.) The MEC was the entity that investigated Plaintiff's involvement in the surgeries. In 2011, individual Defendants Dearborn, Galler, and Nachtigall were members of the MEC. (*Id.* ¶11.) Plaintiff argues that the presence of these three defendants on the MEC shows that they had the opportunity to conspire; he claims this is supported by his inability to obtain the MEC's meeting minutes. (*Id.* ¶112.) Plaintiff argues that the MEC's decision to suspend him was not based on his completion of four unauthorized surgeries, but was instead based on Defendants' desire to exclude him from competition. (*Id.*)

Plaintiff makes similar claims regarding the investigation into two of his surgeries performed between July 2011 and February 2012. (Pl. CSOF ¶119.) A February 2012 investigative report determined that Plaintiff made an error in judgment in one of the surgeries; based on this, in March 2012 the MEC, along with Defendants Nachtigall, Dearborn, and Jungblut voted to "commence a retrospective investigation into all of Dr. Nahas' 2011 vascular cases involving distal lower extremity bypass." (*Id.* ¶127.) Plaintiff adds that "Dr. Galler was aware of" this vote. (*Id.*)

In November 2012, the "Credentials Committee recommended that Dr. Nahas' biannual reappointment application be reduced to a one year appointment because Dr. Nahas was under investigation." (Pl. CSOF ¶134.) Defendant Jungblut was a non-voting member of the Credentials Committee. (*Id.* ¶33.) In August 2013, the MEC voted to restrict Plaintiff's privileges to perform pre-operative arteriograms. The MEC members who participated were: Defendants Nachtigall and Galler, Dr. Herrington, hospital CEO Ron Johnson, and Drs. May, Angelastro, Roche, and Rowe. (*Id.* ¶137.)

In 2013, the heads of Divisions of Cardiology, Diagnostic Radiology, and Vascular Surgery met and determined that access to the Cardiovascular Suite (CVI Suite) should be limited to only

physicians with endovascular privileges. (Def. SOF ¶ 111-116.) Plaintiff argues that this limitation was specifically intended to apply to him; because pre-operative diagnostic arteriography was required to be performed in the CVI suite, the denial of access meant that Plaintiff could no longer perform any pre-operative diagnostic arteriography at SMC.

Overall, Plaintiff argues that the votes to investigate him, to limit his privileges, and to exclude him from the CVI suite were the result not of a desire to further quality healthcare, but rather were intended to exclude him from competition. (Pl. Dep.) This contention is insufficient as a matter of law to support a showing of concerted action.

First, the record shows that the 2011 suspension was a response to Plaintiff's performance of four unauthorized surgeries, despite his allegations that the suspension was based on Defendants' desire to exclude him from the endovascular market. (Doc. 214-20.) In its 2016 decision, the state court noted, "Most troubling in this record is plaintiff's decision to perform four endovascular surgical procedures after SMH had unequivocally denied his application for privileges in that specialty." *Nahas v. Shore Memorial Hospital*, Dkt. No. A-4638-14T2 (N.J. Sup. Ct. App. Div. Dec. 7, 2016). This Court agrees with that framing. Regardless of whether Plaintiff *believed* the four procedures were actually strictly vascular, as he alleges he did, it remains undisputed that he performed procedures defined by SMC as endovascular, an area in which he was aware he did not have privileges. Plaintiff argues that there is no clear medical definition of vascular versus endovascular; however, as the state court noted, "when there isn't a clear cut standard in the community then the hospital has to decide that for themselves. And they made that decision. And they had made a decision that. . . amply supports a finding that the plaintiff has in the past performed procedures that are outside of his defined privileges." (Def. SOF ¶ 37.) As stated earlier, "where defendants have cited legitimate medical reasons for their conduct, the limitation

of staff privileges, without more, does not give rise to an inference of an antitrust conspiracy." *Mathews*, 883 F.Supp. at 1040. Ensuring that only authorized surgical procedures are performed within the hospital is a legitimate medical reason; as such, Plaintiff's 2011 suspension cannot support a finding of concerted action.

Similarly, Plaintiff cannot show concerted action based on the CVI Suite being limited to only those with endovascular privileges. This limitation, which applied to the entire hospital staff and did not target Plaintiff, did not exclude all those except Defendants, as every surgeon with endovascular privileges could still use the suite. (Pl. CSOF 141-142.) There is nothing more in the record that would allow one to infer concerted action as a legal matter from this limitation.

Next, the continued investigation into Plaintiff also does not show concerted action. As detailed above, the MEC and three individual Defendants – Nachtigall, Dearborn, and Jungblut – voted in favor of investigating Plaintiff. Defendant Galler was merely "aware of" the vote. Courts in this circuit have held that a Defendant's "mere presence" at a board meeting "does not give rise to an inference of an antitrust conspiracy." *Novak v. Somerset Hosp.*, 2014 WL 4925200 at *19 (W.D. Pa. 2014). Similarly, this Court finds that a Defendant's mere awareness of a vote does not imply concerted action. This same analysis applies to the Credentials Committee requirement that Plaintiff renew his privileges annually: though Defendant Jungblut was present at that vote, he was a non-voting member, and his mere presence is not sufficient to show concerted action.

As for the MEC and the three individual Defendants that did vote, this vote constituted a professional review action that does not alone allow for an inference of conspiracy. In these situations, the Third Circuit requires evidence of a "conscious commitment by the medical staff to coerce the hospital." *McGary*, 775 Fed.Appx. at 728. No such evidence is present here. Thus, as a

matter of law, Plaintiff cannot show that the investigation into his surgeries stemmed from conspiracy, rather than from a desire to further quality healthcare.

As this Court stated in a prior decision, it is not enough that Plaintiff personally considers the hospital decision "patently unfair and unjust." *Nahas v. Shore Med. Ctr.*, 2014 WL 4828155, at *6 (D.N.J. Sept. 29, 2014). He must actually present evidence showing or implying concerted action. Plaintiff has presented only evidence that just as easily supports a finding of quality health care furtherance as it does an inference of conspiracy. Plaintiff has failed to "present evidence that tends to exclude the possibility that the alleged conspirators acted independently." *InterVest*, 340 F.3d at 160. Because Plaintiff has failed to make a showing of concerted action, he cannot bring a Sherman Act § 1 claim. Accordingly, summary judgment is warranted for Defendant on this claim.

### C. Plaintiff's Discrimination Claim

In the operative complaint, Plaintiff alleges that Defendants engaged in "Disparate treatment, obstruction and interference with contract in violation of 42 USC Section 1981" (SAC ¶203.) Plaintiff alleges that Defendants treated him differently than similarly situated non-minority individuals because he is Arab. (*Id.*) In seeking summary judgment, Defendants argue that Plaintiff "has failed to establish a *prima facie* case of racial discrimination under § 1981" and that, even if he had established a prima facie case, he cannot rebut Defendants' non-discriminatory reasons for the actions at issue. (Def. Mot. at 26.)

Section 1981 "prohibits racial discrimination in the making of private and public contracts." *Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 385 (3d Cir. 1999). Claims brought under § 1981 are analyzed under the *McDonnell-Douglas* burden-shifting framework.

First, the plaintiff must make a *prima facie* showing of discrimination by demonstrating that: "(1) she belongs to an identifiable class of persons who are subjected to intentional

discrimination solely because of their ancestry or ethnic characteristics; (2) defendant intended to discriminate against her on that basis; and (3) defendant's racially discriminatory conduct abridged a contract or rights enumerated in § 1981(a)." *Pamintuan v. Nanticoke Mem'l Hosp., Inc*., 1998 WL 743680, at *12 (D. Del. Oct. 15, 1998), aff'd sub nom. *Pamintuan v. Nanticoke Mem'l Hosp*., 192 F.3d 378 (3d Cir. 1999).

If the plaintiff is able to establish a prima facie case, then "the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision." *Id.* If the defendant successfully meets this burden, "the plaintiff must produce evidence from which a reasonable factfinder could conclude either that the defendant's proffered justifications are not worthy of credence or that the true reason for the employer's act was discrimination." *Bray v. Marriott Hotels*, 110 F.3d 986, 990 (3d Cir.1997). Although "the burden of production may shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999).

Summary judgment is warranted for a defendant on a § 1981 claim "only if it can demonstrate that: (1) the plaintiff is unable to establish a prima facie case of discrimination; or (2) if the plaintiff can establish a prima facie case, the plaintiff cannot produce sufficient evidence from which a factfinder reasonably could infer that the defendant's legitimate, nondiscriminatory reason for discharging plaintiff was pretext." *Pamintuan*, 1998 WL 743680 at *13.

### Prima Facie Case

Defendants argue that Plaintiff cannot show the second or third prong required to show a *prima facie* case because he cannot show that Defendants intended to discriminate against him because he is Arab, and cannot show racially discriminatory conduct by Defendants that abridged

a contract or rights enumerated in § 1981(a). (Def. Mot. at 27.) Defendants contend that Plaintiff admits he is only making a guess that he has been treated poorly on the basis of race, rather than some other basis. (*Id.*)

In his response, Plaintiff misunderstands the requirements of showing a *prima facie* case. In § 1981 claims, the Third Circuit has held that "the elements of a *prima facie* case depend on the facts of the particular case." *Jones v. School Dist. of Philadelphia*, 198 F.3d at 411. "Where, as here, the plaintiff is a non-employee physician complaining of allegedly discriminatory acts of a hospital with whom he is affiliated," the *prima facie* elements laid out above are proper. *Bhatt v. Brownsville Gen. Hosp.*, 2006 WL 167955, at *17 (W.D. Pa. Jan. 20, 2006), aff'd, 236 F. App'x 764 (3d Cir. 2007). Instead of explaining how those elements are met, Plaintiff instead borrows the *prima facie* test from employment discrimination cases, framing the elements as requiring him to show "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, ... the employer continued to seek applicants from persons of complainant's qualifications." (Pl. Resp. at 38.)

If the employment discrimination test averred by Plaintiff were applicable, it is highly likely that he would meet the elements: (i) he is Arab, (ii) he is a board-certified surgeon who applied for surgical privileges, (iii) his application for privileges was denied, and (iv) Defendants accepted other applications for privileges. However, this is not the *prima facie* test used in the context of non-employee physicians whose applications for hospital privileges have been denied. *Bhatt*, 2006 WL 167955 at *17.

Nonetheless, this Court finds that when the applicable test is applied, Plaintiff can make a *prima facie* showing of racial discrimination under § 1981. It is undisputed that Plaintiff meets

factor (i) because he is Arab. (Pl. Resp. at 38); *see Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 613, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) (rejecting the argument that Arabs are Caucasians for purposes of § 1981, as Arabs were not considered Caucasians when § 1981 was enacted in 1870).

Under factor (ii), Plaintiff has raised enough evidence to make a preliminary showing that Defendants discriminated against him on that basis. The vast majority of the evidence Plaintiff offers as showing discriminatory intent is circumstantial, rather than direct.[9] The Supreme Court has held that circumstantial evidence is permissible; for example, "departures from the normal procedural sequence" may be used as evidence that "improper purposes are playing a role." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267, 97 S. Ct. 555, 564, 50 L. Ed. 2d 450 (1977). In rejecting an earlier motion to dismiss in this same case, this Court stated, "Plaintiff has sufficiently pled facts to suggest that the procedures employed by SMC during his application process for endovascular privileges were so irregular and prejudicial that they might considered evidence of an intent to discriminate based on Plaintiff's Arab ancestry and ethnicity." *Nahas v. Shore Med. Ctr.*, 2015 WL 3448021, at *6 (D.N.J. May 29, 2015). While this was based on Plaintiff's Complaint, and the Court is now examining the record, this statement remains accurate here.

One example of irregular procedure in the record is the "supervision requirement" for the 2005 Criteria – Plaintiff argues that this requirement, which was not apparent on the face of the 2005 Criteria, was "contrived" so that he would not meet the required number of procedures. (Pl. Resp. at 39.) Plaintiff also argues that Dr. Herrington, a non-Arab applicant, was given

---

[9] The only direct evidence of racial discrimination is a statement allegedly made by Defendant Galler referring to Plaintiff in his statement, "we got one Arab guy named Nahas, Lebanese guy." (Pl. Dep. at 148.) While this shows one individual defendant's awareness of Plaintiff's race and national origin, it is far from sufficient to show discriminatory intent or motivation.

endovascular privileges despite not meeting 100% of the criteria. (*Id.*). Though Defendants can explain a legitimate reason for these actions in the next step of the *McDonnell-Douglas* analysis, Plaintiff has met his *prima facie* burden for element (ii).

Meeting factor (iii) then becomes simple: as this Court stated in 2015, "the Bylaws afforded certain substantive and procedural rights to Plaintiff, and those rights were allegedly impaired by Defendants. The Court considers this sufficient to state the existence of a contract defendant's racially discriminatory conduct abridged a contract or rights enumerated in § 1981(a)." *Nahas*, 2015 WL 3448021 at *5.

Because Plaintiff can successfully make a *prima facie* case under 42 U.S.C. § 1981, the burden then shifts to Defendants to offer a legitimate, non-discriminatory reason for their conduct.

### *Pretextual Evidence*

Despite Plaintiff's ability to make a *prima facie* showing, summary judgment is nonetheless warranted for Defendants because Plaintiff cannot show that Defendants' proffered non-discriminatory reasons are pretextual.

Defendants offer numerous reasons for denial of Plaintiff's 2009 Application for endovascular privileges, the 2011 suspension and subsequent investigations, limitation of access to the CVI suite, and the reaction to the incident with Dr. Tsyganov. Defendants can explain why Dr. Herrington, a non-Arab doctor, was given privileges despite not meeting 100% of the criteria at the time his application was approved. As detailed above, Dr. Herrington's privileges were conditioned on his meeting the full criteria during the last two months of his fellowship. When Plaintiff applied, he was not in a similar position, and could not show that he would meet the full criteria before beginning to practice at SMC. Defendants also have clear reasons for the 2011 suspension: Plaintiff performed four unauthorized endovascular surgeries, knowing that he did not

have endovascular privileges. (Doc. 214-20.) Further, he was planning to perform a fifth endovascular procedure at the time Defendants reprimanded him. As for the incident with Dr. Tsyganov, Defendants contend that they responded appropriately, and point out that the New Jersey Department of Health was itself concerned with "Plaintiff's conduct in that matter." (Def. Reply at 13.)

Defendants have met their burden of offering non-discriminatory reasons for their action at step two of the *McDonnell-Douglas* analysis; thus, the burden shifts back to Plaintiff to show that the proffered reasons are actually pretext for discrimination. It is clear from Plaintiff's deposition that he cannot make this showing. In his deposition, Defendants asked Plaintiff, "do you have any reason to believe that anyone on the board of trustees at the time that it rendered its July 2013 decision on your 2009 application for privileges in endovascular interventions was motivated by bias against individuals of Arab descent?" and Plaintiff answered, "I don't have any firm knowledge of that." (Pl. Dep. at 57.) Plaintiff was also asked with respect to each individual board member whether he had reason to believe that each member's vote on his "2009 application for privileges in endovascular interventions was motivated by anything other than. . .desire to engage in furtherance of quality healthcare." (Pl. Dep. at 56.) Each time the question was asked, Plaintiff answered, "I believe if he voted against me, it was bias." (*Id*.) To sum up Plaintiff's answers, Defendants asked, "if someone is on the board and votes against you, you view that as evidence of bias; is that right?" (*Id*.) Plaintiff answered, "assuming they have read the information." (*Id*.) Plaintiff had the same answer regarding the 2011 suspension and the CVI suite limitation. He stated that he had no reason to suspect that any member of the board of trustees harbored bias against people of Arab descent, but if they did vote against him, it must mean that they actually were biased against Arabs. (Pl. Dep. at 68.) At other points, Plaintiff states that a vote

against him is evidence of anticompetitive conduct, alternatively or in addition to racial bias. (Pl. Dep. at 82.) Finally, for the incident with Dr. Tsyganov, Plaintiff himself admits he either does not believe or does not know that the response to this incident was based on his race. (Pl. Dep. at 77-80.)

The law is clear that bare assertions not based on evidence cannot overcome a defendant's legitimate, non-discriminatory reason. The Third Circuit has held that "conclusory, self-serving affidavits [and testimony] are insufficient to withstand a motion for summary judgment." *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012). "[A] bare but sworn assertion of a claimant's lack of knowledge will not suffice to create a material dispute of fact where that assertion is impeached by a well supported showing to the contrary." *Id*. Here, Plaintiff has no knowledge of whether Defendants harbor animus towards people of Arab descent. He merely has "his own self-serving speculation" that a vote against him must be based off of his race, rather than based off of the many non-discriminatory reasons that Defendants have given. *Simon v. Shore Cab, LLC*, 2016 WL 1059267, at *6 (D.N.J. Mar. 17, 2016). Further, in his deposition, Plaintiff himself is not even convinced by his bare assertions that any adverse vote is based on his race, repeatedly stating that he does not believe certain board members harbor animus towards Arabs, and saying that it may instead be anticompetitive conduct. (Pl. Dep. at 82, 85, 87, 109, 129, 146.)

To prevail on a § 1981 claim, it is not enough that a defendant took an adverse action against a plaintiff. That action must have been actually motivated by racial discrimination. *Ray v. Pinnacle Health Hosps., Inc.*, 416 F. App'x 157, 163 (3d Cir. 2010) (holding that "an invidious discriminatory reason" must be "more likely than not a motivating or determinative cause of the employer's action"). In Plaintiff's deposition, when asked if he believed a negative vote against his 2009 Application was motivated by racial animus, Plaintiff responded, "if he reviewed the data

and saw the information and understood the information and still voted against it, then I think that, to me, there's bias or he didn't understand it." (Pl. Dep. at 146.) Plaintiff's belief that he was competent and should have received privileges is not proof of discrimination under § 1981. *See Ray*, 416 F. App'x at 163 (finding that the plaintiff-doctor's reliance "primarily upon evidence which he insists shows that similarly situated Caucasian physicians were treated differently, that the process was unfair, and that his professional expertise and judgment are good" was insufficient to show racial animus and rebut Defendant's proffered reasons under § 1981).

Because Defendants have met their burden, and because Plaintiff "cannot produce sufficient evidence from which a factfinder reasonably could infer that the defendant's legitimate, nondiscriminatory reason for discharging plaintiff was pretext," summary judgment for Defendants on this claim is appropriate. *Pamintuan*, 1998 WL 743680 at *13.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment is **DENIED**. Defendants' Motion for Summary Judgment is **GRANTED** as to Count I (Sherman Act § 1 claim) and Count II (42. U.S.C. § 1981 claim). The Third Circuit has held that where all federal claims are dismissed before trial, "the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (citations omitted).[10] Thus, Plaintiff's remaining state law claims (Counts III-VII) are **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c)(3) for lack of subject matter jurisdiction. An accompanying Order shall issue.

---

[10] Having litigated this case in state court for approximately a decade, the parties are more than familiar with the state court system. As this Court no longer has an independent basis for subject matter jurisdiction, the state court presents a more appropriate place for Plaintiff to bring these claims.